**Exhibit 3**

ORIGINAL

1

2       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF NEW YORK
3       ------------------------------------------------X
        THOMAS HARTMANN,
4
                                        PLAINTIFF,
5
                        CV-04-1784 (ILG)(CLP)
6
                           -against-
7
        THE COUNTY OF NASSAU, NASSAU COUNTY POLICE
8       DEPARTMENT, POLICE OFFICER KARL. L SNELDERS,
        POLICE OFFICER MICHAEL KNATZ, DEPUTY INSPECTOR
9       ROBERT TURK, LIEUTENANT THOMAS ZAMOJCIN, POLICE
        OFFICER KEVIN W. SMITH, POLICE OFFICER PHILIP
10      BRADY, DETECTIVE BARRY O. FRANKLIN, POLICE
        OFFICER THOMAS O. MCCAFFREY and "JOHN and JANE
11      DOES 1-15" representing as yet unknown and
        unidentified police officers,
12
                                        DEFENDANTS.
13      ------------------------------------------------X

14                      DATE: May 18, 2005

15                      TIME: 10:20 a.m.

16

17              EXAMINATION BEFORE TRIAL of the

18      Defendant, POLICE OFFICER KARL L. SNELDERS, taken

19      by the Plaintiff, pursuant to an Order, held at

20      the LAW OFFICES OF DANIEL J. HANSEN, ESQ., 233

21      Broadway, New York, New York 10279, before a

22      Notary Public of the State of New York.

23

24

25

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
 1

 2     A P P E A R A N C E S:

 3

 4          DANIEL J. HANSEN, ESQ.
                   Attorneys for Plaintiff
 5                 233 Broadway, 5th Floor
                   New York, New York 10279
 6                 BY:  DANIEL J. HANSEN, ESQ.

 7

 8          LORNA B. GOODMAN, ESQ.
            NASSAU COUNTY ATTORNEY
 9                 Attorney for the Defendants
                   One West Street
10                 Mineola, New York 11501
                   BY: BETHANY O'NEILL, ESQ.
11                 FILE NO.:  04X1628

12
            ALSO PRESENT:
13
                   F. Daniel DeGronach
14
                   Carl Sandel
15

16
                   *          *          *
17

18

19

20

21

22

23

24

25
```

1

2              F E D E R A L   S T I P U L A T I O N S

3

4

5              IT IS HEREBY STIPULATED AND AGREED

6       by and between the counsel for the respective

7       parties hereto, that the filing, sealing, and

8       certification of the within deposition shall

9       be and the same are hereby waived;

10

11             IT IS FURTHER STIPULATED AND AGREED

12      that all objections, except as to the form

13      of the question, shall be reserved to the times

14      of the trial.

15

16             IT IS FURTHER STIPULATED AND AGREED

17      that the within deposition may be signed before

18      any Notary Public with the same force and effect

19      as if signed and sworn to before this court.

20

21

22                      *       *       *       *

23

24

25

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

 1

 2     K A R L   S N E L D E R S, called as a witness,

 3     having been first duly sworn by a Notary Public of

 4     the State of New York, was examined and testified

 5     as follows:

 6     EXAMINATION BY

 7     MR. HANSEN:

 8          Q.    Please state your name for the record.

 9          A.    Karl Snelders.

10          Q.    Where do you reside?

11          A.    1490 Franklin Avenue, Mineola, New york

12     11501.

13          Q.    Good morning, Mr. Snelders.  My name is

14     Dan Hansen and I represent Thomas Hartmann with

15     respect to an accident that occurred on March 12,

16     2004.  I am going to be asking you some questions

17     about yourself, about the incident, things about

18     your background and things about what happened

19     days prior to that accident.  If you don't

20     understand any of my questions, please let me know

21     and I will rephrase the question so you will

22     understand it, okay?

23          A.    Okay.

24          Q.    If at any time during today's deposition

25     you would like to take a break, speak with your

```
 1                          SNELDERS
 2      attorney, get a glass of water, use the mens room,
 3      whatever, let me know and you can do that, okay?
 4           A.    Yes.
 5           Q.    Are you currently employed?
 6           A.    Yes.
 7           Q.    Who do you work for?
 8           A.    Nassau County Police Department.
 9           Q.    How long have you been so employed?
10           A.    Eighteen years.
11           Q.    What did you do before working for the
12      police department?
13           A.    I worked at Shorham, S-H-O-R-H-A-M,
14      Nuclear Power Plant.
15           Q.    What did you do at Shorham Nuclear Power
16      Plant?
17           A.    Security supervisor.
18           Q.    Prior to working for Nassau PD, did you
19      work any police jobs?
20           A.    No.
21           Q.    What was your date of hire?
22           A.    July 18th of 1986.
23           Q.    And where were your first assigned?
24           A.    Police academy.
25           Q.    Did you undergo training at the police
```

1                         SNELDERS

2      academy?

3           A.    Yes.

4           Q.    What did that training consist of?

5           A.    Laws of arrest, use of force, firearms,

6      the whole gamut of police work.

7           Q.    The laws of arrest and the use of force,

8      what were you taught with the use of force back in

9      the police academy?

10          A.    To the best of my knowledge, it was that

11     I could use levels of force starting with just

12     verbal on up to the last one, which is deadly

13     physical force.

14          Q.    Is there some type of continuum, are you

15     familiar with that term?

16          A.    No.

17          Q.    What are the various levels of force

18     that you are instructed on?

19          A.    First is just verbal and then there is

20     physical, then I believe it's use of chemical mace

21     and then there is use of other weapons and then

22     deadly physical force.

23          Q.    That is about five levels you just

24     described?

25          A.    Yes, to my knowledge that's

```
 1                         SNELDERS
 2   approximately what I can recall.
 3        Q.    And what instances were you trained to
 4   use verbal force?
 5        A.    The first level is that you come in
 6   contact with people, talking to people.
 7        Q.    And what instances would you use verbal?
 8        A.    Just about every time you talk to
 9   somebody, you are talking to them.
10        Q.    What type of situation calls for the use
11   of verbal?
12        A.    Every time I confront somebody.
13        Q.    The next phase is physical that you
14   mentioned?
15        A.    Right.
16        Q.    The next stage or level of force?
17        A.    Yes, it would be the next step from
18   verbal, if the person doesn't comply with verbal.
19        Q.    What does physical force consist of?
20        A.    You actually have to use your hands to
21   place them in custody.
22        Q.    What instances, when would you use
23   physical force?
24        A.    When people don't comply with verbal.
25        Q.    The next step you mentioned was mace or
```

```
 1                           SNELDERS
 2      chemical?
 3           A.    Chemical mace.
 4           Q.    Is it known by any other names?
 5           A.    Now we use OC which is -- I don't recall
 6      the exact name.
 7           Q.    What is OC?
 8           A.    It's basically pepper -- hot pepper
 9      spray.
10           Q.    When did you first start using the OC?
11           A.    I don't recall what year, it's probably
12      at least seven or eight years ago.
13           Q.    Did you have training in the use of the
14      OC?
15           A.    Yes.
16           Q.    When did you have that training?
17           A.    When?
18           Q.    Yes.
19           A.    I am not sure exactly when.
20           Q.    Was it when you first began to start
21      using it?
22           A.    Yes, before you switch over, you had to
23      be trained with it.
24           Q.    Did you take some course?
25           A.    It was done down at the range.  After we
```

1                          SNELDERS

2      qualified for our regular pistols, we did a course

3      on the OC pepper spray.

4          Q.    How long did the course last?

5          A.    I don't recall.

6          Q.    Was it more than a day?

7          A.    No.

8          Q.    Was it more than an hour?

9          A.    Again, I don't recall exactly how long

10     it was.

11         Q.    Was it a full day course, half day

12     course or something else?

13         A.    It wasn't a full day, I don't recall how

14     long it was.

15         Q.    Were you given a test?

16         A.    No.

17         Q.    Were you given any written literature or

18     any information concerning the use of the OC?

19         A.    I don't recall.

20         Q.    Did you keep any literature concerning

21     the use of the OC?

22         A.    No.

23         Q.    Are you aware of any departmental

24     guidelines, rules, regulations, bulletins,

25     directives or other regulations, concerning the

1                              SNELDERS

2      use of the OC?

3           A.    Other than once you use it, you have to

4      fill out a card, I don't recall the number of the

5      card that you use.

6           Q.    Are there any guidelines concerning the

7      use of the OC?

8           A.    I believe there are.

9           Q.    Are you familiar with those guidelines?

10          A.    Basic guidelines, yes.

11          Q.    What are those guidelines called?

12          A.    I don't recall.

13          Q.    When was the last time you had seen

14     those guidelines?

15          A.    I couldn't tell you what year or how

16     long ago.

17          Q.    Do you keep a copy of the guidelines?

18          A.    No, I don't.

19          Q.    Was a copy of the guidelines for the use

20     of OC provided to you?

21          A.    Yes.

22          Q.    Did you keep a copy of that?

23          A.    I probably have them somewhere, I don't

24     know.

25          Q.    Do you keep records of the training you

```
 1                         SNELDERS

 2     were provided?

 3          A.     I don't personally keep them.

 4          Q.     You didn't keep any records at all?

 5          A.     No.

 6          Q.     Do you keep any personal records at home

 7     concerning any training that you received either

 8     at the police academy or at any subsequent

 9     training, concerning your on the job duties?

10          A.     No, I don't.

11          Q.     Do you keep any records at your place of

12     work concerning your training or things like the

13     use of the OC?

14          A.     Do I?

15          Q.     Yes.

16          A.     No, I don't.

17          Q.     Where are those records kept at your

18     work place, if they are kept at all?

19          A.     I don't know.

20          Q.     Do you have access to the various

21     records and guidelines concerning the use of the

22     OC?

23          A.     Yes.

24          Q.     Where do you have access to those

25     records?
```

                              SNELDERS

    2        A.    I don't know exactly where they are

    3   kept, I am not sure if I can.

    4        Q.    What is your understanding of when you

    5   could use the OC or should use the OC?

    6        A.    Depends on the level of force the person

    7   is using against me.

    8        Q.    What is your understanding of the level

    9   of force being used against you, that would permit

   10   you to use OC?

   11        A.    When verbal and physical force aren't

   12   enough to have control of a person, then the next

   13   level would be to use that, if it's available.

   14        Q.    What is the next step after that, you

   15   mentioned weapons?

   16        A.    Police baton, slapper.

   17        Q.    What is a slapper?

   18        A.    It's approximately a nine inch leather

   19   piece that has metal on the end of it.

   20        Q.    What other weapons?

   21        A.    That's basically all we use.

   22        Q.    So there is the baton and the slapper?

   23        A.    That's correct.

   24        Q.    And what instances were you trained to

   25   use the baton or the slapper?

```
 1                            SNELDERS

 2          A.     When the Defendant's level of force is

 3      escalated above the use of all the others below

 4      it; verbal, physical and chemical mace.

 5          Q.     What instances would a Defendant have to

 6      engage before you would use a baton or a slapper

 7      or these other weapons?

 8          A.     When none of the other things work.

 9          Q.     Were you required to use verbal force

10      before going on to physical force?

11          A.     No.

12          Q.     Were you required to use physical force

13      before going on to chemical force?

14          A.     No.

15          Q.     Were you required to use the OC before

16      moving on to weapons?

17          A.     No.

18          Q.     Were you required to use weapons before

19      using deadly force?

20          A.     No.

21          Q.     The use of deadly force, did you have

22      training in that?

23          A.     Yes.

24          Q.     What was your training of deadly force?

25          A.     Through the police academy.
```

```
 1                      SNELDERS

 2          Q.    What was your understanding of when you

 3     are permitted to use deadly force?

 4          A.    When a person uses or is threatening to

 5     use deadly physical force against you or another

 6     person.

 7          Q.    Can you give me some examples?

 8          A.    If a person threatens he has a gun or

 9     has a knife.

10          Q.    What if a perspective Defendant has a

11     gun, but it's not displayed, would that entitle

12     you to use deadly force?

13          A.    If I fear he is going to use deadly

14     force against me, yes.

15          Q.    What would you do in that equation?

16          A.    In my mind, what I thought at that time,

17     the Defendant's actions.

18          Q.    What instruments of deadly force did you

19     have available to you?

20          A.    Firearm.

21          Q.    Anything else?

22                MS. O'NEILL:  At what point in time?

23                MR. HANSEN:  Let's talk about 2004?

24          A.    The car.

25          Q.    Anything else?
```

1                        SNELDERS

2        A.      Shotgun.

3        Q.      Anything else?

4        A.      That's it.

5        Q.      Do you have anything else?

6        A.      No, that's it.

7        Q.      Do you have any instruments for deadly

8    force that are available to you?

9        A.      Not at that time.

10        Q.      What about generally?

11        A.      That would be it, that would probably be

12    the only ones, other than if I was attacked.

13        Q.      Let's talk more about your career, you

14    said you have been working for 18 years and you

15    started in the police academy, what was your first

16    assignment after the police academy?

17        A.      I worked in the 1st Precinct.

18        Q.      And what geographical area does that

19    cover?

20        A.      It covers Baldwin, Roosevelt, Uniondale,

21    Merrick, parts of Merrick, North Merrick more,

22    Bellmore, East Meadow.

23        Q.      And your title or duties they are?

24        A.      Police officer.

25        Q.      How long did you remain a police officer

```
 1                          SNELDERS

 2     in the 1st Precinct?

 3          A.     I think it was April of 1993.

 4          Q.     What was your next assignment after

 5     that?

 6          A.     Bureau Special Operations.

 7          Q.     Is that known at BSO?

 8          A.     Yes.

 9          Q.     Was that considered a promotion?

10          A.     Yes -- I wouldn't say a promotion, I am

11     still a police officer.

12          Q.     How would you describe it then; how

13     would you describe that move to BSO, is that

14     something you applied for?

15          A.     Yes.

16          Q.     When did you apply for it?

17          A.     I believe in January of '93.

18          Q.     Did you have to take any tests?

19          A.     No.

20          Q.     Any recommendations made?

21          A.     Yes.

22          Q.     Who made recommendations?

23          A.     My supervisor that was in charge of me

24     and also the CO of the precinct.

25          Q.     The supervisor in charge of you, would
```

1                          SNELDERS

2      that be a lieutenant, sergeant or something else?

3           A.     I don't recall who it was exactly then,

4      it could be either one.

5           Q.     Why did you want to go to BSO?

6           A.     I decided it's what I wanted to do to

7      further my career.

8           Q.     You were still a police officer;

9      correct?

10          A.     Yes.

11          Q.     Did you have a pay increase by going to

12     BSO?

13          A.     Not initially, no.

14          Q.     Did it result in a pay increase at some

15     point in time?

16          A.     Under several contracts ago, yes.

17          Q.     Why, personally, did you want to go to

18     BSO, if at that point it didn't result in any pay

19     increase or any promotion?

20          A.     It's a change in what we do from working

21     in uniform to working in plain clothes and doing

22     anti-crime police work.

23          Q.     Did you have any training before going

24     to BSO?

25          A.     As far as what?

                              SNELDERS

 2          A.     Not when I first came to work.

 3          Q.     From the time you first arrived to work,

 4     until you received your assignment?

 5          A.     I don't recall the time.

 6          Q.     Do you know, approximately, what time?

 7          A.     No.

 8          Q.     What time did Officer Sharp arrive at

 9     the 7th on March 12th?

10          A.     Around 8:30.

11          Q.     Did you meet Officer Sharp at the 7th

12     Precinct that day?

13          A.     Yes.

14          Q.     What assignment were you given on the

15     morning of the 12th?

16          A.     We were looking for Thomas Hartmann and

17     the car that he was driving.  He had supposedly

18     threatened his wife and a cop the night before and

19     I think they were putting out notification, I

20     believe, with information about his car and that

21     he was possibly armed and dangerous.

22          Q.     When were those notifications put out?

23          A.     I believe they were put out over

24     Frequency 5, which is the 4th and the 7th.

25          Q.     Was information given in the morning

```
 1                          SNELDERS
 2    when you first were given the assignment?
 3           A.     The information we were basically given
 4    was that he was supposedly a crack user so to look
 5    in some of the areas where crack is sold.
 6           Q.     Were you given any hand outs, bulletins
 7    or notices concerning Mr. Hartmann on the morning
 8    of 12th?
 9           A.     No.
10           Q.     Were you given any documents or
11    paperwork whatsoever, on the morning of the 12th?
12           A.     No.
13           Q.     At some point in time Mr. Hartmann was
14    arrested; correct?
15           A.     Yes.
16           Q.     That was the evening of the 12th?
17           A.     Yes.
18           Q.     About what time?
19           A.     I would have to look at the paperwork, I
20    don't remember the exact time, 5:30ish.
21           Q.     At any point in time, from the time you
22    first were given the assignment concerning
23    Mr. Hartmann, until the time of his arrest that
24    evening on the 12th, were you ever given any type
25    of paperwork, bulletins, documents, photos, any
```

96

1                                   SNELDERS

2      type of information on paper, printed or

3      otherwise, concerning Mr. Hartmann?

4           A.     I was shown a photo, but I don't think I

5      had -- I don't believe we had a photo with us and

6      I had gotten information from Officer Knatz who

7      ·had spent a lot more time looking for him down in

8      the Long Beach area.

9           Q.     Do you know what photo you were shown?

10          A.     I believe it was an old arrest photo.

11          Q.     Where were you when you were shown the

12     photo?

13          A.     Down by his wife's house in Merrick.

14          Q.     Who showed you the photo?

15          A.     I believe it was Officer Brady.

16          Q.     At what time was this?

17          A.     It was after I dropped my partner off

18     and I picked up Officer Knatz, some time before

19     3:00 or around 3:30, I am not sure of the exact

20     time.

21          Q.     Who else was present?

22          A.     I believe it was just -- I don't even

23     know if it was Officer Brady, I don't recall who

24     Officer Knatz was with right now, whoever he was

25     doubled or tripled up with showed me a picture of

    1                          SNELDERS

    2    him, I don't recall who he was tripled up with.

    3         Q.    Was he with Joe Hughes?

    4         A.    Again, I said I don't recall who he was

    5    with.

    6         Q.    On the morning of the 12th, when you

    7    were first given the assignment concerning

    8    Mr. Hartmann, what were your instructions or what

    9    was your assignment?

   10         A.    Try and locate him.

   11         Q.    Anything in particular?

   12         A.    Place him under arrest.

   13         Q.    Were you assigned to any particular

   14    physical or geographical location?

   15         A.    We went to Roosevelt, Freeport and

   16    Hempstead areas.

   17         Q.    Let's go back to when the call came over

   18    the radio, how was it that you were communicating

   19    that particular day on the 12th, were you using

   20    the various communication devices that you

   21    mentioned before; the pager, the cell phone, the

   22    police radio and all that?

   23         A.    Yes.

   24         Q.    Now, did you have any particular name or

   25    sign or badge number that you were known as over

```
 1                        SNELDERS

 2      the radio, were you Snelders, 921, your badge

 3      number?

 4           A.    921.

 5           Q.    You were just 921?

 6           A.    That's correct.

 7           Q.    Now, if there are two officers in the

 8      car, are they collectively known as 921?

 9           A.    Yes.

10           Q.    Did you have any nicknames at any point

11      in time while on the job?

12           A.    Not that I can recall.

13           Q.    Have you ever been known as The Hammer?

14           A.    People have used that, yes.

15           Q.    How long have you been known as The

16      Hammer?

17           A.    That was after an incident where they

18      arrested somebody for stabbing his girlfriend and

19      he tried to stab me and instead of doing anything

20      else, I punched him in the face and broke his jaw

21      in two places.  When he went to Grand Jury, his

22      claim was that his girlfriend hit him in the face

23      with a hammer and that is where the nickname came

24      from.

25           Q.    How many years have you been known as
```

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
 1                          SNELDERS
 2    The Hammer?
 3           A.    I don't consider it a nickname, but I
 4    was still in uniform.
 5           Q.    You have been called The Hammer since
 6    you have been in uniform, so at least thirteen
 7    years?
 8           A.    Yes.
 9           Q.    Are there any other names you are known
10    by, any other names people call you on the job?
11           A.    Not that I know of.
12           Q.    Anything else?
13           A.    No.
14           Q.    Have you been assigned in any other
15    cars, other than being assigned to car number 921?
16           A.    In BSO?
17           Q.    Yes.
18           A.    No.
19           Q.    You have always been 921?
20           A.    As long as I have been there, yes.
21           Q.    Is that something Officer Sharp carried
22    with him?
23           A.    Yes, periodically I have been in other
24    cars, you know, when he is off, I work with other
25    people but...
```

```
 1                        SNELDERS

 2        Q.    What time did you leave the 7th on

 3   March 12, 2004?

 4        A.    I don't recall the time.

 5        Q.    Do you know if you left before

 6   lunchtime, before noon?

 7        A.    Yes.

 8        Q.    Where was the first place you went upon

 9   leaving the precinct on March 12, 2004?

10        A.    I don't know exactly where we went right

11   away.

12        Q.    Did you have your spiral book that day?

13        A.    Yes.

14        Q.    And you made notes that day, I assume,

15   to keep track of what you were doing?

16        A.    No.

17        Q.    Did you write down, generally, what you

18   are doing on a particular day?

19        A.    No.

20        Q.    Where is the book today?

21        A.    It's probably in 921.

22        Q.    You mentioned before you went to

23   Roosevelt, Freeport and Hempstead, do you know

24   where you went first?

25        A.    No.
```

```
 1                          SNELDERS

 2         Q.    You also mentioned Merrick before and

 3    you also mentioned Officer Sharp, we have five

 4    places; right?

 5         A.    Yes.

 6         Q.    Do you know which of these five places

 7    you went to first?

 8         A.    Probably Roosevelt.

 9         Q.    Is that the closest to the 7th?

10         A.    Freeport is the closest one, we know

11    Roosevelt pretty well so...

12         Q.    What did you do in Roosevelt?

13         A.    Went around to the known crack locations

14    to see if we could see the car.

15         Q.    What were you told, specifically, to do

16    that day, were you told to go look for Hartmann?

17         A.    No, there was something broadcasted over

18    the radio that he was wanted and I don't remember

19    who told us that he was, somebody told us that he

20    was possibly a crack user.  So, usually crack

21    users go to places where they could get crack, so

22    we decided to ride around in those areas to try

23    and spot the car.

24         Q.    Who told you he was a crack user?

25         A.    Again, I said I don't recall.
```

```
 1                       SNELDERS
 2           Q.    What other information did you have
 3     concerning Mr. Hartmann on the morning of March
 4     12th?
 5           A.    Other than I had his name, the type of
 6     car and the plate number of the car and that was
 7     basically it and I think we knew the address that
 8     his wife lived at and I think there was a caper
 9     alarm installed in there.
10           Q.    Did you have any other assignments on
11     the day of the 12th?
12           A.    No.
13           Q.    Did you engage in any general patrols
14     that you mentioned before?
15           A.    Just riding in those areas looking for
16     his car, that was it.
17           Q.    Did you have any assignments that
18     overlapped with the assignment to find
19     Mr. Hartmann's car?
20           A.    Not that I can recall.
21           Q.    Do you know what type of offence
22     Mr. Hartmann was wanted for; a misdemeanor,
23     felony, violation or something else?
24           A.    I knew it was misdemeanors.
25           Q.    This is as of the morning of the 12th
```

```
 1                        SNELDERS

 2    you knew it was misdemeanors?

 3         A.    Yes.

 4         Q.    Did that knowledge change at any point

 5    during the day?

 6         A.    No, it was misdemeanors, but the threat

 7    too.

 8         Q.    Did you understand what the misdemeanors

 9    were?

10         A.    Yes, one was he threatened to kill a

11    cop.

12         Q.    Do you know the facts surrounding that?

13         A.    Not particularly.

14         Q.    Did you ever let it be known that if you

15    did find Mr. Hartmann, he would be hurt?

16         A.    What?

17         Q.    Did you ever let it be known that if you

18    did find Mr. Hartmann, he would be hurt?

19         A.    No.

20         Q.    Do you know what police officer

21    Mr. Hartmann allegedly threatened, who that was?

22         A.    No, I don't.

23         Q.    During the course of the day on

24    March 12, 2004, from the time that you were first

25    given this assignment to look for Mr. Hartmann,
```

```
 1                        SNELDERS

 2    until the time of his arrest, did you acquire or

 3    learn any other information concerning

 4    Mr. Hartmann?

 5         A.    When I picked up Officer Knatz, he had

 6    spent a lot of the day down in the Long Beach area

 7    looking for him and talked to several Long Beach

 8    police officers that said they knew Thomas

 9    Hartmann.

10         Q.    What information did you acquire during

11    the day, whether it be from Officer Knatz or

12    anybody else?

13         A.    That he was a violent person.

14         Q.    Anything else?

15         A.    That he could possibly be armed.

16         Q.    Anything else?

17         A.    Some of his arresting background, he had

18    been arrested before.

19         Q.    What is your understanding of what his

20    background was?

21         A.    Assault, arson, burglary, attempted

22    murder.

23         Q.    Anything else that you came to learn

24    that day?

25         A.    Not that I recall.
```

```
 1                          SNELDERS
 2         Q.    Is all the information that you learned
 3    concerning Mr. Hartmann on the 12th, did all of
 4    that come from Officer Knatz or were there any
 5    other sources of information that you received?
 6              MS. O'NEILL:   Other than what he already
 7         testified about?
 8              MR. HANSEN:   Correct.
 9         A.    I got some information from -- that's
10    why we were sent down to a prior location from
11    Sergeant DeMartinis that he might be showing up at
12    that location.
13         Q.    When did you first speak with or see
14    Sergeant DeMartinis on the 12th of March?
15         A.    I didn't speak with him personally until
16    later on that night.
17         Q.    Did you see him that day or speak with
18    him over the radio or any other way?
19         A.    No.
20         Q.    How did you acquire the information
21    about Brower Avenue?
22         A.    I was asked to call my office and that's
23    when they had an assignment for me to pick up
24    Officer Knatz and to go down to that location.
25         Q.    What time was that?
```

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
 1                        SNELDERS

 2        A.     Late in the afternoon, I don't recall

 3   exactly.

 4        Q.     When you dropped off Officer Sharp, did

 5   you know you were going to be picking up Officer

 6   Knatz?

 7        A.     Yes.

 8        Q.     So it was before you dropped off Officer

 9   Sharp that you got the call that you were going to

10   be picking up Officer Knatz next?

11        A.     That's why I dropped Officer Sharp off

12   because I had to go down to Merrick to pick up

13   Officer Knatz and go down to Brower Avenue.

14        Q.     Who did you speak with that gave you

15   this information, Sergeant Martinez you said?

16        A.     No, somebody in my office, I don't

17   recall.

18        Q.     This was in BSO in the 7th or --

19        A.     No, in Westbury, one of the officers who

20   was assigned to the radio room.

21        Q.     Is that like a desk officer type?

22        A.     No, it's a police officer that is just

23   assigned -- he gives out information.

24        Q.     Now, what were you told about Brower

25   Avenue?
```

1                    SNELDERS

2          A.    We were told to respond down there, they

3     gave us the address and we responded down there

4     and sat on that location, that he possibly might

5     be heading to that location.

6          Q.    And what time was this that you headed

7     down to Brower Avenue?

8          A.    After I dropped my partner off, so it

9     was probably around 3:00, 3:30, I am not sure of

10    the exact time.

11         Q.    So you dropped off your partner, I am

12    not going to ask you where he lives, but in what

13    general vicinity does he live?

14         A.    Not too far from Merrick.

15         Q.    You would have been in the Merrick area

16    when you went to pick up Officer Knatz?

17         A.    That's correct.

18         Q.    And then you went to Brower Avenue?

19         A.    Correct.

20         Q.    Any particular address or location at

21    Brower Avenue?

22         A.    I don't recall the number of the house.

23         Q.    Any particular intersection?

24         A.    I don't remember the name of the street,

25    but it was the first street over the bridge into

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1                           SNELDERS

2      the 4th Precinct from the 1st Precinct.

3           Q.    Over what bridge?

4           A.    It's a bridge that goes over a creek, I

5      don't know the name, it's where Atlantic Avenue

6      turns into Brower Avenue or where they meet.

7           Q.    During the course of the day on the

8      12th, did you see or speak with any supervisors,

9      sergeants or anybody of any rank, concerning

10     Mr. Hartmann?

11          A.    I am not sure, I don't recall.

12          Q.    Did you hear any broadcast over the

13     radio or any other communications whether it be

14     telephone or otherwise, concerning Mr. Hartmann on

15     the 12th, other than what we just discussed,

16     anything else whatsoever?

17          A.    No.

18                MR. HANSEN:   Off the record.

19                (Whereupon, an off-the-record discussion

20          was held.)

21                MR. HANSEN:   We will take a lunch break

22          now.

23                (Whereupon, it is 12:29 p.m. and we are

24          breaking for lunch.)

25                (Whereupon, it is 1:41 p.m. and we are

```
 1                         SNELDERS

 2            commencing with the deposition.)

 3       CONTINUED EXAMINATION BY

 4       MR. HANSEN:

 5            Q.   At some point in time you got to Brower

 6       Avenue; is that right?

 7            A.   Yes.

 8            Q.   Where was your location immediately

 9       prior to going to Brower Avenue?

10            A.   At his wife's house picking up Officer

11       Knatz.

12            Q.   And Officer Knatz was stationed outside

13       the wife's house?

14            A.   Yes.

15            Q.   And the wife's house was in Merrick;

16       right?

17            A.   Yes.

18            Q.   And Brower Avenue, what town was that

19       in?

20            A.   Oceanside.

21            Q.   And who was in the patrol car 921 at

22       Brower Avenue?

23            A.   Myself and Officer Knatz.

24            Q.   And that's the blue Lumina?

25            A.   Yes.
```

1                          SNELDERS

2          Q.    What were you wearing?

3          A.    Exactly, I don't know, but normally I

4     wear jeans, a black BSO T-Shirt and then another

5     shirt over it.

6          Q.    A long sleeve shirt?

7          A.    Probably, it was March, I would think

8     so.

9          Q.    And what kind of shoes were you wearing?

10         A.    Sneakers.

11         Q.    And what was Officer Knatz wearing?

12         A.    Similar clothes, but I am not sure of

13    exactly what he was wearing.

14         Q.    Do you know the color of Officer Knatz's

15    clothes?

16         A.    No.

17         Q.    Do you know what he was wearing on top,

18    a T-shirt or jacket or anything?

19         A.    I don't recall.

20         Q.    Do you know what direction you were

21    facing at Brower Avenue?

22         A.    Eastbound.

23         Q.    Is Brower Avenue a two-way street?

24         A.    Yes.

25         Q.    Were you at or near any particular

    1                          SNELDERS

    2    intersection?

    3         A.    No, I was between blocks so I am not

    4    sure.

    5         Q.    You were mid-block?

    6         A.    Yes.

    7         Q.    What time did you get to the Brower

    8    Avenue location?

    9         A.    I don't know the exact time.

   10         Q.    Tell me, approximately?

   11         A.    It's hard to approximate, it was shortly

   12    after I left my partner and picked him up, so

   13    maybe fifteen, twenty minutes after, I wasn't

   14    looking at my watch.

   15         Q.    How long had you been sitting at the

   16    Brower Avenue location before you saw

   17    Mr. Hartmann?

   18         A.    Before I saw him?

   19         Q.    Yes.

   20         A.    Maybe half an hour, forty-five minutes.

   21         Q.    What were you doing during that half

   22    hour, forty-five minutes?

   23         A.    Sitting there watching the cars go by.

   24         Q.    Did you have any discussions with

   25    Officer Knatz during that half hour to forty-five

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1                    SNELDERS

2    minutes?

3        A.    He just kept explaining what he had done

4    earlier.

5        Q.    Was it the Long Beach trips that he had

6    taken?

7        A.    Yes.

8        Q.    What did he tell you?

9        A.    He was bringing me up on the background

10   of Mr. Hartmann.

11       Q.    Tell me what he told you in sum and

12   substance?

13       A.    I don't remember exactly, but some of

14   the things he did tell me was, in the past he had

15   fired shots in his own house and they were covered

16   up with drywall compound and that they had put an

17   emergency caper in the house the night before

18   because he made threats to his wife that he was

19   going to kill her.

20       Q.    What else did Officer Knatz tell you

21   during that time period?

22       A.    That one of the Long Beach police

23   officers patted him on the back, "Oh, good you

24   have your vest on."

25       Q.    Anything else?

2        A.    I don't recall, just conversations about

3   where he had looked and the places they had gone.

4        Q.    What did he tell you?

5        A.    That they had gone to crack houses in

6   Long Beach looking for him, that's about it, I

7   don't recall everything.

8        Q.    Were you wearing a belt on the day of

9   March 12th?

10       A.    Yes.

11       Q.    Where was the shotgun?

12       A.    In the trunk.

13       Q.    Did you have your nine millimeter with

14   you?

15       A.    Yes.

16       Q.    Was it on your person?

17       A.    Yes.

18       Q.    Was it on your right hip?

19       A.    Yes.

20       Q.    Was it accessible?

21       A.    Depends on when you are talking about.

22       Q.    As you were sitting at Brower Avenue,

23   was your nine millimeter accessible?

24       A.    From underneath my shirt, yes.

25       Q.    It was underneath your shirt?

```
 1                         SNELDERS

 2        A.    Yes.

 3        Q.    And at any point in time did you remove

 4   your shirt?

 5        A.    No.

 6        Q.    Any reason why you didn't?

 7        A.    I didn't feel the need to.

 8        Q.    What were the weather conditions like as

 9   you sat on Brower Avenue?

10        A.    Clear.

11        Q.    Was it a nice day, sunny day?

12        A.    I believe it was.

13        Q.    It was daylight as you sat there the

14   entire time?

15        A.    Yes.

16        Q.    When was the first time that you had any

17   indication that you were in the presence of

18   Mr. Hartmann?

19        A.    I saw in my rear-view mirror an SUV that

20   had been described to me that he was driving,

21   black, I don't recall the make and I could see the

22   letters on the plate as it was getting closer and

23   it was the same letters.

24        Q.    So he came up from behind?

25        A.    Yes.
```

1               SNELDERS

2       Q.    So he came in the same direction as you

3   were facing on Brower Avenue?

4       A.    Yes.

5       Q.    What was the distance from the black

6   SUV, to your vehicle when you first saw it?

7       A.    It was maybe 300, 400 feet behind me

8   coming at me.

9       Q.    At some point in time, the SUV passed

10  you?

11      A.    Yes.

12      Q.    And where did it go next?

13      A.    It made a turn onto the block right next

14  to the house that we were sitting and watching.

15      Q.    Did it make a left or right turn?

16      A.    Left turn onto the block.

17      Q.    Do you know what that block is?

18      A.    I don't recall the name of it.

19      Q.    What distance separated the front of

20  your RMP 921, from that block that the SUV turned

21  onto?

22      A.    It would be an estimate.

23      Q.    Your best estimate?

24      A.    I would say a little over 500 feet,

25  maybe more.

1                          SNELDERS

2          Q.    Now, as a police officer, you are

3    trained in terms of giving estimates as to speed?

4          A.    That's correct.

5          Q.    And you are trained in terms of giving

6    estimates in terms of distance; correct?

7          A.    That's correct.

8          Q.    You are trained in terms of giving

9    estimates as far as observation and what you see;

10   correct?

11         A.    Yes.

12         Q.    And you have given tickets in cases for

13   speeding; correct?

14         A.    Yes, I have.

15         Q.    And that's based upon not only any

16   mechanical means, but also your professional

17   experience as a police officer and evaluating

18   speeds of cars; correct?

19         A.    That's correct.

20         Q.    Have you given testimony in court

21   concerning speeding cases?

22         A.    No.

23         Q.    You have issued Summons's for speeding

24   violations based upon your expertise in estimating

25   or determining speed and distances; correct?

```
 1                        SNELDERS

 2        A.     Yes.

 3        Q.     At what rate of speed was the black SUV

 4   traveling at the moment it passed your RMP?

 5        A.     He was doing around the speed limit

 6   which was 30.

 7        Q.     Are there any speed signs on that

 8   street?

 9        A.     I am sure there are, I don't recall

10   where they are.

11        Q.     How do you know it's 30?

12        A.     Most of the town of Hempstead is 30

13   miles an hour, it could be 35, I am not sure.

14        Q.     Now, when the SUV made the left turn

15   onto this other block, how far on this other block

16   did the SUV travel before it came to a stop?

17        A.     About two to three car lengths.

18        Q.     How many feet would you say that is?

19        A.     Twenty-five feet.

20        Q.     At some point in time when you saw the

21   black SUV, did you move your vehicle?

22        A.     Yes.

23        Q.     As you were sitting there when the black

24   SUV approached your vehicle from the rear, was

25   your vehicle running or was the engine turned off?
```

```
 1                        SNELDERS
 2        A.    It was running.
 3        Q.    Was the car in park, drive or something
 4   else?
 5        A.    Park.
 6        Q.    When you first noticed the black SUV
 7   approaching from your rear, did you or Officer
 8   Knatz say anything either to yourself or to each
 9   other?
10        A.    I told him the car is coming up from
11   behind us.
12        Q.    Is that when you first noticed it or
13   some other point in time?
14        A.    When I first noticed it, I realized it
15   was his car.
16        Q.    What did Officer Knatz say to you, if
17   anything?
18        A.    I don't recall.
19        Q.    Did you say anything else to Officer
20   Knatz, from the time you first noticed the SUV,
21   until it passed you?
22        A.    After it passed me, I saw the whole
23   plate and I said, "That's definitely the car,
24   that's the right plate."
25        Q.    Did Officer Knatz give you any response,
```

```
 1                         SNELDERS

 2     did he say anything back to you?

 3          A.    Not that I recall.

 4          Q.    Did you make any broadcasts or

 5     transmissions over any radios at that point in

 6     time?

 7          A.    No, I didn't.

 8          Q.    At the time that the black SUV came to a

 9     stop the twenty-five feet or so into the next

10     block, was your car still stopped, was it moving

11     or something else?

12          A.    As it passed me, I started to pull out

13     -- I put my seat belt on and started to pull out

14     and I was putting the red light up onto the

15     dashboard.

16          Q.    How far passed you was the black SUV

17     when you started to pull out?

18          A.    Maybe a hundred feet or so, it could

19     have been further.

20          Q.    Did you have a siren on at this time?

21          A.    No.

22          Q.    At some point in time, did you catch up

23     to the black SUV?

24          A.    Yes.

25          Q.    Was the driver in or out of the car at
```

```
 1                            SNELDERS
 2      that point in time?
 3           A.     As we were turning onto the block, he
 4      was getting out of the car.
 5           Q.     At any point in time did he fully get
 6      out of SUV?
 7           A.     Yes.
 8           Q.     As you were in your turn, had he stepped
 9      out of the car?
10           A.     Yes.
11           Q.     Was he fully out or just starting to get
12      out?
13           A.     He had one foot out and the second
14      foot --
15           Q.     Did he look in your direction?
16           A.     Yes, he did.
17           Q.     Did you have a siren on at this time?
18           A.     No.
19           Q.     Did you have your lights on?
20           A.     Yes.
21           Q.     At that point in time when you saw him
22      stepping out of the car, how many feet separated
23      the front of your patrol car, from the rear of the
24      SUV?
25           A.     Twenty-five feet.
```

1                          SNELDERS

2          Q.    How much time elapsed, from the time

3     that you first put your car in motion and to the

4     time that you were twenty-five feet from the rear

5     of the SUV, approximately?

6          A.    It's hard to say, I wasn't really

7     worrying about time, it was a few seconds, you

8     know, maybe five to ten seconds, maybe a little

9     bit more, I am not sure.

10         Q.    What was the highest rate of speed that

11    you reached traveling from your stop on Brower

12    Avenue, to the time you reached the point where

13    the SUV was as you traveled on Brower or the other

14    street?

15         A.    I never went over the speed limit.

16         Q.    You never went over the speed limit?

17         A.    I don't believe so.

18         Q.    What was your highest rate of speed?

19         A.    I don't recall, I didn't look at the

20    speedometer.

21         Q.    Can you estimate for me as an expert?

22         A.    No.

23         Q.    When you saw Mr. Hartmann exiting the

24    SUV, was your car stopped, in motion or something

25    else?

```
 1                         SNELDERS

 2          A.    When he was exiting the SUV?

 3          Q.    As you saw him stepping out at that

 4     moment, what was your patrol car doing, moving or

 5     stopped?

 6          A.    Moving towards his car.

 7          Q.    At what rate of speed?

 8          A.    Fairly slow.

 9          Q.    One mile an hour, five miles an hour?

10          A.    I am not going to guess.

11          Q.    I want you to estimate?

12          A.    I am not going to estimate.

13          Q.    Did you see Mr. Hartmann at this time?

14          A.    Yes.

15          Q.    Did you see his full body?

16          A.    Yes.

17          Q.    You made an observation of him; correct?

18          A.    Yes.

19          Q.    What did you see?

20          A.    A man wearing jeans and a baggy

21     sweatshirt.

22          Q.    Was he wearing a belt?

23          A.    I couldn't tell, his sweatshirt was over

24     his belt.

25          Q.    What was he wearing on his feet?
```

1                              SNELDERS

2         A.    I don't recall.

3         Q.    What color was his sweatshirt?

4         A.    I don't recall that either.

5         Q.    Was he wearing anything on his head?

6         A.    No.

7         Q.    Did the sweatshirt have a hood?

8         A.    No.

9         Q.    Did it have a zipper or was it a pull

10   over?

11        A.    It was a pull over with writing on it.

12        Q.    What did the writing say?

13        A.    Some construction company or demolition

14   company, one of the two.

15        Q.    His jeans were blue or something else?

16        A.    Faded blue.

17        Q.    At the time you saw him stepping out of

18   the black SUV, at that moment, did he have

19   anything in either of his hands?

20        A.    No.

21        Q.    At this point in time, did you say

22   anything to Officer Knatz?

23        A.    I don't believe so.

24        Q.    Did he say anything to you?

25        A.    No.

1                      SNELDERS

2          Q.    Did you say anything to Officer Knatz

3    other than what we just discussed, from the time

4    you first put your vehicle in motion, until the

5    point in time when you saw Mr. Hartmann stepping

6    out of his SUV?

7          A.    Not that I can recall.

8          Q.    Now, let's talk about the point when the

9    front of your vehicle is twenty-five feet from the

10   rear of the black SUV, were you directly behind

11   it, off to the side or some other location in the

12   street?

13         A.    Off to the side in the roadway, over to

14   the left side of it, the driver's side of it.

15         Q.    Where was the SUV at this point in time

16   in relation to the curb?

17         A.    Up against the curb.

18         Q.    At that point in time, as you were

19   twenty-five feet from the back of the SUV, what

20   was your intention?

21         A.    Pull up to him slowly, get out, tell him

22   that he was under arrest and place him under

23   arrest.

24         Q.    Why would you get out?

25         A.    The only way to put handcuffs on

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
 1                            SNELDERS

 2    somebody is to get out of the car.

 3         Q.    At some point in time, did you continue

 4    following this slow place as you mentioned before?

 5         A.    Yes.

 6         Q.    For how long did you continue forward in

 7    terms of time?

 8         A.    I don't know about time.

 9         Q.    Approximately?

10         A.    I can't approximate.

11         Q.    You have no idea?

12         A.    I am not going -- I don't know exactly

13    how long it took me to stop the car.

14         Q.    I am not asking you exactly,

15    approximately?

16         A.    Again, I don't know how long it was.

17         Q.    How much distance did you travel until

18    you next brought your car to a stop?

19         A.    It was approximately ten feet behind his

20    car.

21         Q.    So you traveled another fifteen feet?

22         A.    That's correct.

23         Q.    At what rate of speed were you traveling

24    during that fifteen feet?

25         A.    Slow.
```

```
 1                       SNELDERS

 2        Q.    Do you know what rate of speed?

 3        A.    No.

 4        Q.    Do you know how long it took to travel

 5   those fifteen feet?

 6        A.    No.

 7        Q.    The first fifteen feet, where was

 8   Mr. Hartmann, did he remain halfway out of his SUV

 9   or did he go into some other position?

10        A.    He got out of his car and started to

11   walk towards the back of his car towards us.

12        Q.    At that point in time, did Mr. Hartmann

13   say or gesture anything during that five feet that

14   you traveled?

15        A.    Not until I came to a stop.

16        Q.    The next five feet that you traveled,

17   did Mr. Hartmann say anything or make any

18   gestures?

19        A.    Not until I stopped.

20        Q.    So nothing happened in that fifteen feet

21   that you traveled in terms of his gestures or

22   statements?

23        A.    No statements, he looked up at us.

24        Q.    Do you know if he could see into your

25   car?
```

1                           SNELDERS

2          A.     I don't know, I believe he could.

3          Q.     During that fifteen feet of travel, did

4     you say anything to Officer Knatz?

5          A.     No.

6          Q.     Did he say anything to you?

7          A.     Not that I recall.

8          Q.     Did you unbuckle your seat belt?

9          A.     No.

10         Q.     You were intending to get out of your

11    car to arrest him?

12         A.     Yes, after I stopped and saw what he was

13    doing.

14         Q.     So during that period of time when you

15    traveled the fifteen feet, where had Mr. Hartmann

16    gone, he started out of his driver's side door;

17    right?

18         A.     Yes.

19         Q.     Describe his path as you traveled that

20    fifteen feet, describe where he went?

21         A.     He got completely out of the car, turned

22    facing my car and started to walk towards it.

23         Q.     Walk towards your car?

24         A.     Yes.

25         Q.     At some point in time did you come to a

1                          SNELDERS

2      stop?

3           A.    Yes.

4           Q.    How far away from your patrol car was

5      Mr. Hartmann when you came to a full stop?

6           A.    He was, approximately, ten feet, he was

7      close to the rear of his car.

8           Q.    Was he towards the driver's side rear,

9      the middle rear or passenger side rear?

10          A.    Driver's side rear.

11          Q.    What, if anything, was he doing or

12     saying at this point in time, the point where you

13     came to a full stop?

14          A.    When I came to a stop, he took a step

15     back and reached into his waistband, he put his

16     hand under his sweatshirt.

17          Q.    Did you see anything in his waistband?

18          A.    No.

19          Q.    Did you see any bulge in his pants?

20          A.    I just saw him reaching into his

21     waistband.

22          Q.    Did you see an outline or silhouette of

23     any object?

24          A.    I couldn't tell from there.

25          Q.    From the fifteen feet you couldn't tell?

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
1                      SNELDERS
2       A.   No.
3       Q.   Did you see anything in either of his
4   hand during that period of time?
5       A.   I couldn't see his left hand.
6       Q.   Did he lift up his sweatshirt to put his
7   hands in his pants?
8       A.   Slightly, but his hand disappeared under
9   it.
10      Q.   When he lifted up his sweatshirt to put
11  his hand in his pants, did you see an outline, any
12  bulge, any objects, any silhouette or any other
13  indication that Mr. Hartmann had any type of
14  weapon?
15      A.   All I thought was that he was reaching
16  for a gun.
17      Q.   At that point in time, did you unholster
18  your weapon?
19      A.   No, I didn't.
20      Q.   Did Officer Knatz unholster his weapon?
21      A.   I don't know what he did.
22      Q.   Was he in the car with you?
23      A.   He had opened the door and took a step
24  out, like, he was going to get out.
25      Q.   At what point in time did Officer Knatz
```

1                          SNELDERS

2     take a step to get out, where was Mr. Hartmann?

3          A.    Right when we stopped the car.

4          Q.    Is it your testimony that as soon as you

5     stopped the car, Officer Knatz unbuckled to get

6     out?

7          A.    I don't know if he was ever buckled.

8          Q.    Is it your testimony that Officer Knatz

9     opened his door to get out immediately when you

10    came to a stop?

11         A.    It was immediate.

12         Q.    How much time passed?

13         A.    We are talking -- this whole thing took

14    seconds.

15         Q.    How much time, from the time you

16    stopped, until the time Officer Knatz opened his

17    door?

18         A.    Again, I don't know how long it was, the

19    whole incident took seconds.

20         Q.    How many seconds?

21         A.    I don't know.

22         Q.    Was it more than ten seconds?

23         A.    I don't know.

24         Q.    Was it more than five seconds?

25         A.    I don't know.

1                    SNELDERS

2         Q.    Was it more than two seconds?

3         A.    Again, you are asking me the same

4    question over and over, I don't know.

5         Q.    At any point in time while you were in

6    the area of Brower Avenue, did Officer Knatz ever

7    fully get out of the car?

8         A.    No, he did not.

9         Q.    At this point in time, did you ever

10   unholster your weapon?

11        A.    No.

12        Q.    Did you ever reach for your weapon?

13        A.    No.

14        Q.    Did you reach for any weapon?

15        A.    No, I didn't.

16        Q.    Did you reach for the mace, the

17   flashlight or any other objects you may or may not

18   have had in the car?

19        A.    No, I didn't.

20        Q.    Now, which hand did Mr. Hartmann put in

21   his waistband?

22        A.    His right hand.

23        Q.    Where was he when he put his right hand

24   in his waist band?

25        A.    Approximately ten feet in front of me.

```
 1                        SNELDERS

 2      Q.   Where was he in relation to the SUV?

 3      A.   Towards the rear, but on the driver's

 4   side.

 5      Q.   Was there anything obstructing your view

 6   of Mr. Hartmann at that point in time?

 7      A.   No.

 8      Q.   And it was a clear, sunny day?

 9      A.   Yes.

10      Q.   At any point in time did Mr. Hartmann

11   ever get closer to your car?

12      A.   At any point?

13      Q.   At the Brower Avenue location?

14      A.   No.

15      Q.   Did he get closer than the ten feet?

16      A.   No.

17      Q.   What happened after Mr. Hartmann

18   allegedly put his right hand in his waist band,

19   what happened next, if anything?

20      A.   It was allegedly, that's what he did.

21      Q.   Okay; what happened next?

22      A.   He yelled out, "You better shoot me,

23   before I shoot you."

24      Q.   Did he say anything else?

25      A.   No.
```

1                         SNELDERS

2        Q.    How many times did he say that?

3        A.    I heard it at least twice.

4        Q.    Where was he when he said this to you?

5        A.    Same place when he reached into his

6    waist band.

7        Q.    Was he moving at all when this was said?

8        A.    He was bouncing around a little, but not

9    really moving in a direction.

10       Q.    He was just swaying?

11       A.    No, he wasn't standing in one spot, he

12   was shuffling his feet.

13       Q.    As he shuffled his feet and he said

14   this, did you say anything to Officer Knatz?

15       A.    I think I am sure I told him, "I think

16   he's got a gun."

17       Q.    And what did Officer Knatz say to you,

18   if anything?

19       A.    Nothing.

20       Q.    Did you unholster your weapon at that

21   point in time?

22       A.    No.

23       Q.    Did Officer Knatz unholster his weapon?

24       A.    I don't know.

25       Q.    Did Officer Knatz have a weapon that

1                    SNELDERS

2    evening?

3         A.    Yes.

4         Q.    What was he carrying?

5         A.    A similar gun to mine.

6         Q.    Is Officer Knatz left- or right-handed?

7         A.    Right-handed.

8         Q.    Where was his weapon holstered?

9         A.    Similar place to mine.

10        Q.    Did he have any other weapons with him,

11   other than his nine millimeter?

12        A.    Not that I know of.

13        Q.    At the time that Mr. Hartmann was saying

14   things to you with his right hand in his waist

15   band, was your car in drive, park or something

16   else?

17        A.    Drive.

18        Q.    Where was your right foot?

19        A.    On the brake.

20        Q.    How long had your right foot been on the

21   brake, while you were at the Brower Avenue

22   location, when Mr. Hartmann was out of his car?

23        A.    I don't know how long it was.

24        Q.    Did you have any idea; a minute,

25   seconds, two minutes, three seconds?

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1        SNELDERS

2   A. This whole incident took seconds, it

3 wasn't that long, so I don't know the exact time.

4   Q. Did you remain fully stopped as

5 Mr. Hartmann was outside his vehicle the entire

6 time?

7   A. Yes.

8   Q. At any point in time did Mr. Hartmann

9 change his position or course?

10   A. Yes.

11   Q. Where did he go after he was behind the

12 vehicle shuffling his feet as you described?

13   A. It wasn't behind the vehicle it was to

14 the side of it near the rear of it.

15   Q. From that position that you just

16 described, where did he go next, if anything?

17   A. He ran back, he turned around and ran

18 towards the driver's door, opened it up and got

19 in.

20   Q. Did he make any hand gestures to you?

21   A. No.

22   Q. Did you see him remove his right hand

23 from his waist band?

24   A. Yes.

25   Q. As he removed his right hand from his

1                         SNELDERS

2    waist band, did you see any indication that he had

3    a weapon?

4         A.    By then his back was to me.

5         Q.    How would you describe how he went from

6    the back or rear passenger side of the SUV, back

7    into his car, did he walk, run or something else?

8         A.    Ran.

9         Q.    At that point in time, was the SUV's

10   motor running or turned off?

11        A.    I don't know.

12        Q.    Do you know if he had to restart the

13   car?

14        A.    I don't remember.

15        Q.    During that period of time when

16   Mr. Hartmann ran from the driver's rear of the

17   SUV, to get back into the car, did you remain

18   fully stopped or did you put your car in motion?

19        A.    Can you repeat the question.

20              MR. HANSEN:   The Reporter will read it

21        back.

22              (Whereupon, the referred to question was

23        read back by the Reporter.)

24        A.    It was stopped.

25        Q.    Where was Mr. Hartmann the next time

```
 1                          SNELDERS

 2      that you had any motion in your car?

 3           A.    He was in the driver's seat.

 4           Q.    Was the door closed?

 5           A.    Yes.

 6           Q.    At this point in time, did you move your

 7      car again?

 8           A.    Yes.

 9           Q.    Where did you move your car to?

10           A.    I started it, pulled up alongside of him

11      to try to cut him off because I figured he was

12      going to take off in the car.

13           Q.    How much time did that take to go that

14      distance?

15           A.    Again, a short period of time.

16           Q.    Do you know how many seconds?

17           A.    No.

18           Q.    What distance did you travel to go to

19      try to cut him off?

20           A.    I was behind his car and the length of

21      his car so maybe a little bit less than twenty

22      feet.

23           Q.    Did the front of your car pass or get in

24      front of the SUV?

25           A.    No.
```

```
 1                           SNELDERS

 2        Q.    At some point in time did you come to a

 3   stop next to the SUV?

 4        A.    For a brief second.

 5        Q.    Were your windows up or down at this

 6   time?

 7        A.    Both of them were down.

 8        Q.    How long had they been down, were they

 9   down the entire time you were on Brower or some

10   other point?

11        A.    I remember it being down the whole time

12   at Brower, mine was down.

13        Q.    What about the passenger side?

14        A.    I don't recall.

15        Q.    Was it ever down?

16        A.    It was down when we pulled up alongside

17   of his car, I know it was down then, but I don't

18   remember when it went down.

19        Q.    Did you or Officer Knatz say anything to

20   Mr. Hartmann as he was outside his vehicle?

21        A.    Officer Knatz yelled out his first name,

22   "Thomas, you are under arrest."

23        Q.    Did he say anything else, Officer Knatz?

24        A.    Not that I can recall.

25        Q.    As you approached the car, can you
```

1                          SNELDERS

2      describe the rate of speed, from the time you left

3      that full stop fifteen feet or so behind the SUV,

4      until the time you pulled up next to the SUV?

5           A.    Very slow.

6           Q.    How much time did that take?

7           A.    I don't recall.

8           Q.    And when you pulled up next to the SUV,

9      could you see into Mr. Hartmann's SUV, any of the

10     windows?

11          A.    I could see Mr. Hartmann in the window,

12     yes.

13          Q.    From your position, you could see him?

14          A.    Yes.

15          Q.    And you could see into which window?

16          A.    Into the driver's side window.

17          Q.    Did you see through your front

18     windshield or passenger side window or something

19     else?

20          A.    First the windshield and I was far

21     enough away from his car I could see into it.

22          Q.    How far into the side of the SUV was the

23     passenger side of your car, what distance

24     separated the two sides of each car?

25          A.    An estimate would be four or five feet,

1                           SNELDERS

2      maybe a little more.

3           Q.    At some point in time did you bring your

4      car to a stop next to the SUV?

5           A.    For a short second.

6           Q.    And during that short second, was the

7      SUV also stopped?

8           A.    Yes.

9           Q.    Was there any conversation between you

10     or Officer Knatz during that period of time, as

11     you rolled forward?

12          A.    No.

13          Q.    Was there anything said between either

14     you and Officer Knatz and Mr. Hartmann during that

15     period of time?

16          A.    His window was up.

17          Q.    Mr. Hartmann's window was up?

18          A.    Yes.

19          Q.    Did Mr. Hartmann's window remain up the

20     entire time while you were on Brower Avenue?

21          A.    Yes.

22          Q.    Was anything said to him while you were

23     on Brower Avenue after you pulled up next to him?

24          A.    No.

25          Q.    Did you ever see his face while you were

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1                        SNELDERS

2    there?

3         A.    Yes.

4         Q.    Did he make any gestures or say anything

5    to you that you could see that he was mouthing to

6    you?

7         A.    No, I saw -- it looked to me that he was

8    reaching under the seat of his car for something.

9         Q.    You could see this from your seat?

10        A.    I could see him bend down and his

11   shoulder moving up and down.

12        Q.    Which shoulder?

13        A.    His right one.

14        Q.    Where were you positioned, at this point

15   in time, when you saw Mr. Hartmann's right

16   shoulder moving?

17        A.    Side by side.

18        Q.    And were you in the driver's side seat?

19        A.    Yes.

20        Q.    And there was four to five feet

21   separating the passenger side of your vehicle from

22   the driver's side of Mr. Hartmann's vehicle?

23        A.    That's correct.

24        Q.    And which window did you see this

25   through?

1                          SNELDERS

2          A.    The passenger's window.

3          Q.    How were you positioned in your vehicle

4     when you saw this?

5          A.    I was leaning up to see what he was

6     doing.

7          Q.    Were you leaning up looking through the

8     windshield or the side window?

9          A.    I said, I was looking through the side

10    window.

11         Q.    Where was Officer Knatz at this time?

12         A.    Sitting next to me.

13         Q.    Were you wearing your seat belt at this

14    time?

15         A.    Yes.

16         Q.    Were you able to shift over in your seat

17    to look over or no?

18         A.    I said, I leaned forward and I looked up

19    to the right and could see what he was doing.

20         Q.    How much time was this going on for,

21    that you looked up and saw what he was doing?

22         A.    Seconds because I figured if he didn't

23    have a gun in his waist maybe he left it in the

24    car, so I decided to back away from him.

25         Q.    Did you identify yourself as a police

```
 1                          SNELDERS

 2      officer at this time, when you were at Brower?

 3          A.     I think Officer Knatz, when he stood up

 4      or started to get out of the car said, "Police,

 5      Thomas you are under arrest" and we had the red

 6      lights flashing.

 7          Q.     Did either you or Officer Knatz display

 8      a shield at any point in time at Brower?

 9          A.     I didn't have mine out yet, no.

10          Q.     Did Officer Knatz have his out?

11          A.     I don't recall.

12          Q.     Is that something typically you have

13      out, the shield?

14          A.     No.

15          Q.     Did you see Officer Knatz take his

16      shield out as you went from the stopped position

17      on Brower, until the time of the encounter with

18      Mr. Hartmann?

19          A.     I don't recall if he did.

20          Q.     Where does Officer Knatz wear his

21      shield?

22          A.     Similar to mine.

23          Q.     Around his neck?

24          A.     Yes.

25          Q.     Let's go back to the point in time when
```

```
 1                              SNELDERS

 2     you were backing up, was the SUV's engine running

 3     at this time or was it not running?

 4          A.    I don't recall.

 5          Q.    How far did you back up in relation to

 6     the SUV?

 7          A.    A safe distance away, probably where the

 8     front of my car was right near the rear of his.

 9          Q.    As you were stopped towards the rear of

10     the SUV, could you see Mr. Hartmann?

11          A.    No.

12          Q.    When you backed up towards the rear of

13     the SUV, did you come to a stop?

14          A.    Yes.

15          Q.    How long did you remain stopped?

16          A.    Seconds.

17          Q.    How many seconds?

18          A.    I don't recall.

19          Q.    Was there any movement in the SUV during

20     the seconds that you were stopped behind the SUV?

21          A.    Just about when I stopped, he took off

22     going northbound.

23          Q.    As you were backing up and during the

24     seconds that you were stopped, did you ever

25     unholster your weapon?
```

```
 1                              SNELDERS

 2          A.     No, I didn't.

 3          Q.     Did Officer Knatz unholster his weapon?

 4          A.     I don't recall, I didn't see him.

 5          Q.     During the entire time, from the time

 6     you first saw the SUV approaching your rear-view

 7     mirror while on Brower, until the time that

 8     Mr. Hartmann started the SUV after you backed up,

 9     did you make any radio transmissions?

10          A.     I didn't, I believe Officer Knatz did.

11          Q.     What was his transmission?

12          A.     That he was with the subject vehicle at

13     the Brower Avenue location -- I don't know exactly

14     what he said I know he put it over that we had the

15     car.

16          Q.     Did he say anything else?

17          A.     I don't recall what he said.

18          Q.     Did you request assistance?

19          A.     I didn't think we did at that time, I am

20     not sure.

21          Q.     At that point in time, did you feel any

22     threats on your life?

23          A.     Yes.

24          Q.     If you felt a threat on your life, is

25     there a reason you didn't request any assistance?
```

1                     SNELDERS

2        A.     It took seconds.

3        Q.     As you were sitting at that location and

4    during the seconds that you were traveling, did

5    anybody ever request assistance over the radio?

6        A.     We didn't have time to yet.

7        Q.     During the time that you pulled up next

8    to the vehicle and during the time that you backed

9    up from the SUV, did anybody ever call for

10   assistance?

11       A.     No.

12       Q.     When Officer Knatz made the transmission

13   that you had the vehicle, was there anything

14   preventing him from also saying the words, "Please

15   give us assistance"?

16       A.     I don't know if he didn't.

17       Q.     If an officer feels his or her life is

18   threatened, is there a practice or procedure

19   within the department, in your 18 years on the

20   job, as far as requesting assistance for backup?

21       A.     You have to repeat the question.

22       Q.     If you feel your life was threatened as

23   a police officer and you are in a situation with a

24   suspect, is it your practice and procedure to

25   request assistance?

1                           SNELDERS

2          A.    When you have time to.

3          Q.    So it's your position you didn't have

4    the time or Officer Knatz didn't have time to get

5    on the radio?

6          A.    That's correct.

7          Q.    Officer Knatz had the time to get on the

8    radio to say he had the vehicle?

9          A.    That's as we were approaching his car,

10   yes.

11         Q.    Was there anything preventing him to

12   say, "Send help"?

13         A.    There was no threat yet.

14         Q.    What about when you left the area, did

15   anybody request assistance during that time?

16         A.    Left what area, when?

17         Q.    After Mr. Hartmann left the Brower

18   Avenue location from the stop, did you request

19   assistance at this time?

20         A.    After he had already threatened us once,

21   yes.

22         Q.    After you left Brower Avenue, where did

23   you go next?

24         A.    We continued northbound on that block

25   and that block curves to the left westbound and --

1                          SNELDERS

2        it's hard without a map, it curves westbound and I

3        believe we eventually came out on to Foxhurst

4        (phonetic) where he made a right onto Foxhurst

5        going sort of northbound.

6              Q.    What rate of speed were you traveling

7        down those roads?

8              A.    Faster than the speed limit.

9              Q.    Do you know how fast you were going or

10       you have no idea?

11             A.    I would say in excess of forty,

12       forty-five miles an hour at that time.

13             Q.    Where did you go next?

14             A.    Northbound on Foxhurst and we headed up

15       over 55.

16             Q.    On Foxhurst?

17             A.    Yes, it is a long road passed the

18       school.  Then he went through a red light almost

19       getting hit by three different cars.  They had to

20       lock their brakes up from hitting him.  I

21       continued and I had to slowdown and I got through

22       that intersection and he had made, I think it's

23       the first right which is Allen and I lost sight of

24       the car for a second.

25             Q.    Does the department have any rules on

```
 1                         SNELDERS

 2     pursuit?

 3          A.    Yes.

 4          Q.    What is your understanding of the rules

 5     of pursuit that the department has promulgated?

 6          A.    My understanding of it is to pursue a

 7     vehicle, notify radio that you are pursuing it in

 8     an unmarked car and as soon as a marked car is

 9     available, they will take over the pursuit and you

10     will just be the secondary unit, but at any time

11     it can be called off by a supervisor.

12          Q.    During the time that you were pursing

13     the SUV, were there any radio transmissions?

14          A.    Several.

15          Q.    Who was operating the radio?

16          A.    Officer Knatz.

17          Q.    Was he operating the radio in the car or

18     one of the hand helds?

19          A.    I believe he was using a hand held radio

20     and it was on Frequency 5, which is the 1st and

21     7th Precinct.

22          Q.    Why wasn't he using the detective

23     frequency?

24          A.    I think that's the radio he had in his

25     hand when the whole thing started so...
```

```
 1                              SNELDERS
 2          Q.    Did you make any radio transmissions,
 3     yourself, during that pursuit?
 4          A.    No.
 5          Q.    What transmissions did Officer Knatz
 6     make?
 7          A.    He kept putting over our location as we
 8     changed streets.
 9          Q.    Was anything, other than your location,
10     transmitted by Officer Knatz?
11          A.    I don't know.
12          Q.    Were you in the car with him?
13          A.    Yes.
14          Q.    Did you hear him make any other
15     transmissions, other than your location?
16          A.    I just said, I don't recall what he
17     said.
18          Q.    At any point in time while you were in
19     pursuit, did you ever request backup?
20          A.    That's why Officer Knatz was over the
21     radio telling our location that we were chasing
22     him.
23          Q.    Did he ever mention that you thought
24     your lives were in danger?
25          A.    I don't recall what he said.
```

```
1                           SNELDERS
2          Q.   Would there be a practice and procedure
3     as far as advising either central command or BSO
4     that you thought your lives were in danger?
5          A.   No, not then, I wouldn't.  I never heard
6     that put over.
7          Q.   Was there any communication broadcasted
8     by either you or Officer Knatz that you believed
9     Mr. Hartmann had a weapon or a gun?
10         A.   I didn't broadcast anything.
11         Q.   As you were sitting in the car with
12    Officer Knatz, did you hear any transmission or
13    broadcast that you believe Mr. Hartmann had a gun
14    or weapon?
15         A.   As I said, I don't recall what he said.
16         Q.   What was the closest that your car came
17    to the rear of the SUV during the pursuit?
18         A.   It would be more than a hundred feet, I
19    never got real close to him.
20         Q.   Is it that you couldn't catch him or
21    some other reason?
22         A.   I was just trying to stay with him, I
23    didn't want to catch him.
24         Q.   Why not?
25         A.   Not until I had help.
```

```
1                        SNELDERS

2         Q.    At some point in time, did you see

3    Mr. Hartmann's vehicle come to a stop?

4         A.    No, I didn't see it come to a stop.

5         Q.    At some point in time, did you see it

6    stop?

7         A.    Yes.

8         Q.    And did you see Mr. Hartmann in the

9    vehicle or someplace else?

10        A.    Out of the vehicle.

11        Q.    Where was he in relation to the vehicle?

12        A.    Outside the driver's door.

13        Q.    And where was your vehicle when you

14   first saw Mr. Hartmann after the pursuit?

15        A.    Just as I turned onto, I believe it was

16   Allen.

17        Q.    What was the other road that you turned

18   from Allen?

19        A.    Foxhurst.

20        Q.    How many feet into Allen was

21   Mr. Hartmann when you saw him as you turned the

22   corner?

23        A.    I don't recall exactly how many feet.

24        Q.    How many car lengths?

25        A.    Several.
```

```
 1                        SNELDERS

 2        Q.    Could you give me an estimate of how

 3   many several is?

 4        A.    I don't know exactly how many, there is

 5   a whole diagram with the amount of feet, I don't

 6   recall.

 7        Q.    Was there any conversation between you

 8   and Mr. Hartmann or Officer Knatz and Mr. Hartmann

 9   when you first saw him out of his vehicle?

10        A.    When I first saw him out of the vehicle,

11   I was still moving.

12        Q.    You were still moving?

13        A.    When I saw him out of the vehicle, I was

14   still moving.

15        Q.    Over by Allen?

16        A.    Yes.

17        Q.    At what rate of speed were you moving

18   when you first saw him?

19        A.    I was turning the corner, I saw the car

20   and then I was slowing down to a stop.

21        Q.    Did you come to a stop at some point in

22   time or some location on Allen?

23        A.    Yes.

24        Q.    Where, on Allen, did you come to a stop

25   in relation to the SUV?
```

```
 1                        SNELDERS

 2        A.    To the left of it, I don't know the

 3    exact footage.  Again, that's all on the diagram,

 4    but I was to the left and behind it.

 5        Q.    Do you know what compass direction you

 6    were facing?

 7        A.    Eastbound.

 8        Q.    And where was the SUV in relation to the

 9    curb when it was stopped on Allen?

10        A.    It was away from the curb and slightly

11    with the front closer to the curb and the rear.

12        Q.    Can you describe the area where you saw

13    the SUV stopped on Allen, is that a residential

14    area, commercial area or something else?

15        A.    All residential.

16        Q.    Is there a sidewalk and curb?

17        A.    Yes, there is a curb and a small patch

18    of grace and then a sidewalk.

19        Q.    There are residential homes there?

20        A.    Yes.

21        Q.    With driveways leading to Allen?

22        A.    Yes.

23        Q.    When you saw Mr. Hartmann out of his

24    vehicle, where was he in relation to his vehicle;

25    was he just stepping out, was he towards the
```

```
 1                            SNELDERS

 2     front, the rear or some place else?

 3          A.    Outside the door with the door closed.

 4          Q.    How far was he from the SUV?

 5          A.    A couple of feet.

 6          Q.    Which direction was he facing?

 7          A.    He was looking at us, he was facing

 8     westbound.

 9          Q.    At some point in time, did you stop your

10     vehicle?

11          A.    Yes.

12          Q.    And when you came to a stop, what, if

13     anything, happened next in terms of your action?

14          A.    Mine, I stopped the car, Officer Knatz

15     opened the door and started to get out or got out

16     and I don't remember what he said, something along

17     the lines of, you know, "It's going to be a foot

18     pursuit now."

19          Q.    What happened?

20          A.    Mr. Hartmann, rather then running away,

21     ran towards my car -- the front of my car and came

22     up to the driver's side window.

23          Q.    And where was your partner?

24          A.    He was out of the car, I didn't know

25     where he was at.
```

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

156

```
1                        SNELDERS

2          Q.    And where were you?

3          A.    I was still seated in the car seat

4     belted in.

5          Q.    How much time elapsed, from the time you

6     came to a full stop, until the time Mr. Hartmann

7     came up to your driver's side window?

8          A.    Seconds.

9          Q.    Was your window still open?

10         A.    Yes.

11         Q.    Can you describe the manner in which he

12    approached the car, did he walk, run?

13         A.    He was running.

14         Q.    And is there a reason that you didn't

15    get out of the car?

16         A.    I didn't have time to.

17         Q.    Officer Knatz had time?

18         A.    Yes.

19         Q.    And he was fully out of the car?

20         A.    Yes.

21         Q.    As Mr. Hartmann approached your car and

22    got to your driver's side window, was Officer

23    Knatz's door opened or closed; in other words, was

24    the passenger door opened or closed?

25         A.    It was closed.
```

1                       SNELDERS

2          Q.    So Officer Knatz had time to open the

3     door, get out, close the door and go to the back

4     of the car?

5          A.    I didn't say he went to the back of the

6     car, I don't know where he was, I know he got out

7     of the car, he thought he was going to have to

8     chase him, but instead, he came towards us.

9          Q.    Did Officer Knatz say anything to

10    Mr. Hartmann at the scene on Allen Avenue?

11         A.    I didn't hear anything.

12         Q.    Did you say anything to either Officer

13    Knatz or to Mr. Hartmann during the entire time

14    that you were at Allen Avenue?

15         A.    No, I didn't say anything to him.

16         Q.    Did he say anything to you?

17         A.    He was yelling and cursing something

18    along the lines, "What is the matter, what are

19    you, a pussy," and that's as he came up to my

20    window.  I started to lean towards the passenger

21    seat, put my hands up because when he came to the

22    window he had his hand in his waistband again and

23    I thought he was going to pull a gun out and

24    shoot.

25              I put my hands up, ducked down towards

1                          SNELDERS

2     the passenger seat reaching over to the side panel

3     where I kept mace and I was reaching for it.

4          Q.   The passenger side?

5          A.   Yes.

6          Q.   Where was the mace kept in the passenger

7     side of the police car?

8          A.   In the pocket, in the door.

9          Q.   Was anything else said, other than what

10    you just told me?

11         A.   He said to me he was going to -- again,

12    he said the same words, "You better shoot me

13    before I shoot you."

14         Q.   Which hand was in his waistband?

15         A.   His right hand.

16         Q.   When did he put his hand in his waist

17    band?

18         A.   As he was approaching my window.

19         Q.   How far was he from you, when he put his

20    right hand in his waistband?

21         A.   A couple of feet.

22         Q.   Two or three feet?

23         A.   Yes.

24         Q.   Did you see him put his hand in his

25    waistband?

1                       SNELDERS

2          A.    Yes.

3          Q.    Did he lift his shirt to put his hand in

4    his waistband?

5          A.    He put his hand under his shirt, not

6    really lifting it.

7          Q.    Did you see any indication of any weapon

8    or anything like that?

9          A.    I couldn't, no.

10         Q.    Did you see any bulge, silhouette or

11   anything in Mr. Hartmann's hand, at any point in

12   time?

13         A.    No, because his sweatshirt covered -- it

14   was so far down, I couldn't see anything, it was

15   down almost to his crotch area.

16         Q.    You didn't see anything, at all, no sign

17   of a weapon?

18         A.    No.

19         Q.    At any point in time during this period

20   where Mr. Hartmann was next to your driver's side

21   window, did you hear Officer Knatz say anything?

22         A.    No.

23         Q.    Did you know where he was?

24         A.    No.

25         Q.    Where was Officer Knatz the next time

1                    SNELDERS

2    you saw him or had an awareness of where he was?

3         A.    Where I thought he was?

4         Q.    Any type of awareness, either heard him

5    or saw him?

6         A.    As I was reaching for the mace and I had

7    my hand up and ducking, I was watching

8    Mr. Hartmann, I saw him look towards the rear of

9    the car and run back towards his car, I figured he

10   must have seen Officer Knatz come around from the

11   back of the car, that was my thought.

12        Q.    You were ducking down in your car?

13        A.    Yes.

14        Q.    Across the front seat; right?

15        A.    Yes.

16        Q.    And you were reaching towards the

17   passenger side door pocket?

18        A.    Yes.

19        Q.    And you looked up and saw Mr. Hartmann

20   looking towards the back of the car?

21        A.    Yes.

22        Q.    How close was he to the car when you saw

23   him doing this?

24        A.    He was almost in the window.

25        Q.    Was he standing up, bent down or

```
 1                         SNELDERS
 2    something else?
 3         A.    He wasn't completely standing, he was
 4    semi crouched.
 5         Q.    Did you hear Mr. Hartmann say anything
 6    to Officer Knatz?
 7         A.    No.
 8         Q.    At this point in time, was your car in
 9    park, driving or something else?
10         A.    Parked.
11         Q.    Do you know why Officer Knatz got out of
12    the car?
13         A.    He thought he was going to have to chase
14    him.
15         Q.    How long did Mr. Hartmann remain at your
16    driver's side window?
17         A.    Seconds.
18         Q.    How many seconds?
19         A.    I don't recall.
20         Q.    At some point in time, did he leave your
21    driver's side window?
22         A.    Yes.
23         Q.    What, if anything, did he do?
24         A.    He got backup and he started, not
25    running, but walking real fast towards his car and
```

1                          SNELDERS

2     I put the car back in drive and I started creeping

3     slowly forward.

4          Q.    What rate of speed were you going?

5          A.    Slow, not even a mile, like, real slow.

6          Q.    Not even a mile an hour?

7          A.    Real slow.

8          Q.    Would that be true, not even a mile an

9     hour?

10         A.    Yes.

11         Q.    And at that point in time when you first

12    started creeping your car along not even one mile

13    per hour, what distance separated the front of

14    your car from the rear of the SUV?

15         A.    I don't recall how far.

16         Q.    Do you know, approximately, how many car

17    lengths?

18         A.    No.

19         Q.    Where was Mr. Hartmann when you first

20    put your car back in drive, when you started

21    creeping along?

22         A.    He was almost by the driver's side of

23    his car.

24         Q.    Where was his right hand?

25         A.    I don't remember seeing it.

```
 1                         SNELDERS

 2        Q.    Do you know where his left hand was?

 3        A.    No.

 4        Q.    Do you know where Officer Knatz was at

 5   that point when you put your car in drive?

 6        A.    No.

 7        Q.    Did you see Mr. Hartmann get back into

 8   his car?

 9        A.    No, I didn't.

10        Q.    Where was he in relation to his SUV as

11   you were creeping along in your car?

12        A.    I said he started going towards the

13   driver's side of his car, but he went around the

14   front of it instead.

15        Q.    Did he stop, at all, by his SUV, from

16   the time he left your window or did he continue

17   away from your patrol car?

18        A.    He stopped when he got to the front of

19   his SUV.

20        Q.    As he was going towards the SUV, what

21   direction was he facing?

22        A.    He was going sort of Southeast.

23        Q.    So his body was facing --

24        A.    Away.

25        Q.    Towards the SUV?
```

164

1                              SNELDERS

2          A.    Yes.

3          Q.    And towards the direction of traffic you

4     were going?

5          A.    Sort of, but he was going off to the

6     right, he was kind of still going straight.

7          Q.    When you say off to the right, off

8     towards the front of the SUV and towards the curb

9     that the SUV was somewhat adjacent to?

10         A.    Yes, but off a ways.

11         Q.    You said the front of the SUV was

12    pointed towards the curb, now you are telling me

13    he wasn't?

14         A.    It was pointed just a little bit -- the

15    front was closer to the curb than the rear, it was

16    a foot or two on a slight angle, it was out in the

17    roadway several feet.  I am not sure of the exact

18    distance.

19         Q.    How far was the front of the SUV from

20    the curb, the nearest point of the SUV to the

21    curb?

22         A.    I don't know the exact distance, it's on

23    that diagram.

24         Q.    When Mr. Hartmann went back towards the

25    SUV, did he continue away from you?

```
 1                            SNELDERS

 2          A.    Until he got to the front of the SUV,

 3     then he stopped.

 4          Q.    What happened next?

 5          A.    He turned around semi facing me now and

 6     he reached down into his waistband again, but this

 7     time it looked like he stuck his hand further down

 8     into his pants, I lost more sight of his arm.

 9          Q.    Did you see his pants?

10          A.    No, I couldn't see his pants.

11          Q.    When he walked away, did he remove his

12     right hand from his waistband?

13          A.    I didn't see him do that, when he turned

14     around his hands were out, when I started

15     approaching him, he stuck it back down.

16          Q.    When his hands were out, were they

17     empty?

18          A.    Yes.

19          Q.    When he stopped in front of the SUV, did

20     he say anything as he put his hand back in his

21     waistband?

22          A.    No.

23          Q.    Where was he positioned in relation to

24     the SUV?

25          A.    He was probably in the middle of the SUV
```

1                          SNELDERS

2    -- maybe -- I am not sure of the exact distance,

3    he was five to ten feet in front of the SUV.

4         Q.    And where was your car at this point in

5    time, at this particular moment, when he first put

6    his hand back into his waistband when he was in

7    front of the SUV?

8         A.    I had just started turning towards the

9    SUV.

10        Q.    Had the front of your patrol car reached

11   the front of the SUV at that point in time?

12        A.    Not yet.

13        Q.    In relation to the SUV, where was the

14   front of your car as he put his hand in his

15   waistband while he stood in front of the SUV, had

16   you reached the rear door, the rear quarter panel,

17   the front door, the front quarter panel or

18   something else at that particular moment?

19        A.    I wasn't going straight, I was going

20   slightly on an angle towards the car, I wasn't

21   really looking where the SUV was, I was just

22   watching him.

23        Q.    Where were you in relation to him as he

24   put his hand in his waistband, what distance?

25        A.    Again, I am not sure of the exact

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1                           SNELDERS

2       distance.

3             Q.    Can you approximate for me?

4             A.    It was under ten feet.

5             Q.    You were under ten feet from where

6       Mr. Hartmann was located in front of his SUV?

7             A.    Yes.

8             Q.    Did you continue going forward as he

9       reached into his waistband while he was in front

10      of the SUV?

11            A.    Yes.

12            Q.    Did you continue at the same speed, the

13      one mile per hour or under?

14            A.    Yes.

15            Q.    From the time that you first put your

16      car into gear, until the time that you saw

17      Mr. Hartmann reach into his waistband, how much

18      time had elapsed?

19            A.    I don't recall the exact amount of time.

20            Q.    Now, as you saw Mr. Hartmann reach into

21      his waistband, what, if anything, did you do next?

22            A.    I continued towards him and he started

23      to back up a little bit and he started to pull his

24      hand out of his pants and as he started to pull

25      his hand out of the pants, I gunned the engine and

```
 1                          SNELDERS
 2    I cut the wheel to the right so I hit him with the
 3    front right quarter panel of the car, right about
 4    at the curbline.
 5         Q.    Was he right at the curb when you hit
 6    him?
 7         A.    Close to it, I am not sure exactly, he
 8    was fairly close to the curb.
 9         Q.    In which direction was he facing when
10    you hit him?
11         A.    He was facing North.
12         Q.    What part of your car hit Mr. Hartmann?
13         A.    Front right quarter panel.
14         Q.    Where in relation to the right front
15    wheel?
16         A.    It was close to the right.
17         Q.    Was it in front of the wheel, behind the
18    wheel, at the wheel well?
19         A.    It wasn't behind the wheel, it was
20    either the middle to the front, somewhere around
21    there.
22         Q.    From the time that Mr. Hartmann left the
23    driver's side window of your RMP, until the time
24    that he was struck by your RMP, did he remain
25    standing erect that entire time or upright?
```

1                          SNELDERS

2         A.    Not really.

3         Q.    What changed?

4         A.    When he was at the front of his car, he

5    was semi crouched, bent over a little bit and

6    reaching for something in his waistband.

7         Q.    Was he moving in a direction at this

8    point?

9         A.    Stepping back, but slowly back peddling

10   a bit.

11        Q.    Where was Officer Knatz at this time?

12        A.    I don't know.

13        Q.    When was the next time that you saw

14   Officer Knatz?

15        A.    After I hit Mr. Hartmann, he went over

16   the curb to the front lawn, I got out and I saw

17   Officer Knatz standing over Mr. Hartmann holding

18   him at gunpoint.

19        Q.    At any point in time while you were at

20   the scene as you were creeping your car forward at

21   the one mile an hour or so, did you unholster your

22   weapon?

23        A.    No, I didn't.

24        Q.    Did you get out of car?

25        A.    No, I didn't.

1                          SNELDERS

2          Q.    Is there any reason you did not

3     unholster your weapon?

4          A.    I didn't have time to.

5          Q.    How much time would it take you as a BSO

6     officer trained in tactical maneuvers, how much

7     time would it take you to unholster your weapon as

8     you were sitting in the car?

9          A.    I don't know.

10         Q.    How much time does it take you to

11    unholster a weapon?

12         A.    Each situation is different.

13         Q.    As you are sitting in the car, how much

14    time does it take you to unholster your weapon?

15         A.    I just answered that, I don't know how

16    long it would take me.

17         Q.    Does it take a minute?

18               MS. O'NEILL:   On the day of the accident

19         or any instance?

20               MR. HANSEN:   Any time.

21               MS. O'NEILL:   I think he already

22         testified every instance is different.

23         Q.    How is it different, what is the

24    variable?

25         A.    I was seat belted in, I had a shirt over

1                          SNELDERS

2       my holster, my gun, I would have to remove the

3       seat belt, remove the shirt or get under the

4       shirt.

5            Q.    How long would that all take to get the

6       weapon out?

7            A.    I don't know.

8            Q.    Was it your intention to hit

9       Mr. Hartmann with the car?

10           A.    Yes, it was.

11           Q.    Was it your intention to run him over?

12           A.    No.

13           Q.    Did you run him over?

14           A.    Yes, I believe I did.

15           Q.    Which wheel of the car ran Mr. Hartmann

16      over?

17           A.    I don't know, I went up and over the

18      curb and I ended up on the front lawn.

19           Q.    Was it your expressed purpose to strike

20      him with the car?

21           A.    It was my purpose to stop him from

22      pulling out what I thought was a handgun.

23           Q.    Did you hit him intentionally?

24           A.    Yes.

25           Q.    What part of Mr. Hartmann's body was hit

172

1                              SNELDERS

2     by your car?

3          A.     I believe probably around mid legs.

4          Q.     Did you hit the front of his legs, the

5     side of his legs or the back of his legs?

6          A.     Front.

7          Q.     Did Mr. Hartmann go down immediately

8     when you struck him?

9          A.     Yes, he went backwards landing on his

10    back.  The last time I saw him, he was going face

11    towards me down onto his back.

12         Q.     And how did he come to a rest on his

13    front or back?

14         A.     I don't know, I didn't see him.  Once he

15    went down passed the quarter panel, I didn't see

16    him.

17         Q.     How much time elapsed from the time you

18    gunned the engine, until the time you hit

19    Mr. Hartmann?

20         A.     I don't know.

21         Q.     How much distance did you travel, from

22    the time you gunned the engine, until the time you

23    hit Mr. Hartmann?

24         A.     I don't know the exact distance.

25         Q.     Do you know the approximate distance?

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
 1                          SNELDERS
 2        A.    No.
 3        Q.    The time that you gunned the engine,
 4   where was your car in relation to the SUV?
 5        A.    Almost perpendicular to it.
 6        Q.    Was the front of your car passed the
 7   front of the SUV?
 8        A.    Yes.
 9        Q.    And approximately, what distance
10   separated the nearest part of your car, to the
11   nearest part of the SUV, was it a car length?
12        A.    I don't recall the exact distance.
13        Q.    The approximate distance is fine?
14        A.    It's all on the diagram that we did with
15   crime scene.
16        Q.    Officer Snelders, you are trained as an
17   observer; right?
18        A.    Yes.
19        Q.    You are trained for time and
20   observation?
21        A.    That's correct.
22        Q.    What distance separated your car, when
23   you gunned the engine, to the nearest point of the
24   SUV?
25        A.    I am not sure of the distance, when it
```

1                              SNELDERS

2    was all over we tried to put it back together as

3    best we could.

4          Q.    Tell me the approximate distance?

5          A.    I can't, I don't know what it was.

6          Q.    Approximately, what distance did your

7    car travel after you struck Mr. Hartmann?

8          A.    Again, I don't know how far it went.

9          Q.    How much time elapsed, from the time you

10   struck Mr. Hartmann, until you came to a stop?

11         A.    It's all a matter of seconds, I don't

12   know.

13         Q.    Approximately, how many seconds?

14         A.    I am not going to get into that again.

15         Q.    At what rate of speed were you traveling

16   when you struck Mr. Hartmann?

17         A.    Between five and eight miles an hour,

18   somewhere around there, you know, from going to

19   almost a dead stop and gunning the motor and going

20   a short distance.

21         Q.    When you gunned the engine, was

22   Mr. Hartmann saying anything?

23         A.    No.

24         Q.    Was there anything preventing you from

25   backing up?

```
1                         SNELDERS

2         A.    No.

3         Q.    Was there anything preventing you from

4    getting out of the car?

5         A.    The seat belt, the fact that the car was

6    in drive.

7         Q.    Was there anything preventing you from

8    putting the car in park, unbuckling yourself and

9    getting out of the car like Officer Knatz did?

10        A.    The threat in front of me.

11        Q.    Did Officer Knatz have any threat?

12        A.    No.

13        Q.    Officer Knatz was with you; right?

14        A.    I don't know where he was then.

15        Q.    When you first approached Allen, Officer

16   Knatz was with you; correct?

17        A.    Yes.

18        Q.    And if Mr. Hartmann is coming from the

19   right side by his SUV, Officer Knatz is actually

20   closer to Mr. Hartmann, isn't that right, as you

21   first stopped on Allen?

22              MS. O'NEILL:  He already testified he

23          doesn't know where Officer Knatz was.

24        Q.    I am talking about, when you first

25   stopped on Allen behind the SUV and you see
```

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1                            SNELDERS

2      Mr. Hartmann, Officer Knatz is actually closer to

3      Mr. Hartmann than you are, isn't that right?

4            A.    At that time he was -- it's hard to say

5      where he was, he was starting to move -- I don't

6      remember where he was.

7            Q.    If Mr. Hartmann is by his driver's side

8      door and you pulled up to the left of his vehicle

9      behind him, isn't it true that Officer Knatz is

10     closer to Mr. Hartmann then you are?

11           A.    He was a little closer, but we weren't

12     actually behind him, when I stopped our car -- his

13     car was here (indicating) in the middle of the

14     roadway, mine was behind him and to the right, but

15     not that far behind him.

16           Q.    I am going to ask the same question,

17     isn't it true that as you stopped on Allen by the

18     SUV or behind the SUV, isn't it true that at that

19     point in time, Officer Knatz was closer to

20     Mr. Hartmann then you were, physically?

21           A.    Yes.

22           Q.    And he had time to get out?

23           A.    Yes.

24           Q.    When was the next time that you saw

25     Officer Knatz?

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

1                              SNELDERS

2          A.     Like I said before, when I got out of

3    the car after I came to a stop on the lawn.

4          Q.     Did you stay in the car for a period of

5    time?

6          A.     No.

7          Q.     Did you get out immediately?

8          A.     Yes.

9          Q.     Was your weapon drawn?

10         A.     As I got out and went around the front

11   of the car, yes.

12         Q.     You unholstered your weapon?

13         A.     Yes.

14         Q.     From the time you stopped the car, how

15   long did it take for you to put the car in park,

16   unbuckle your seat belt and get out of car and

17   unholster your weapon, how much time did that

18   take?

19         A.     I don't know.

20         Q.     Approximately?

21         A.     I am not going to approximate.

22         Q.     Was it more than a second?

23         A.     I am not going to approximate.

24         Q.     Was it more than two seconds?

25                MS. O'NEILL:   Counselor --

1                              SNELDERS

2              MR. HANSEN:  I am entitled to probe.

3              MS. O'NEILL:  He has already answered

4         the same answer every time you probed.

5         Q.    Was it more than three seconds?

6         A.    I am not going to approximate how long

7    it took.

8         Q.    Is it you won't approximate or you can't

9    approximate?

10        A.    I won't approximate, I am not going to

11   answer the question that I don't know the answer

12   to.

13        Q.    When you got out of the car after you

14   came to a stop, where was the car stopped after

15   you hit Mr. Hartmann?

16        A.    It was on the lawn facing westbound.

17        Q.    And when you first got out of the car,

18   where did you go?

19        A.    Around the front -- to the front of the

20   car.

21        Q.    The front of your car?

22        A.    Yes.

23        Q.    At what point in time did you unholster

24   your weapon?

25        A.    As I was going towards the front of my

```
 1                        SNELDERS

 2    car.

 3         Q.    Was your car still running or did you

 4    turn it off?

 5         A.    I turned it off.

 6         Q.    At some point in time did you get back

 7    to the area where Mr. Hartmann was?

 8         A.    Yes.

 9         Q.    Where was he?

10         A.    Lying on the sidewalk, I think his body

11    was actually on the grass portion and his leg was

12    on the sidewalk.

13         Q.    Where was Officer Knatz?

14         A.    Standing in close proximity to him.

15         Q.    Where was he in relation to the curb,

16    your car and the SUV?

17         A.    Who?

18         Q.    Officer Knatz?

19         A.    I don't recall exactly where he was.

20         Q.    Was he between you and Mr. Hartmann, was

21    he on the far side of Mr. Hartmann as you

22    approached from your vehicle or someplace else?

23         A.    I remember seeing him coming from -- he

24    might have been coming from the left, he was

25    approaching from the SUV towards Mr. Hartmann.
```

```
 1                           SNELDERS

 2        A.     No.

 3        Q.     Did Lieutenant Mulrain ask you any

 4   questions?

 5        A.     Not that I recall.

 6        Q.     Did you speak with anybody else at the

 7   scene about what just had happened?

 8        A.     No.

 9        Q.     How long did you remain at the scene?

10        A.     I don't know what time we left, it was

11   until after crime scene was done.

12        Q.     Did you speak with any crime scene

13   officer?

14        A.     Yes.

15        Q.     Who did you speak with from crime scene?

16        A.     I don't know his name.

17        Q.     Do you know what rank the individual

18   was?

19        A.     Detective.

20        Q.     What did you say to the officer from

21   crime scene?

22        A.     I don't recall what I said to him, we

23   went over the areas of what happened and that's

24   how we came up with the diagram.

25        Q.     What time did crime scene arrive?
```

1                        SNELDERS

2        A.    I don't recall.

3        Q.    Did crime scene take measurements?

4        A.    Yes, they did.

5        Q.    At the time crime scene took

6   measurements, had any of the vehicles been moved,

7   at all?

8        A.    No.

9        Q.    Did you see the officer from crime scene

10  take any photographs?

11       A.    Yes.

12       Q.    Can you describe to me what was done by

13  the officer from crime scene?

14       A.    He took measurements and photographs.

15       Q.    Did the officer from crime scene tell

16  you he was Lieutenant or Detective Giovinneitone,

17  G-I-O-V-I-N-N-E-I-T-O-N-E, would that refresh your

18  recollection?

19       A.    No.

20       Q.    Did the officer from crime scene speak

21  with Officer Knatz or was it just limited to you?

22       A.    No, both of us.

23       Q.    Did he speak with you together?

24       A.    At times we were together.

25       Q.    Were you together with Officer Knatz the

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

```
 1                            SNELDERS

 2    entire time after the incident?

 3         A.    No.

 4         Q.    Were you there the entire time that the

 5    crime scene detective was present?

 6         A.    Yes.

 7         Q.    And what questions did the crime scene

 8    officer ask you, the detective?

 9         A.    What did he ask me?

10         Q.    Yes, what did he ask you?

11         A.    Basically where was my car when we first

12    started to where it ended, where was the person

13    when I struck him, these were all approximations.

14         Q.    And this is while you were at the scene;

15    right?

16         A.    Yes.

17         Q.    Were markers placed at the scene or

18    cones?

19         A.    I believe number markers were placed.

20               MR. HANSEN:  Can you please mark these

21         as documents as Plaintiff's Exhibits for

22         identification.

23               (Whereupon, the aforementioned

24         incident/vehicle accident diagram was marked

25         as Plaintiff's Exhibit 1 for identification as
```

```
 1                           SNELDERS

 2         of this date by the Reporter.)

 3                   (Whereupon, the aforementioned scene

 4         examination report was marked as Plaintiff's

 5         Exhibit 2 for identification as of this date

 6         by the Reporter.)

 7                   (Whereupon, the aforementioned crime

 8         scene search section was marked as Plaintiff's

 9         Exhibit 3 for identification as of this date

10         by the Reporter.)

11                   (Whereupon, the aforementioned

12         photographs were marked as Plaintiff's

13         Exhibits 4 thru 23 for identification as of

14         this date by the Reporter.)

15         Q.    I am showing you what has been marked as

16    Plaintiff's Exhibit 1 for identification of

17    today's date, can you just tell me what that is?

18         A.    It's a diagram prepared by a crime scene

19    detective.

20         Q.    Were you present when it was prepared?

21         A.    No.

22         Q.    Do you know who prepared that?

23         A.    I can't read his last name, Detective

24    something.

25         Q.    Is that a document that is prepared in
```

SNELDERS

1
2    the regular ordinary course of business by the
3    police department?
4          A.    Yes.
5          Q.    And is it the business of the police
6    department, obviously, to prepare these types of
7    documents including this one?
8          A.    Yes.
9          Q.    Now, I am going to show you two other
10   documents that have been marked as Plaintiff's
11   Exhibit 2 and Plaintiff's Exhibit 3 for
12   identification as of today's date, do you
13   recognize these two documents?
14         A.    Yes.
15         Q.    What do you recognize the documents to
16   be?
17         A.    It's the measurements that they took.
18               MS. O'NEILL:  Which one are you talking
19         about?
20               THE WITNESS:  They are both the same,
21         just a continuation.
22         Q.    Exhibit 3 is a continuation of Exhibit
23   2?
24         A.    Yes, see where it stops with ten and
25   starts with eleven.

```
 1                        SNELDERS

 2   police officer; correct?

 3        A.    That's correct.

 4        Q.    There is a designation of "First

 5   District," that would be Court; correct?

 6        A.    Yes.

 7        Q.    Then it says, "The people of the State

 8   of New York against Thomas Hartmann"?

 9        A.    Yes.

10        Q.    Mr. Hartmann would be the Defendant?

11        A.    Yes.

12        Q.    And 95 Central Boulevard, that's LKA,

13   the last known address?

14        A.    That's correct.

15        Q.    And there is a description in all

16   capital letters that identifies you, POLICE

17   OFFICER SNELDERS SHIELD NUMBER 3022, is that you?

18        A.    That's me.

19        Q.    And it says, "that you being a member of

20   the Nassau County Police Department depose and

21   says"?

22        A.    Yes.

23        Q.    So you swear; right?

24        A.    Yes.

25        Q.    On or about the 12th of March 2004,
```

```
 1                            SNELDERS

 2       that's the date of the accident; correct?

 3            A.    Yes.

 4            Q.    At about 4:57 p.m.?

 5            A.    Yes.

 6            Q.    You are alleging that Mr. Hartmann

 7       violated penal law 120.4151; correct?

 8            A.    Yes.

 9            Q.    And that is menancing in the third

10       degree; correct?

11            A.    Yes.

12            Q.    And there is a section that says, "to

13       whit"; correct?

14            A.    Yes.

15            Q.    Is that your description of the

16       violation you are alleging?

17            A.    I didn't type this, but that is the

18       description I put down, yes.

19            Q.    And that is something you accepted and

20       swore to; correct?

21            A.    Yes.

22            Q.    And did you make any changes to this?

23            A.    No, I didn't.

24            Q.    Did you make any corrections?

25            A.    No.
```

                              SNELDERS

1

2          Q.    Would you say something is wrong here?

3          A.    No.

4          Q.    If there was something incorrect, you

5    would have an opportunity to correct it and change

6    it?

7          A.    That's correct.

8          Q.    I want you to read the section that

9    says, "Defendant yelled at officer, you better

10   shoot me before I shoot you," do you see that?

11         A.    Yes.

12         Q.    Is that your description of what

13   happened that evening?

14         A.    That's part of it.

15         Q.    It says next, "your deponent," which

16   would be you?

17         A.    Yes.

18         Q.    And it say, "RMP 921," that's your

19   vehicle?

20         A.    Yes.

21         Q.    "To terminate the Defendant I approached

22   him by hitting him with the car"; correct?

23         A.    That's correct.

24         Q.    Was Mr. Hartmann approaching you at the

25   time you hit him with the car?

1                          SNELDERS

2          A.    The way this was spelled out, it was

3     spelled out to include everything that happened at

4     Allen, it doesn't spell out every single word.

5          Q.    This is the factual basis for your

6     allegations?

7          A.    That's correct, it doesn't have to be

8     word for word.

9          Q.    But it should be accurate?

10         A.    It is accurate when he came up to my

11    window he did say those two things.

12         Q.    Is there anything about this document

13    that you would change?

14         A.    No, not really, not for what he is being

15    charge with, no.

16         Q.    There is nothing about this that you

17    would change, at all?

18         A.    No.

19             MR. HANSEN:   Mark this as Plaintiff's

20         Exhibit 27 for identification.

21             (Whereupon, the aforementioned arrest

22         report was marked as Plaintiff's Exhibit 27

23         for identification as of this date by the

24         Reporter.)

25         Q.    I am showing you what has been marked as

```
 1                         SNELDERS

 2      Plaintiff's Exhibit 27 for identification of

 3      today's date, do you know what that document is?

 4           A.    Yes.

 5           Q.    You do?

 6           A.    Yes.

 7           Q.    What is it?

 8           A.    His arrest report.

 9           Q.    Prepared by who?

10           A.    Not me.

11                 MS. O'NEILL:  Do you know who it was

12           prepared by?

13                 THE WITNESS:  No -- it was printed out

14           by Detective Archer that it tells you on the

15           top.

16           Q.    Does it have a description of

17      Mr. Hartmann's clothing?

18           A.    Yes, black shoes, black slacks, black

19      long sleeve shirt, that's a mistake.  What

20      happened is our computer system, when somebody has

21      been arrested prior, if you don't look through it

22      and change it, it will print up when he was

23      arrested the last time what he was wearing.  That

24      wasn't what he was wearing.

25           Q.    That arrest report is incorrect?
```

```
 1                         SNELDERS

 2                    C E R T I F I C A T E

 3

 4     STATE OF NEW YORK      )
                              :  SS.:
 5     COUNTY OF KINGS        )

 6

 7              I, JAMIE NEWMAN, a Notary Public for and

 8     within the State of New York, do hereby certify:

 9              That the witness whose examination is

10     hereinbefore set forth was duly sworn and that

11     such examination is a true record of the testimony

12     given by that witness.

13              I further certify that I am not related

14     to any of the parties to this action by blood or

15     by marriage and that I am in no way interested in

16     the outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18     my hand this 1st day of June, 2005.

19

20                              Jamie Newman
                                JAMIE NEWMAN
21

22

23

24

25
```

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241

## ERRATA SHEET

| Page | Line | Original Text | Correction |
|------|------|---------------|------------|
| 33 | 15 | Keeper | CAPER |
| 37 | 9 | Sauer | Sig Sauer |
| 86 | 2 | Squad | SWAT |
| 92 | 2 | 7:30 | 3:30 |
| 94 | 24 | 4th + 7th | 1st + 9th |
| 132 | 20 | Was | Wasn't |
| 137 | 10 | it | moving |
| 154 | 18 | Grace | Grass |
| 175 | 12 | No | I don't Know |
| 181 | 3 | No | Yes |
| 245 | 11 | Motor | Mobile |
| 245 | 17 | Motor | Mobile |
| 248 | 16 | Tank | Take |
| ____ | ____ | | |
| ____ | ____ | | |
| ____ | ____ | | |
| ____ | ____ | | |
| ____ | ____ | | |

_Karl A. Snelders_
**(Witness Name)**

_Karl A. Snelders_ (signature)
**(Witness Signature)**

Subscribed and sworn to before me
this 27th day of September 2005.

_Bethany Bresnaider_
**NOTARY PUBLIC**

BETHANY L. BRESNAIDER
Notary Public, State of New York
No. 02BR5074557
Qualified in Nassau County
Commission Expires March 17, ~~1777~~ 2007

```
 1                           SNELDERS

 2         A.    I have no knowledge if they have a file.

 3               MS. O'NEILL:  Off the record.

 4               (Whereupon, an off-the-record discussion

 5         was held.)

 6         Q.    Now, the crime scene, do they maintain a

 7    file?

 8         A.    I don't know.

 9               MR. HANSEN:  I have nothing further.

10               (Whereupon, at 5:13 p.m., the

11         Examination of this Witness was concluded.)

12

13                                   _____
                                         KARL SNELDERS

14

15    Subscribed and sworn to before me

16    this  21ᵗʰ  day of  September  2005.

17

18    _____
                NOTARY PUBLIC

19

20          BETHANY L. BRESNAIDER
          Notary Public, State of New York
               No. 02BR5074557
            Qualified in Nassau County
21        Commission Expires March 17, 2001

22

23

24

25
```

DIAMOND REPORTING-718-624-7200-16 Court St., B'klyn, NY 11241