UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

THOMAS HARTMAN,                         :

                                    :

                   Plaintiff,         :        Docket No. 04-cv-01784 (CLP)

                                      :

       -against-                       :

                                      :

POLICE OFFICER KARL N. SNELDERS and   :
POLICE OFFICER MICHAEL KNATZ,        :

                                      :

                  Defendants.      :

---------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT
# OF THE DEFENDANTS' MOTION IN LIMINE

Garrett W. Swenson, Jr. (GS-2625)
Attorney for Defendants
76 Bay Road
Brookhaven, New York 11719
(516) 380-2808

On the Brief:

Sondra M. Toscano
Deputy County Attorney
Office of John Ciampoli
Nassau County Attorney
One West Street
Mineola, New York 11501
(516) 571-3066

Jarrett M. Behar (JB-4983)
Sinnreich Kosakoff & Messina LLP
267 Carleton Avenue, Suite 301
Central Islip, New York
(631) 650-1200

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL HISTORY................................................................................4

LEGAL STANDARDS ................................................................................5

ARGUMENT ................................................................................7

POINT I

PLAINTIFF SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE
OF THE INDIVIDUAL DEFENDANTS' PERSONNEL FILES REGARDING
CIVILIAN AND/OR OTHER COMPLAINTS MADE AND/OR DISCIPLINARY
ACTION TAKEN AGAINST THEM ............................................................7

POINT II

PLAINTIFF SHOULD BE PRECLUDED FROM
OFFERING EXPERT TESTIMONY CONCERNING
THE ALLEGED USE OF EXCESSIVE FORCE
AND ITS JUSTIFICATION BECAUSE SUCH
TESTIMONY INVADES THE PROVINCE OF THE JURY ....................................12

POINT III

PLAINTIFF SHOULD BE PRECLUDED FROM
OFFERING EVIDENCE IN SUPPORT OF THE
ALLEGATIONS THAT ANY DEFENDANT ACTED
IN A RECKLESS AND GROSSLY NEGLIGENT MANNER....................................13

POINT IV

PLAINTIFF SHOULD BE PRECLUDED
FROM INTRODUCING "COLOR ENHANCED"
VERSIONS OF PLAINTIFF'S X-RAYS ................................................14

POINT V

PLAINTIFF SHOULD BE PRECLUDED
FROM INTRODUCING INACCURATE AND
CONTESTED ACCIDENT RECONSTRUCTION DRAWINGS ...............................17

POINT VI

PLAINTIFF SHOULD BE PRECLUDED FROM CALLING
WITNESSES INVOLVED IN THE INVESTIGATION
OF THE INCIDENT AND FROM INTRODUCING
DOCUMENTS RELATED TO THE INVESTIGATION
BECAUSE HIS *MONELL* CLAIMS HAVE BEEN WITHDRAWN..........................................18

CONCLUSION..........................................................................................................................19

## PRELIMINARY STATEMENT

Plaintiff Thomas Hartmann ("Plaintiff" or "HARTMANN") has brought claims against Defendant Police Officers, Karl N. Snelders ("SNELDERS") and Michael Knatz ("KNATZ") under 42 U.S.C. § 1983 for allegedly using excessive force against him in violation of the United States Constitution and the New York State Constitution. HARTMANN alleges that on March 12, 2004, SNELDERS used excessive force against him in violation of the United States Constitution and the New York State Constitution. Specifically, HARTMANN maintains that he made no threatening gestures or comments to the police, yet SNELDERS intentionally struck him with a Nassau County Police Department police vehicle from which he sustained serious injuries.

Defendants contend that based on the information that SNELDERS and KNATZ knew about HARTMANN's background, the reason that HARTMANN was being sought for arrest, HARTMANN's unpredictable and erratic behavior as he fled from SNELDERS and KNATZ leading them on a high speed chase through a residential area, getting out of the car more than once, motioning as though he were retrieving a handgun from his waistband and yelling at them, "Shoot me before I shoot you," it was objectively reasonable during the tense, uncertain and rapidly evolving circumstances for SNELDERS to believe that HARTMANN possessed a weapon and that HARTMANN's use of deadly force against him, other police officers and residents was imminent at that the time that SNELDERS made a split second decision about the amount of force necessary in the particular situation and intentionally struck HARTMANN with the police vehicle.

The defendants submit this memorandum of law to preview evidentiary issues that may arise in the above-captioned trial, scheduled for jury selection on February 1, 2010. The

defendants seek to preclude plaintiff's counsel from introducing personnel files of defendants SNELDERS and KNATZ regarding civilian and other complaints made and/or any disciplinary action taken against them.  Such evidence is irrelevant since HARTMANN withdrew his claims pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and such evidence unfairly prejudicial to the defendants.  *See* Docket No. 66 (copy annexed as Exhibit A).  Moreover, said evidence is inadmissible under Fed. R. Evid. 404(b) to show the defendant's propensity to commit such acts and under Fed. R. Evid.  608 or 609 since it is not probative of their truthfulness or untruthfulness.

Additionally, the defendants seek to preclude plaintiff's counsel from introducing expert testimony concerning the alleged use of excessive force and its justification.  This proposed testimony of Timothy M. Sheahan expresses a legal conclusion and would thereby usurp the function of jury by "merely telling the jury what result to reach."  Such testimony as to the ultimate legal conclusion should be entrusted to the jury and thus be excluded.

Moreover, the defendants seek to preclude plaintiff's counsel from offering evidence of allegedly reckless or grossly negligent conduct on the part of the defendants at trial.  Such evidence supporting these allegations are inconsistent with the law of the case, pursuant to the holding of this Court in its April 28, 2008 Memorandum and Order, whereby the Court stated that plaintiff's negligence claim cannot be sustained in its excessive force claim.  Therefore such evidence is not relevant to plaintiff's actual claims in this case, for excessive use of force under 42 U.S.C. § 1983, and for state law assault and battery.

Furthermore, the defendants seek to preclude plaintiff's counsel from introducing "color enhanced" x-rays as trial exhibits that have been augmented with color to depict, in a truly gruesome and shocking manner, the alleged state of HARTMANN's legs following the incident,

including the specific inclusion of torn and degloved flesh and blood focused at the fracture points that not contained in the original x-rays. These proposed exhibits lack supporting proof of accuracy and are without a foundation as to how they were created or by whom they were created. The "color enhanced" x-rays are not medically accurate and therefore cannot be considered a "fair and accurate representation" of HARTMANN's actual condition. Additionally, the "color enhanced" x-rays are potentially misleading, and there is the real danger that, with the underlying facts controverted, the jury being overwhelmed by the "dramatic and impressive" effect of the gruesomely "color enhanced" x-rays. As a result, the "color enhanced" x-rays are highly prejudicial nature and not admissible.

Similarly, defendants are seeking to preclude plaintiff's counsel from offering an alleged reconstruction of the trajectory of the police car that struck HARTMANN. In no way can this alleged reconstruction be proven to show a "substantial similarity in circumstances" between the reconstruction and the original accident. Additionally, the additions on the reconstruction, including blood spots and a bloody cartoon body, are again potentially misleading to the jury of contested facts, and thereby highly prejudicial and not admissible.

Finally, defendants are seeking to preclude plaintiff's counsel from calling witnesses involved in the investigation of the incident and from introducing documents related to the investigation because the *Monell* claims against the municipality have been withdrawn. Therefore, the subsequent investigation of the incident is irrelevant to the only remaining claims of Federal excessive use of force and state law assault and battery against the only remaining defendants SNELDERS and KNATZ. *See* Fed. R. Evid. 401, 402, 602.

Accordingly, the defendants respectfully request that the Court grant their *motion in limine* excluding the above evidence, exhibits and witnesses at trial.

## PROCEDURAL HISTORY

On or about April 30, 2004, HARTMANN served a Complaint against defendants the County, Nassau County Police Department ("NCPD"), SNELDERS, KNATZ, Deputy Inspector Robert Turk ("TURK"), Lieutenant Thomas Zamojcin ("ZAMOJCIN"), Police Officer Kevin W. Smith ("SMITH"), Police Officer Philip Brady ("BRADY"), Detective Barry O. Franklin ("FRANKLIN"), Police Officer Thomas O. McCaffrey ("MCCAFFREY"), and John and Jane Does 1-15 under 42 U.S.C. § 1983 for alleged deprivation of HARTMANN's civil rights.   On June 16, 2004, the defendants answered.

On June 14, 2005, HARTMANN served an Amended Complaint against the defendants. On July 5, 2005, the defendants answered.

On December 8, 2006, HARTMANN moved to amend his complaint a second time.   On January 8, 2006, the defendants opposed that motion.   On September 10, 2007, by letter to the Court, HARTMANN withdrew his "*Monell*" municipal liability claims and discontinued the action against the NCPD, TURK, ZAMOJCIN, SMITH, BRADY, FRANKLIN, MCCAFFREY, and John and Jane Does 1-15.   At that juncture, the only remaining defendants were the County, SNELDERS and KNATZ.

On October 29, 2007, the defendants, pursuant to Federal Rule of Civil Procedure 56, filed a motion for judgment as a matter of law. On November 30, 2007, HARTMANN opposed that motion.   On April 28, 2008, the Court granted in part and denied in part, the defendants' summary judgment motion.   After the Court's decision, the only remaining claims are Federal excessive use of force and state law assault and battery and the only remaining defendants are the County, SNELDERS and KNATZ.   Moreover, the Court permitted HARTMANN to amend the complaint to include a claim of individual liability against SNELDERS and KNATZ.

On April 30, 2008, HARTMANN filed a second amended complaint.  On May 16, 2008, the defendants filed a second amended answer.   On May 27, 2008, the defendants filed an interlocutory appeal to the United States Court of Appeals for the Second Circuit on the issue of qualified immunity. On November 5, 2009, the Second Circuit affirmed the Court's judgment and remanded the case.  The parties have stipulated to the dismissal of all claims against the County, and the only remaining defendants are now SNELDERS AND KNATZ.  Since the parties are unable to agree upon a settlement in this matter, jury selection, to be immediately followed by a civil jury trial in the matter, is scheduled for February 1, 2010.

## LEGAL STANDARDS

A.     Federal Rule of Evidence 401, 402, 403

One of the standards that potential evidence must meet is that it must be relevant.  *See* Fed. R. Evid. 401, 402.  The probative value of evidence must outweigh its prejudicial effect. *See* Fed. R. Evid. 402, 403.

B.     Federal Rule of Evidence 404(b)

Federal Rule of Evidence 404(b) governs the admissibility of evidence of other crimes, wrongs, or bad acts.  *See* Fed. R. Evid. 404(b).  Rule 404(b) authorizes the admissibility of such evidence to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.   *See* Fed. R. Evid. 404(b).   The Second Circuit ascribes to the inclusionary approach, wherein evidence of uncharged bad acts or crimes are admissible for any reason, except to prove a defendant's propensity to commit the crime, if the evidence is relevant and its probative value outweighs its prejudicial value.  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).  A trial judge

has broad discretion in ruling on the admissibility of evidence under Rule 404(b).  *See U.S. v. Smith*, 727 F.2d 214, 220 (2d Cir. 1984).

  C.  <u>Federal Rule of Evidence 608</u>

  Rule 608 governs the admissibility of evidence of a witness's character and conduct.  *See* Fed. R. Evid. 608.  A witness's credibility may be cross-examined by evidence bearing upon the witness's character for truthfulness or untruthfulness.  *See id.*  The Federal Rules of Evidence provide a trial judge with broad discretion to decide the admissibility of evidence.  *See See U.S. v. Abel*, 469 U.S. 45, 54 (1984).

  D.  <u>Federal Rule of Evidence 609</u>

  Rule 609 governs the admissibility of criminal convictions for impeachment purposes. *See* Fed. R. Evid. 609. Rule 609(a) authorizes the admissibility of such evidence under two circumstances.  *See id.*  First, Rule 609(a)(1) permits impeachment of a witness with evidence of prior crimes punishable by death or imprisonment in excess of one year, that are less than ten years old, if the court determines that the probative value of such evidence outweighs its prejudicial effect.  *See* Fed. R. Evid. 609(a)(1). Second, evidence that any witness has been convicted of a crime involving "dishonesty or false statement" must be admitted regardless of the severity of the punishment or any resulting prejudice.  Fed. R. Evid. 609(a)(2).

  Rule 609 affords broad discretion to a trial judge.  *United States v. Ortiz*, 553 F.2d 782, 784 (2d Cir. 1977).  In making a determination as to what evidence is admissible pursuant to Rule 609, a predominant factor for the court to consider is whether the crime is probative of a witness' lack of veracity.  *Ortiz*, 553 F.2d at 784; *United States v. Feola*, 651 F. Supp. 1068, 1127 (S.D.N.Y. 1987).

**ARGUMENT**

**POINT I**

**PLAINTIFF SHOULD BE PRECLUDED FROM INTRODUCING
EVIDENCE OF THE INDIVIDUAL DEFENDANTS' PERSONNEL FILES
REGARDING CIVILIAN AND OTHER COMPLAINTS MADE
AND/OR DISCIPLINARY ACTION TAKEN AGAINST THEM**

The defendants anticipate that plaintiff's counsel will attempt to introduce evidence involving the defendants' personnel files regarding any civilian and/or other complaints made and/or disciplinary taken against them.   The defendants seek to preclude said evidence since it is irrelevant under Rule 401, 402, and 403 because HARTMANN withdrew his claims pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and unfairly prejudicial to the defendants.  Notwithstanding, HARTMANN can not justify admission of the personnel files under any theory since said evidence is inadmissible under Rule 404(b) to show the defendant's propensity to commit such acts and since such evidence under Rule 608 or Rule 609 is not probative of their truthfulness or untruthfulness.

Here, on September 10, 2007, in a letter to the Court, filed by ECF, HARTMANN withdrew his claims pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).   *See* Docket No. 66.  Moreover, in the Court's decision on the defendants' summary judgment motion, the Court disposed of HARTMANN's claim against the County of Nassau for negligent hiring, retention, training and supervision noting that:

> Plaintiff did not respond to this argument in his papers.  Indeed, by letter dated September 10, 2007, Plaintiff withdrew his Monell claims and the rest of the claims against all defendants except for Officer Snelders and Knatz.   Accordingly, the Court denies as moot defendants' motion to dismiss plaintiff's negligent hiring, retention, training and supervision claim against the defendants.

*See* Docket No. 86; *see also Hartman v. County of Nassau*, 04 CV 1784, 2008 U.S. Dist. LEXIS

34729, at *51 (April 28, 2008).  Since HARTMANN's claims against the County for any alleged violation of his constitutional rights resulting from an alleged municipal policy, practice, and/or custom no longer exist, evidence involving the defendants' personnel files regarding any  civilian and/or complaints made and/or disciplinary taken against them is irrelevant and should be excluded from trial.  *See Swift v. Mauro*, 04-CV-899, 2008 U.S. Dist. LEXIS 52203, (N.D.N.Y. July 7, 2008) (precluding evidence of prior civilian complaints, internal affairs reports, or notices of claims where *Monell*-related claims were dismissed pursuant to stipulation of the parties); *see also Hiep v. Clark*, 90 Civ. 3196, 1995 U.S. Dist. LEXIS 21206, at *4-*5 (S.D.N.Y. Sept. 9, 1996) (allowing prior bad acts evidence for the limited purpose of establishing the municipal claims, permitting the plaintiffs to use that evidence only on the second stage of the bifurcated trial related to such municipal claims).

Moreover, evidence involving the defendants' personnel files regarding any civilian and/or other complaints made and/or disciplinary taken against them is inadmissible under Rule 608 or 609 since such evidence does not bear upon the defendants' veracity.  *See U.S. v. Stone*, 05 CR 401, 2007 U.S. Dist. LEXIS 92093 (E.D.N.Y. Dec. 14, 2007); *U.S. v. Belk*, 01 CR 180, 2002 U.S. Dist. LEXIS 3427 (S.D.N.Y. Mar. 4, 2002).

In *U.S. v. Stone*, 05 CR 401, 2007 U.S. Dist. LEXIS 92093 (E.D.N.Y. Dec. 14, 2007), a criminal case, the government moved to preclude evidence of a pending investigation against a police officer witness for allegations that he abused his authority as well as an off-duty altercation in which he had punched another.  In *Stone*, the Court granted the government's motion to preclude under Federal Rules of Civil Procedure Rules 608(b) and 609.  The *Stone* court found that "neither the substance of the CCRB complaint nor the allegation of assault are probative of truthfulness or untruthfulness."  *Id.* at 2.

8

Likewise, in *U.S. v. Belk*, 01 CR 180, 2002 U.S. Dist. LEXIS 3427 (S.D.N.Y. Mar. 4, 2002), another criminal case, the government moved to preclude evidence of a recently acquired civilian complaint review board complaint against a prosecution witness. The defense argued that the complaint was probative of the police officer's credibility and of his bias "in that [his] desire to curry favor with his employer and avoid an adverse resolution of the charges could motivate him to tailor his trial testimony." *Id.* at *9-*10. The *Belk* court granted the government's *motion in limine* and precluded the evidence because there was no indication that the police officer's testimony would be tainted and the complaint was not probative of his veracity. *Id.* at *11.

Finally, evidence involving the defendants' personnel files regarding any prior civilian complaints made and/or disciplinary against them is inadmissible under Rule 404(b) to show propensity. *See McLeavey v. McMahon*, 55 Fed. Appx. 594 (2d Cir. 2003); *see also Swift v. Mauro*, 04-CV-899, 2008 U.S. Dist. LEXIS 52203 (N.D.N.Y. July 7, 2008).

In *McLeavey v. McMahon*, 55 Fed. Appx. 594 (2d Cir. 2003), a civil rights action analogous to the case at bar, the Plaintiff appealed from trial rulings precluding evidence of a prior excessive use of force allegation against one of the defendants and evidence of another defendant's termination from law enforcement for drug use. The *McLeavey* court upheld the district court's ruling regarding the prior excessive force allegation, finding that the Plaintiff's argument was a "veiled attempt" to admit the evidence under Rule 404(b) to show the defendant's propensity to commit such acts. *Id.* at 595. The *McLeavey* court also upheld the district court's ruling regarding the drug use since it found that the evidence had no relevance to the issues on trial. *Id.*

In *Swift v. Mauro*, 04-CV-899, 2008 U.S. Dist. LEXIS 52203 (N.D.N.Y. July 7, 2008),

another case similar to the instant action, the defendants moved by *motion in limine* to preclude the plaintiff from offering evidence against them regarding prior civilian complaints, internal affairs reports, or notices of claims involving them.   Notably, the defendants conceded that were municipal claims pending, such evidence would be relevant.  *See Swift v. Mauro*, 2008 U.S. Dist. LEXIS 52203, at *2-*3.   The *Swift* court precluded those items of evidence since it found that such items were irrelevant, inappropriate under Rule 404(b) to prove that the defendants acted in conformity therewith, and prejudicial to the defendants under Rule 403.  *Id. at* *3-*7.

In *Hiep v. Clark*, 90 Civ. 3196, 1995 U.S. Dist. LEXIS 21206 (S.D.N.Y. Sept. 9, 1996), another civil rights action, the defendants moved by *motion in limine* to preclude evidence of prior incidents which was being offered for the purpose of demonstrating that the defendants acted in conformity therewith and prior bad acts evidence to show the municipality defendants' unconstitutional custom, practice and policy permitting violations of civilians' civil rights.  *Id.*  at *3.   The *Hiep* court precluded the prior incidents evidence, but allowed the prior bad acts evidence for the limited purpose of establishing the municipal claims, permitting the plaintiffs to use that evidence only on the second stage of the bifurcated trial.  *Id.* at *4-*5.

To that end, evidence involving the defendants' personnel files regarding any civilian and other complaints made and/or disciplinary taken against them is highly and unfairly prejudicial since the Plaintiff would undoubtedly be using such evidence to prove the defendant's propensity.  *See supra, Swift*, 2008 U.S. Dist. LEXIS 52203.

Even under in the "inclusionary" approach used by the Second Circuit, evidence of prior civilian complaints must be relevant for a purpose other than demonstrating the defendant's propensity to commit the act in question, and the probative value of the evidence must outweigh

the danger of unfair prejudice.  *See Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir. 1991)

(citing, *inter alia*, Fed. R. Evid. 403, 404(b)).

Further, to use such evidence to establish a pattern of conduct, "the extrinsic acts must

share 'unusual characteristics' with the act charged or represent a 'unique scheme.'"  *Id.* (finding

no such pattern in "the varied conduct alleged in the prior complaints" against the defendant)

(quoting *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978)).  Indeed, this is a high

standard.  In the context of using prior criminal complaints against a criminal defendant, the

Second Circuit has stated:

> To prove other like crimes by the accused so nearly identical in
> method as to earmark them as the handiwork of the accused. Here
> much more is demanded than the mere repeated commission of
> crimes of the same class, such as repeated burglaries or thefts. The
> device used must be so unusual and distinctive as to be like a
> signature.

*Benedetto*, 571 F.2d at 1249.  Specifically, in *Benedetto*, the claimed "signature" was bribery

through the "passing of folded bills by way of a handshake."  *Id.*  The Court rejected that such

conduct constituted evidence of a "signature" stating:  "that method of bribery is about as unique

as using glassine envelopes to package heroin."  *Id.*  Accordingly, it is clear that there is a high

standard to demonstrate that prior complaints are evidence of a pattern of conduct.

By way of contrast, in *Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990), the Second Circuit

upheld the introduction of evidence of a similar incident committed by the defendant officer in a

1983 action after incident at issue.  *Id.* at 188.  In that case, however, "the complaint arose under

nearly identical circumstances to the incident for which the defendant was then on trial."

*Berkovich*, 922 F.2d at 1023 (citing *Ismail*, 899 F.2d at 188).  Specifically, the defendant officer

had allegedly struck both the plaintiff and the complainant without provocation, attempted to

cover up the assault by falsely claiming that he was responding to an attack on his partner, and

11

brought both the plaintiff and the complainant to the station to be charged with assault.  *See Ismail*, 899 F.2d at 188.  In this case, as there are no prior complaints alleging that Officer Snelders hit the complainant with a car, either intentionally or otherwise, such prior complaints are not admissible to establish a pattern of conduct.

Accordingly, the defendants respectfully request that the Court grant their *motion in limine*, excluding evidence at trial about their personnel files regarding civilian and other complaints made and/or any disciplinary action taken against them.

**POINT II**

**PLAINTIFF SHOULD BE PRECLUDED FROM
OFFERING EXPERT TESTIMONY CONCERNING
THE ALLEGED USE OF EXCESSIVE FORCE
AND ITS JUSTIFICATION BECAUSE SUCH
<u>TESTIMONY INVADES THE PROVINCE OF THE JURY</u>**

It is established in the Second Circuit that the expert testimony that expresses a legal conclusion must be excluded.  *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (citing, *inter alia*, *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988)).  As such, "[w]hereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." *Id.* at 364.

In *Hygh*, an excessive force case brought under 42 U.S.C. § 1983, the plaintiff called an expert concerning the defendant officer's use of force.  *Id.*  The expert ultimately testified that the officer's conduct was "not 'justified under the circumstances,' not 'warranted under the circumstances,' and 'totally improper.'"  *Id.*  This testimony "'merely [told] the jury what result to reach.'"  *Id.* (quoting Fed. R. Evid. 704 advisory committee's notes).  Accordingly, the Second Circuit found that the expert's "testimony regarding the ultimate legal conclusion entrusted to the jury crossed the line and should have been excluded."  *Id.*

Similar to the facts of *Hygh*, plaintiff has disclosed that it intends to call Timothy M. Sheahan as an expert witness concerning SNELDER'S use of force in this case.  Specifically, Mr. Sheahan's report states that he intends to testify as follows:

> When P.O. Snelders used deadly physical force to inflict injuries upon Mr. Hartmann, Snelders created a substantial risk of death, caused protracted and serious disfigurement and cause protracted impairment of health.  He used the ultimate in excessive physical force deadly physical force, in his effort to apprehend Hartmann wanted on misdemeanor charges.  Snelders was not justified in his use of deadly physical force as defined in the Penal Law, State of New York nor were the actions consistent with the Rules and Regulations of the Nassau County Police Department.

*See* Report of Timothy M. Sheahan, dated August 30, 2006, at p.36 (copy annexed as Exhibit B).

This proposed testimony is identical to the testimony that the Second Circuit found should have been excluded in *Hygh* as usurping the function of jury by "merely telling the jury what result to reach."  Such testimony as to the "ultimate legal conclusion entrusted to the jury" should thus be excluded.

## POINT III

### PLAINTIFF SHOULD BE PRECLUDED FROM OFFERING EVIDENCE IN SUPPORT OF THE ALLEGATIONS THAT ANY DEFENDANT ACTED IN A RECKLESS AND GROSSLY NEGLIGENT MANNER

In its April 28, 2008 Memorandum and Order partially granting the defendants' motion for summary judgment (Docket No. 86), the Court, in dismissing plaintiff's negligence claim, specifically held that the "caselaw in this circuit is clear that a negligence claim will not stand where a plaintiff asserts an excessive force claim premised upon a defendant's allegedly intentional conduct."  *Id.* at 29 (citations omitted).  As such, where "defendants have conceded that Officer Snelders' use of deadly force in attempting to apprehend plaintiff was intentional,

13

plaintiff's negligence claim cannot be sustained in this case." *Id.* at 30.

Despite this holding from the Court, plaintiff included in his Second Amended Complaint allegations that SNELDERS operated his vehicle "in a reckless and grossly negligent manner..." and that the "actions of the defendants were reckless, grossly negligent and unwarranted, performed with a conscientious disregard for the safety of others, including the plaintiff herein." Second Amended Complaint (Docket No. 87) ¶¶ 63, 64 at p. 13.

Because these allegations are inconsistent with the holding of this Court in its April 28, 2008 Memorandum and Order, which constitutes law of the case, they are not relevant to plaintiff's actual claims in this case, for excessive use of force under 42 U.S.C. § 1983, and for state law assault and battery. Accordingly, plaintiff should be precluded from offering evidence of allegedly reckless or grossly negligent conduct on the part of the defendants at trial. *See* Fed. R. Evid. 401, 402.

### POINT IV

### PLAINTIFF SHOULD BE PRECLUDED FROM INTRODUCING "COLOR ENHANCED" VERSIONS OF PLAINTIFF'S X-RAYS

On January 12, 2010, Plaintiff's attorney presented to the defendants for the first time proposed trial exhibits consisting of x-rays of HARTMANN's legs that were " color enhanced" to portray a truly gruesome and shocking depiction of the alleged state of HARTMANN's legs following the incident, including the specific inclusion of torn and degloved flesh and blood focused at the fracture points that was not contained in the original x-rays. (Copies annexed as Exhibit C). On January 15, 2010, during a conference call between counsel for defendants and plaintiff's counsel, plaintiff's counsel described the enhancements as a mere "dab of color," which is clearly an extreme understatement of the extent of the augmentation of the x-rays.

Additionally, these proposed exhibits were offered with no supporting information as to how they were created or by whom they were created.  There is no supporting proof that these proposed depictions are accurate and no foundation has been provided to support their admissibility.  *See Moskowitz v. Coscette*, 3 Fed. Appx. 1, 6 (2d Cir. 2001).

Photographs of relevant matters may be admitted as demonstrative evidence of witness testimony only when the testimony authenticates the photograph by stating it is a fair and accurate representation of what the witness observed.  *U.S. v. Valdes*, 417 F.2d 335, 338 (2d Cir. 1969), *cert. denied*, 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1970) (witness who was present when photograph of defendant was taken testified that photograph was fair representation of defendant as he appeared at that time).

In this case, the proposed exhibits, due their "color enhanced" nature are not a "fair and accurate representation" of HARTMANN's x-rays.   For example, it is not medically accurate that blood would only be located at the fracture points.  Therefore, the "color enhanced" x-rays are not admissible.

Moreover, the enhancements added to the x-rays, much more than the purported mere "dab of color," include the gruesome addition of torn flesh, bloody lacerations, tissue and fractured bone, that in addition to being an inaccurate depiction of the Plaintiff's legs, are highly prejudicial and are therefore inadmissible.  *See* Fed. R. Civ. P. 403.

"The decision whether to admit graphic or gruesome pictorial representations of plaintiff's injuries lies within the discretion of the Court."  *Colon v. BIC USA, INC.*, 199 F. Supp. 2d 53, 98-99 (S.D.N.Y. 2001); *See In re Air Crash Disaster at John F. Kennedy Intern. Airport on June 24, 1975.,* 635 F.2d 67, 72-73, 7 Fed. R. Evid. Serv. 21 (2d Cir. 1980); *Martin v. Maintenance Co.,* 588 F.2d 355 (2d Cir.1978); *Whelan v. Penn Central Co.,* 503 F.2d 886 (2d

Cir. 1974).  Relevant photographic evidence may, however, be excluded pursuant to Fed. R. Evid. 403 if its prejudicial effect outweighs its probative value. *Colon,* 199 F. Supp. 2d at 99 (S.D.N.Y. 2001); *See Handbook of Fed. Evid.* § 401.7.  In *Colon*, the photographs were admissible only because the graphic nature of the photographs would have a limited prejudicial effect for they were not introduced during the liability phase of the trial. *Colon,* 199 F. Supp. 2d at 99 (S.D.N.Y. 2001) (citing *Vichare,* 106 F.3d at 466) ("The interests served by bifurcated trials [include the] negation of prejudice.").

In addition, the Court should take into account the potentially misleading nature of the particular chart or diagram.  *In re Air Crash Disaster at John F. Kennedy Intern. Airport on June 24, 1975.*, 635 F.2d 67, 73, 7 Fed. R. Evid. Serv. 21 (2d Cir. 1980) (in airplane accident case, national safety board chart comparing standard "glide slope path" with actual path of aircraft was properly excluded pursuant to Fed. R. Evid. 403 because thickness of lines on chart and times of conversation marked on chart did not match stipulated conversation times, thereby potentially misleading jury); *U.S. v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986), rev'd on other grounds, 853 F.2d 1055 (2d Cir. 1988) (summary charts that are more likely to confuse or mislead jury than to assist it should be excluded under Fed. R. Evid. 403).

Finally, there is the very real danger, especially where the underlying facts are controverted, that its "dramatic and impressive" effect may cause the jury to lose sight of the contested nature of the evidence.  *U.S. v. Ellenbogen*, 365 F.2d 982, 988 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967).

The "color enhanced" x-rays are extremely misleading as to the true facts of the case, especially in light of the lack of foundation as to the accuracy of the enhancements.  In addition, these gruesome pictures can, and likely will, have the effect of causing the jury to be

overwhelmed by the alleged representations, and lose sight of the true issues at the center of the case.  Therefore, the "color enhanced" x-rays are highly prejudicial and should not be admissible in this case.

Finally, defendants are not contesting either plaintiff's traumatic physical injuries or the causal relationship between those injuries and the incident, and have, in fact, offered to stipulate such matters.  *See* Docket No. 117, Proposed Joint Pretrial Order at p.5.  As a result, the proposed "color enhanced" x-rays also constitutes inadmissible "needless presentation of cumulative evidence" under Fed. R. Evid. 403.  *See United States v. Hayutin*, 398 F.2d 944, 949 (2d Cir. 1968) (affirming District Court's refusal to allow cumulative evidence on an uncontested issue because the "proffered testimony in no way contradicted the Government's contentions or Breger's testimony; it was simply cumulative proof on an uncontested matter").

### POINT V

### PLAINTIFF SHOULD BE PRECLUDED FROM INTRODUCING INACCURATE AND <u>CONTESTED ACCIDENT RECONSTRUCTION DRAWINGS</u>

Plaintiff's counsel has also indicated that he intends to introduce exhibits that are drawings of an alleged reconstruction of the path of the police vehicle which struck HARTMANN on March 12, 2004 (copies annexed as Exhibit D).  Defendants were only previously provided with one black and white depiction which showed the alleged trajectory of the police vehicle (Ex D, p. 1).  Plaintiff is now offering as an exhibit a breakdown into individual frames the car's alleged path, which has been placed on a blurry color aerial photograph of the scene and is complete with a bloody body.

"[C]ourts have treated with skepticism evidence that seeks to recreate accidents." *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 278 (1st Cir. 2002) (citing *Swajian v. Gen. Motors Corp.*,

916 F.2d 31, 36 (1st Cir.1990) (upholding exclusion of a videotape test which portrayed the consequences of a car's axle fracturing)).  "When a party introduces evidence that attempts to reconstruct an accident, that party must show a "substantial similarity in circumstances" between the reconstruction and the original accident."  *Id.* (quoting *Fusco v. Gen. Motors Corp.,* 11 F.3d 259, 264 (1st Cir.1993)).

The proposed reconstruction of the police vehicle cannot meet this high standard of proof to show a "substantial similarity in circumstances" between the reconstruction and the original accident.  Firstly, the police vehicle's alleged path has been placed onto on a blurry color aerial photograph that has no date or verification that it is an accurate representation of the scene of the incident.  Additionally, there is no scale to even show that accuracy of the cars on the depiction or reference points.  Finally, as noted above, the addition of the blood spots and cartoon bloody body to the pictures renders these pictures gruesome and prejudicial.   Again, the very real danger, especially where the underlying facts are controverted, that the reconstruction will have a "dramatic and impressive" effect that may cause the jury to lose sight of the contested nature of the evidence, is present with respect to the alleged reconstructions.  *See Ellenbogen*, 365 F.2d at 988.  As a result, the proposed reconstruction drawings are both unreliable and prejudicial, and should be excluded.  *See* Fed. R. Civ. P. 403, 703.

**POINT VI**

**PLAINTIFF SHOULD BE PRECLUDED FROM CALLING
WITNESSES INVOLVED IN THE INVESTIGATION
OF THE INCIDENT AND FROM INTRODUCING
DOCUMENTS RELATED TO THE INVESTIGATION
<u>BECAUSE HIS *MONELL* CLAIMS HAVE BEEN WITHDRAWN</u>**

As noted above, all of plaintiff's *Monell* claims against the municipality have been withdrawn, and the only remaining claims are Federal excessive use of force and state law

assault and battery and the only remaining defendants are the County, SNELDERS and KNATZ. As a result, the subsequent investigation of the incident is not relevant to any of the surviving claims in this case, and none of the witnesses involved in the investigation have any personnel knowledge of what transpired during the incident and events immediately prior to the incident in this case.  *See* Fed. R. Evid. 401, 402, 602.  Moreover, any of the investigators' representations as to what SNELDERS or KNATZ may have told them in the course of their investigation would be inadmissible heresay.  *See* Fed. R. Evid. 802.

## <u>CONCLUSION</u>

For all of the aforementioned reasons, the Court should grant the defendants' *motion in limine* and preclude HARTMANN from introducing at trial:  (1) evidence of their personnel files regarding civilian and other complaints made and/or any disciplinary action taken against them; (2) expert testimony concerning the alleged use of excessive force and its justification; (3) evidence of allegedly reckless or grossly negligent conduct on the part of the defendants; (4) enhanced x-rays as trial exhibits; (5) alleged reconstruction of the trajectory of the police car as trial exhibits; and (6) witnesses involved in the investigation of the incident and from introducing documents related to the investigation.

Dated: Central Islip, New York
      January 17, 2010

By:     /s/ Garrett W. Swenson, Jr.
      Garrett W. Swenson, Jr. (GS-2625)
Attorney for Defendants
76 Bay Road
Brookhaven, New York 11719
Tel.:  (516) 380-2808
Fax: (631) 536-2229
E-mail:  Garrett.Swenson@yahoo.com

On the Brief:

Sondra M. Toscano
Deputy County Attorney
Office of John Ciampoli
Nassau County Attorney
One West Street
Mineola, New York 11501
(516) 571-3066

Jarrett M. Behar (JB-4983)
Sinnreich Kosakoff & Messina LLP
267 Carleton Avenue, Suite 301
Central Islip, New York
(631) 650-1200


To:     Daniel J. Hansen, Esq.
        Attorney for Plaintiff
        711 Third Avenue
        Suite 1505
        New York, New York 10017

# EXHIBIT A

*Daniel J. Hansen*

ATTORNEY AT LAW
_____

WOOLWORTH BUILDING
233 BROADWAY, FIFTH FLOOR
NEW YORK, NY 10279
TEL: (212) 697-3701
FAX: (212) 697-3711

September 10, 2007

Magistrate Judge Cheryl L. Pollack
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    Hartmann v. County of Nassau
                  Docket No.: 04 CV 1784 (ILG) (CLP)

Your Honor:

I represent the plaintiff in the referenced action.

I have reviewed the complaint and the plaintiff agrees to the following:

1.     Withdraw the <u>Monell</u> claims.
2.     Discontinue the action as against the defendants Nassau County Police Department, Deputy Inspector Robert Turk, Lieutenant Thomas Zamojcin, Police Officer "John" Smith, Police Officer "John" Brady, Detective Barry O. Franklin, Police Officer Thomas O. McCaffrey and "John and Jane Does 1-15."

Respectfully,

Daniel J. Hansen (DJH: 0211)

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

THOMAS HARTMAN,

               Plaintiff,

       -against-

THE COUNTY OF NASSAU, NASSAU
COUNTY POLICE DEPARTMENT,
POLICE OFFICER KARL N. SNELDERS,
POLICE OFFICER MICHAEL KNATZ,
DEPUTY INSPECTOR ROBERT TURK,
LIEUTENANT THOMAS ZAMOJCIN,
POLICE OFFICER "JOHN" SMITH,
POLICE OFFICER "JOHN" BRADY,
DETECTIVE BARRY O. FRANKLIN,
POLICE OFFICER THOMAS O. McCAFFREY
and "JOHN and JANE DOES 1-15" representing
as yet unknown and unidentified police officers.

               Defendants.

------------------------------------------------------------------------x

Docket No.: 04 CV 1784 (ILG) (CLP)

**PLAINTIFF'S
EXPERT DISCLOSURE**

       The plaintiff intends to call Timothy M. Sheahan, 14 Warbler Lane, Commack, NY 11725, as

an expert witness at trial.  Mr. Sheahan bills at a rate of $275 per hour but has not yet submitted a bill

for his review, analysis, and report.  Mr. Sheahan's expected fee for trial is $275 per hour, with a total

fee determined after testimony based upon time spent in preparation and at trial.  Annexed hereto is a

report authored and signed by Mr. Sheahan setting forth a statement of the opinions to be expressed and

the basis of the and reasons therefor and the data and the and other information considered by the expert

in forming the opinions as well as a copy of Mr. Sheahan's c.v. listing his qualifications. A listing of

cases in which the expert has testified in the past four years will be provided under separate cover.



DEFENDANT'S
EXHIBIT NO. A
FOR IDENTIFICATION
DATE: 1/5/07  RPTR: 84

Dated:  New York, New York
        September 1, 2006

                                        _____
                                        Daniel J. Hansen (DJH 0211)
                                        Attorney for Plaintiff
                                        233 Broadway, Fifth Floor
                                        New York, NY 10279
                                        (212) 697-3701

To:     Lorna B. Goodman
        Nassau County Attorney
        Attorneys for the Defendants
        One West Street
        Mineola, NY 11501
        (212) 571-6146

## DOCUMENTS

The following are the list of documents reviewed in the case of Thomas Hartmann, Plaintiff against The County of Nassau, the Nassau County Police Department, et al, defendants.

1) **Depositions**
   a)   Thomas Hartmann, dated March 8, 2005
   b)   Thomas Hartmann (50H), dated October 26, 2004

2) **Examination Before Trial**
   a)   Karl Schoepp, dated December 15, 2005
   b)   Jamie Florio, dated September 1, 2005
   c)   George Archer, dated August 29, 2005
   d)   John DeMartinis, dated August 24, 2005
   e)   Barry O. Franklin, dated August 24, 2005
   f)   John Carney, dated July 29, 2005
   g)   Robert Giovannettone, dated July 29, 2005
   h)   Donald Stewart, dated July 22, 2005
   i)   Michael Knatz, dated May 25, 2005
   j)   Robert Turk, dated May 20, 2005
   k)   Karl L. Snelders, dated May 18, 2005

3)   a)   Plaintiff's Expert Disclosure – U.S. District Court, Eastern District of New York, dated November 18, 2005 including preliminary analysis and report by George L. Ruotolo, dated September 21, 2005.
   b)   Defense Expert Richard Hernance, Mathematical Slide Calculation for Side Impact (1 page)
   c)   Plaintiff's Medical Report prepared by Lone Thanning, M.D. dated August 7, 2006 (23 pages)

4)   a)   Defendant's Response to Plaintiff's Discovery Demands – U.S. District Court, Eastern District of New York, dated July 20, 2006 including response documents.
   b)   NCPD Notice of Claim Investigation from CO Legal Bureau to Deputy CO, BSO, dated July 13, 2004 (2 pages)

5) **Witness Statement**
   a)   Jamie Florio, dated March 21, 2004, received on or about August 26, 2005.

6) **NCPD Reports**
   a)   Case Report – PD32SJ -- 204CR0019--2 pg 2 & 3 authored by Sgt. Steward BSO, dated March 12, 2004.

1

    b)     Crime Scene Examination Report incl. Incident/Vehicle Accident Diagram with twenty (20) scene photographs authored and photographed by Det. Giovannettone, CSU, dated March 12, 2004 (11 pages).

    c)     Deadly Physical Force Report, authored by D.I. Robert M. Turk, C.O., BSO, dated March 12, 2004. (5 pages)

7)    **Processing Documents (Nassau County Police Department)**

    a)     Domestic Incident Report #19484 7th Pct. NC, dated 2230 hrs. March 22, 2004. (1 page)

    b)     Teletype Alarm Sheet Det. Div. #7-432-04 other, #204CR19484 authorized by Det. Scalzo, 7th Sqd., dated March 12, 2004.

    c)     Case Report PDCN 32SJ - 204CR0019746 written by 6760SNELD dated 3/12/2004 (pages 3 & 4)

    d)     Case Report PDCN 32SJ.-.204CR0019743 written by 6760SNELD dated 3/12/2004 (page 3)

    e)     Crime Report – PDCN 85ASJ – 204CR0019484 written by 5815 ARCHER, dated March 12, 2004 (pages 1-3)

    f)     Crime Report – PDCN 85ASJ – 204CR0019743 written by 5815ARCHE, dated March 12, 2004 (pages 1-3)

    g)     Crime Report – PDCN 85ASJ – 204CR0019746 written by 5815ARCHE, dated March 12, 2004 (pages1-3)

    h)     NCPD Arrest Report – PDCN 81SJ – 204AR0004356 Hartmann Thomas P Printed 3/13/04 (2 pages)

    i)     PDCN – Serious Incident Time Log Worksheet started by P.O. Talsky sh#3212, dated March 12, 2004 1710 hrs. (start time) (1 page)

    j)     NCPD – HELO 4 report w/log prepared by P.O. Plezia AEMT #058986, dated March 12, 2004 (2 pages)

    k)     NCPD Motor Vehicle Impound Worksheet/Invoice, Impound #4-67-04, dated March 12, 2004 (1 page)

    l)     NCPD Property Receipt – PDCN 41ASJ -- 204AR0004356 Hartmann, Thomas P., not authored or dated (1 page)

    m)    NCPD -- Arrest Transport Slip – not authored or dated (1 page)

    n)     NCPD – Defense Notification – not authored or dated (1 page)

    o)     NYS, DMV Simplified Traffic Information, NCPD #LI683845-1 issued by P.O. Snelders, BSO on March 12, 2004 (1page)

    p)     NCPD MDT Message Log – 1st and 4th Pct. Regarding 3/12/04 (4 pages redacted)

    q)     District Court Information Arrest# 204AR0004356 dated March 12 & 13, 2004, not authored, not signed (4 pages)

          1 – CR#204CR0019484    P.O. Thomas O. McCaffrey
          2 – CR#204CR0019489    Det Barry O. Franklin
          3 – CR#204CR0019743    P.O. Karl A. Snelders
          4 – CR#204CR0019746    P.O. Karl A. Snelders

    r)     Fax documents from 631 547-1390 dated April 21, 2004

02:45 (11 pages)

1 – Dist Ct. Information pgs. 1-4 duplicates of (o) above

2 – Dist Ct. Information Arr#204AR0004356 dated March 13, 2004 not authored, not signed, no CR# for Det. Barry O. Franklin (1 page)

3 – Supporting Depositions of Kim Hartmann, dated March 11, 2004 2340 hrs and March 12, 2004 (no time) (2 pages)

4 – Simplified Traffic Information #LI683845-1 dated March 12, 2004 (1 page)

5 – Herald Newspaper clipping – illegible (2 pages)

6 – Newsday Home Edition pg A21 "Cop in Car Rams Suspect", article dated March 13, 2004 (1 page)

8) **Nassau County Police Academy Lesson Plans**
   a) Arrest Procedures (Module One) 01.428.01 revised October 29, 2001 Recruit (6 pages)
   b) Powers of Arrest – Laws of Arrest – Concepts of Custody 01.325.00 reviewed July 18, 2001 Recruit (27 pages).
   c) Arrest Powers/Laws of Arrest/Concepts of Custody 01.325.01 reviewed July 18, 2001 Recruit (25 pages) (2)
   d) Use of Force, revised August 19, 2001 Recruit/P.O. (10 pages) (2)
   e) Progression of Force – Liability, revised August 15, 2001 Recruit (8 pages).
   f) Vehicle Stops 01.435 00 dated June 2006

9) **Nassau County Police Department In-Service Training Material**
   a) Use of Force #321, October 1998 review, March 2000 revision, January 2001 revision and March 2004 revision (23-25 pages per edition) (2)
   b) Mechanics of Arrest, July 1, 1999 version, January 2001 revision (4 pages ea. edition)
   c) Laws of Arrest Standards of Proof/Arrest Powers #324/325 revised October 2000 (40 pages, even # pgs. only)
   d) Laws of Arrest Standards of Proof/Arrest Powers #324/325 revised October 2000 (40 pages).
   e) Vehicle Stops reviewed and revised June 2006.

10) **Nassau County Police Department Procedure**
   a) Vehicle Pursuit OPS 6460, revisions 0, effective November 1, 1996 (6 pages) (2)
   b) Preliminary Investigation OPS 8105 revision 0 effective October 18, 2004 (3 pages)
   c) Case Reports OPS 8110 revision 1 effective October 18, 2004 (5 pages).
   d) Deadly Force Response (DFR) Team ADM 1221 revision 0 effective September 1, 1996 (6 pages).

3

11)  **Nassau County Police Department Rules**
   a)  Standards of Conduct Rule 16, Use of Force, no date (1 page, page 6 of 6)
   b)  Arrest, Article 17 revisions 0, effective October 30, 1998 (10 pages)
   c)  General Article 6 revisions 3 effective May 17, 2002 (4 pages).

12)  **Nassau County Teletype Alarm Sheet**
   a)  File #3212 CO8, Teletype Order #105,Carotid Restraint Deadly Physical Force, dated May 13, 1987(11 pages).
   b)  File #OCOP 1173 SJR:rba Teletype Order # 106 Complaint Tracking Procedure, dated May 29, 1991 (1 page).
   c)  File #OCOP 1173 DFK:RB:Iv Teletype Order # 47 Complaint Tracking Procedure, dated March 31, 1992 (1 page).

13)  **Nassau County Police Department Legal Bulletin**
   a)  Legal Bulletin #2 dated March 2, 1992 (7 pages).

14)  **Nassau County Police Department Training Bulletin**
   a)  Auto Accident Investigation File 2158 Number 2002-02 dated April 3, 2002 (5 pages).

15)  **Nassau County Police Department News Release**
   a)  Incident: Arrest/aggravated harassment, Location: Oceanside, Date/time: March 12, 2004, 1700, Details by: Inspector Turk BSO 3/13/14 1130/6087

16)  **Nassau County Police Department Communications Division Audio Tape**
   a)  Side 1 – 3/12/04 3247 Brower Ave., Allen Ave. and Fortesque Ave., Oceanside (1) 911 and Radio F6 1655:23 – 1729:00, F5 1655.16 – 1702.30, F7 1654:29 -- 1656:45.
   b)  Con't F7 1657:40 – 1819:05.

17)  **Penal Law of the State of New York**
   a)  Article 35 – Defense of Justification
   b)  Section 120.15 – Menacing, 3rd degree (B Misd)
   c)  Section 205.30 – Resisting Arrest (A Misd)
   d)  Section 240.30 – Aggravated Harassment 2nd degree (A Misd)

18)  **N.Y.S. Vehicle and Traffic Law**
   a) Article 22 – section 600, 601, 603, 603a, 604, 605

19)  **Misc.**
   a)  Herald article, Plaintiff's exhibit 25, dated May 18, 2005 (1 page)

4

b)   Find Law -- U.S. Supreme Court, Tennessee vs. Garner,
471 US 1 (1985) (25 pages)

20)   **Site visits at 454 Allen Avenue** and pursuit route from Brower Avenue,
July 7, 2006, July 13, 2006 and July 20, 2006.

5

## INCIDENT

On March 12, 2004, at approximately 1700 hours, P.O. Karl L. Snelders, serial #6760, and assisted by P.O. Michael Knatz, serial #7003 of the Nassau County Police Department assigned to the Bureau of Special Operations (BSO) Squad B effected the arrest of Thomas P. Hartmann M/W/35 of 96 Central Blvd, Merrick, N.Y. 11566. Thomas P. Hartmann was arrested and charged with Aggravated Harassment 2nd degree, subd 1, (A Misd.), Resisting Arrest (A Misd), Reckless Driving (A Misd.) and Menacing 3rd degree (B Misd.) 2 counts. The arrest was affected on the lawn in front of 454 Allen Avenue, Oceanside, New York under the following circumstances as per the Police reports on the incident and depositions of P.O. Snelders and P.O. Knatz.

The arrest was initiated based on crime report numbers CR0019484 and CR0019743 filed on March 11, 2004, which alleged that Hartmann made telephone threats against the safety and well being of his wife, Kim Hartmann, and did additionally allegedly make threats on the telephone to the Nassau County Police Officers present taking the report. As a direct result of the preceding reports, on March 12, 2004, several officers from the Bureau of Special Operations were assigned to visit and/or surveil locations throughout Nassau County in an effort to locate and apprehend Hartmann. P.O. Snelders and Knatz performing different assignments in the A.M. regarding Hartmann were reassigned in mid afternoon together in BSO/RMP 942 to perform surveillance near 3247 Brower Avenue, Oceanside, N.Y., the home of Hartmann's brother. With P.O. Snelders as the operator, their vehicle was parked approximately 500 feet west of 3247 Brower Avenue on the eastbound side of the roadway. Shortly before 1700 hours, P.O. Snelders observed Hartmann approaching from the west in his 2000 Lexus SUV (Black). As Hartmann passed the RMP, P.O. Snelders applied his seat belt, placed his flashing red light on the vehicle dashboard and pulled from the curb. Hartmann had proceeded to the intersection with East Sunnybrook Drive, turned left, preceded 2-3 car lengths onto the roadway then parked on the right hand side of the street. P.O. Snelders and Knatz followed. P.O. Snelders and Knatz state that Hartmann had exited his vehicle and had proceeded to the rear bumper as they stopped their vehicle 10 feet behind and toward the center of the road behind the SUV. P.O. Snelders and Knatz claim Hartmann at that time placed his right hand in his pants and began to yell threats at them – "they had better shoot him or he would shoot them". P.O. Knatz states that he was halfway in and out of the vehicle with his gun drawn in his right hand advising Hartmann that he was under arrest. P.O. Snelders remained behind the wheel in the vehicle. Hartmann then backpedaled toward the SUV, turned and reentered his vehicle. P.O. Knatz reentered his vehicle, holstered his weapon and P.O. Snelders pulled the RMP alongside Hartmann's vehicle. P.O. Snelders claims he observed Hartmann reaching for something and reversed the RMP. Hartmann then drove away with P.O. Snelders and Knatz in pursuit.

The pursuit proceeded north on Fortesque Avenue to Allen Avenue, a distance of 1.1 miles at speeds up to 60 MPH. The pursuit terminated on Allen Avenue when Hartmann turned right from Fortesque Avenue and stopped his vehicle in front of 454 Allen Avenue facing diagonally toward the curb on the south side of the street (facing

6

southeasterly) and exited the SUV. P.O. Snelders brought the RMP to a stop approximately 25 feet behind the SUV in the center of the roadway and P.O. Knatz exited the RMP with gun drawn anticipating a foot pursuit. Again P.O. Snelders remained in the RMP. Both P.O. Snelders and P.O. Knatz claim at this time, Hartmann began to approach the RMP placing his right hand into his pants, yelling and threatening them. P.O. Knatz moved to the rear of the RMP as Hartmann approached the left front of the RMP and continued to the vehicle operator's door. P.O. Snelders claims to have leaned across the front seat in an effort to reach the OC spray in the passenger door pocket. Meanwhile, P.O. Knatz moved to the left rear of the RMP with gun drawn. At this point, Hartmann began to back away toward his SUV. P.O. Knatz moved to the rear of the SUV as P.O. Snelders proceeded to move the RMP forward toward Hartmann. The police report states the P.O. Snelders fearing Hartmann had a gun and having moved to cover and in a position to fire upon the officers posed an imminent threat of deadly physical force. P.O. Snelders drove the RMP slowly around the front of the SUV then gunned the engine intentionally striking Hartmann. Hartmann upon being struck fell to the ground whereupon P.O. Snelders intentionally continued forward onto the lawn running over Hartmann's legs. P.O. Snelders continued on to the lawn completing a U-turn from the roadway which brought the RMP into a position parallel to the roadway facing west, opposite to its original eastbound direction. P.O. Snelders and P.O. Knatz approached Hartmann, searched him for weapons with negative result then called for medical assistance.

## METHODOLOGY

There is one point of agreement among the individuals of the Nassau County Police Department (NCPD) involved in the incident in question. All agree, including P.O. Karl Snelders, that at approximately 1657 hours, March 12, 2004, P.O. Snelders, while operating RMP 942 did intentionally strike and run over Thomas Hartmann in the vicinity of 454 Allen Avenue, Oceanside, N.Y. The principle question and reason for this report is whether the actions of P.O. Snelders were justifiable under the Penal Law, State of New York and within the guidelines of the rules and regulations of the NCPD. The methodology used to approach this issue was a comprehensive review, collation and analysis of the NCPD reports, arrest documents and court information prepared relative to the events of March 12, 2004. These documents were compared and contrasted with the depositions and related material listed in the Documents section, as well as site visits to Brower Avenue and Sunnybrook Drive, the pursuit route and Allen Avenue – all in Oceanside, N.Y. The objective was to determine if the findings of Deputy Inspector Robert Turk in his Deadly Physical Force report, that the actions of P.O. Snelders were justified under the Penal Law, State of New York and the NCPD rules and regulations in his use of deadly physical force, were supported by the documents provided.

8

## DOCUMENT REVIEW, COLLATION AND COMPARISONS

The integrity and value of the conclusions of an investigation rest upon its objectivity, thoroughness and documentation of details. The reports regarding events on March 12, 2004 involving Thomas Hartmann have been reviewed, collated and analyzed, revealing discrepancies, inconsistencies and/or omitted details among the reports, corresponding documents and related depositions provided. These items are all listed in the Documents section of this report. The ability to perform an analysis of the qualitative and quantitative compliance of P.O. Snelders and the related reports and documents to the administrative, operational, procedural and tactical requirements of the NCPD is limited by the documents provided through the County Attorney. Upon receipt of additional requested documents, a supplemental report can be prepared to further analyze compliance. The following analysis of documents is presented in sequential order of preparation in relation to events of 3/12/04.

1)   Case Report PDCN32SJ 204CR0019--2 Pursuant Report written by 5912STEWA on 3/12/04

Sgt. Donald Stewart, BSO squad A Supervisor, based solely on his conferral with P.O. Snelders and P.O. Knatz did write the Pursuit Report on the evening of 3/12/04 at the 7th Precinct, identified as Plaintiff's Exhibit 30, dated 5/18/05. Sgt. Stewart, who is not familiar with Oceanside, and had never been on Allen Avenue, responded to the scene at 1840 hours and departed at 1900 hrs. on the evening of 3/12/04. He states that he did not see the officers (Snelders and Knatz) at the scene although they are logged there from 1658 to 1948 hours. Sgt. Stewart stated that the first time he saw the officers was at the 7th Precinct. At that time, he interviewed them separately and typed up his report in a computer terminal in WORD. Sgt. Stewart states he read the report back to the officers and that it contained all the information about what happened, (13:9-16:13) and that neither officer suggested any changes. He called this single draft into case offense without review or saving the original draft. When finished, he advised D.I. Turk that the pursuit report was completed. P.O. Snelders, at first stated, that he did not speak to Sgt. Stewart at anytime that he could recall. He later stated Sgt. Stewart was not present at the scene but he did recall providing information to Sgt. Stewart regarding the incident at the 7th Precinct.. P.O. Snelders, then later stated, he does not remember talking with Sgt. Stewart.

The report itself contains a number of omissions, contradictions and inconsistencies when compared to P.O. Snelders, P.O. Knatz, Det. Archer and Thomas Hartmann's depositions, as well as, the Crime Report narratives prepared by Det. Archer. Thomas Hartmann (Hartmann) states that there was no confrontation with the police on Sunnybrook Drive. He observed the police across the street as he was getting out of his vehicle. He had opened the door to his SUV, stepped out and had not closed the door behind him. He observed the police on Brower Avenue turning left on to Sunnybrook Drive, got back in his vehicle and drove off. He states that he did not have any

conversation with the police nor did he make any threats. He never observed police officers getting out of their vehicle.

Sgt. Stewart's pursuit report which he affirmed at his deposition was accurate and Det. Archer's Crime Report narratives make no reference to the RMP having pulled parallel to the SUV following Hartmann's alleged threats and his re-entry into his SUV. Just as Sgt. Stewart had, Det Archer based his report on interviews with Snelders and Knatz.

Officer Knatz stated he first observed Hartmann standing in the roadway on Sunnybrook Drive at the rear bumper of his SUV. Knatz partially exited the passenger side of the RMP (one foot out – one foot in) with his weapon in his right hand*. Hartmann stood at the rear of his SUV with his right hand in his waistband shouting threats. Hartmann then returned to the driver's side door of his SUV and re-entered the vehicle. Knatz got back in the RMP and reholstered his weapon believing Hartmann was going to drive away. Where upon P.O. Snelders, the vehicle operator, slowly pulled up parallel to the SUV. The RMP and SUV were very tight. So close, that Knatz could not open his door to get out. Knatz's window was down and Hartmann's was up. Knatz looked up to the right but could not see Hartmann through his open window. The SUV was higher and Knatz did not have a good angle because the vehicles were extremely tight. Knatz could see nothing of Hartmann or his body. Knatz had no idea what Hartmann was doing, although Snelders said Hartmann was reaching for something.. Snelders backed up the RMP to the rear of the SUV. Hartmann then drove off.

P.O. Snelders account varies on some details from Knatz. Snelders first observed Hartmann's SUV traveling eastbound on Brower Avenue, where he was parked. When the SUV was a hundred or more feet past his parked location he then pulled from the curb. Before pulling from the curb, he first put the red light on the dashboard, put on his seat belt and Knatz advised Communication Bureau that they had the vehicle. Snelders proceeded to the first left hand turn (Sunnybrook Drive) and observed Hartmann exiting his vehicle as he turned onto Sunnybrook Drive. He proceeded slowly forward from the corner and stopped in the middle of the roadway ten (10) feet behind Hartmann's parked SUV. Snelders account of Hartmann's movements, threats and return to the SUV are consistent with Knatz. Snelders states that after Hartmann was seated in his SUV, he pulled the RMP alongside the SUV to try to cut off Hartmann's escape. Snelders estimates that he stopped the RMP with about 4 to 5 feet between the vehicles. Snelders also claims he was wearing his seat belt while Knatz was seated to his right in the passenger seat. Leaning across from this position he states was able to look to his right through the passenger side window - not the windshield – and, despite his poor visibility and partially obstructed view, Snelders indicates he was able to observe what Hartmann was doing (something Knatz in the passenger seat was unable to accomplish). Snelders claims he observed Hartmann's right shoulder through the passenger side window and that Hartmann was reaching under his seat. Snelders backed up the RMP and stopped when RMP front end was at the SUV rear bumper. Hartmann then drove away in his SUV.

Sgt. Stewart's report reflects that the pursuit lasted five (5) minutes and covered

1.1 miles. Pursuit speeds reached approximately 60 MPH*. The pursuit was initiated by an unmarked vehicle in a residential neighborhood (on Brower Avenue, Fortesque Avenue and Foxhurst Avenue) during a time that there is a high potential for roadways to have pedestrians (including a school) and vehicular traffic. Contrary to Sgt. Stewart's report Detective Archer states it was a low speed chase, not high speed. The conflicting reports reflect the inconsistency of time, distance and speeds reported.

2)   Crime Scene Report consisting of the Scene Examination Report, Incident Vehicle Accident report and Photographs (20) prepared by Det. Robert Giovannettone, Crime Scene Search Section NCPD.

Det Giovannettone was present at the scene on Allen Avenue from 1810 hours until 1905 hrs on March 12, 2004. In his deposition, he states that he spoke to both Snelders and Knatz at the scene, but he identifies Snelders as the only source of information for the crime scene sketch*. This point was also noted on the Scene Examination Report. Det. Giovannettone does not recall speaking to any other officer on the scene nor did he speak with other detectives from the 7th squad or any other squad.

Det. Giovannettone has received no specific training in accident or incident reconstruction*. He stated the purpose of crime scene investigation is the documenting of the scene with photographs and depending on the situation, to locate and recover physical evidence*. His goal was to strictly document what he physically saw and memorialize it in a diagram and photographs and recover physical evidence*. It is not the crime scene detective's job to draw conclusions as to how things happened. The point of impact noted on the sketch was identified by Snelders.

In that the incident was called in as an auto accident, that is how he handled it. Det. Giovannettone destroyed the initial paperwork which he states is customary in non-criminal cases. He also stated, he was not aware that criminal charges emanated from this incident although he had marked Menacing as the incident type on the sketch. He found no blood or auto parts in the roadway but failed to note vehicle skid marks visible in a photograph. He did not examine the entire crime scene area for evidence, etc., just the roadway in proximity to the path of the vehicle. The path of the vehicle was not established by Det. Giovannettone. He did not identify the rub-off on the passenger side rocker panel under both doors of the RMP in his report; nor did he include the tree located between the roadway and sidewalk planted in the grass strip west of the driveway at 454 Allen Avenue on his sketch.

It would appear based upon NCPD Training Bulletin Auto Accident Investigation 2158 that more duties and responsibilities are placed on the average patrol officer than the Crime Scene detective. According to Det. Giovannettone CS, the purpose of crime scene is to strictly document what you see, not to draw conclusions as to how things happened, whereas a patrol officer's responsibility at

11

an accident scene is to determine the cause(s) of an accident. The officer is not merely a report taker. He should consider whether the statements made are consistent with physical damages...Determine the point of impact...Examine damage to the vehicle, length and direction of skid marks. All the responsibilities left unattended by the crime scene investigator and everyone else from the NCPD in a position of responsibility, the evening of 3/12. In addition, detectives are required to respond if any person is considered likely to die or an accident or involves serious physical injury and there are criminal charges. Both of these conditions existed at the scene on Allen Avenue.

...The bulletin goes on to say that witnesses should be separated, identified and encouraged to remain at the scene. Snelders and Knatz were obviously identified and did remain at the scene but they were not separated. In fact, they remained together at the scene for about three (3) hours, traveled back to the Precinct together and essentially remained together throughout the arrest processing procedure at the 7th Precinct.

Snelders did not complete an MV104 although he acknowledged when there is a car crash (RMP), normally there is an accident report. It is a supervisory responsibility and should be done for any accident involving injury. There were at least three (3) supervisors from BSO and one (1) uniform sergeant from the 4th Precinct at the scene and four (4) supervisors from BSO, two (2) supervisors from the 7th squad and one (1) from the 7th Precinct* present at the 7th Precinct on the evening of 3/12/04 eliminating the unavailability of supervisory manpower as a reason for not preparing the MV104. Although it is customary in most Police Departments to complete an MV104 for an accident/incident involving an RMP, it would appear from the documents provided that none of the supervisors present saw a duty, responsibility or need to complete one. According to D. I. Turk a report was prepared for Fleet Services Bureau regarding damages to the vehicle. That report was not furnished with documents.

Inconsistencies and omissions abound in the various accounts of the events on Allen Avenue. Hartmann's version is the most abbreviated. He states he went toward the front of his SUV when he exited the SUV. He "observed one guy opened the door and was getting out or the passenger" (side of the RMP) as he got out of the SUV to run". He was running because he did not want to be arrested. He never ran toward the RMP on Allen Avenue. While running away from the street and toward the house* facing south, he was struck by the passenger side of the RMP and fell to the ground of the sidewalk grass area. He was hit in the back of his legs, the lower part. Instantly, after being struck the car rolled over his legs (back of legs). He was not dragged, not elevated, nor was he projected. He had fallen on his right side. He believed it was only about five (5) seconds from the time he exited his auto until the first impact.

Sgt. Stewart's pursuit report indicates Snelders drove his RMP approximately ten (10') feet (from original stopped position) hitting Hartmann,

12

knocking him to the ground causing leg injuries. This would place the point of impact in the middle of the roadway fifteen (15) feet to the rear of Hartmann's SUV.

In his deposition, Snelders states, as he was turning onto Allen Avenue, he first saw Hartmann on Allen Avenue outside his SUV by the driver's side door. The SUV door was closed. When Snelders stopped the RMP to the left and behind the SUV, Knatz exited the RMP, closing the door behind him. After Knatz exited, Hartmann ran toward the front of the car and around to the driver's side window. Hartmann was 2-3 feet away when he put his hand in his waistband. Snelders further claimed when Hartmann reached the window, Hartmann said, "you better shoot me, before I shoot you". Snelders leaned toward the passenger seat, put his hands up, ducking down and reaching over to the side panel where he kept mace. Hartmann then retreated at a quick pace, not running but walking fast back toward his car. As Hartmann was almost by the driver's side of his car, Snelders put the RMP in drive and very slowly crept forward. Hartmann continued forward around the front of his vehicle still facing away from Snelders. When Hartmann reached the front of his vehicle, he turned semi-facing Snelders. When Hartmann turned his hands were out of his pants and they were empty. By the time Hartmann had moved five to ten feet in front of the SUV, Snelders had moved the RMP forward to a position turning on an angle toward the SUV. The RMP was now pointing toward Hartmann who was less than ten (10) feet away. Hartmann semi-crouched, bent over a little again, placed his hand in his waistband as Snelders was turning the RMP toward the SUV. Hartmann began to back up a little bit and started to pull his hand out of his pants. Snelders "gunned the engine and cut the wheel to the right hitting Hartmann with the front right quarter panel of the car, right about at the curb line". Hartmann went right down when he was struck. Snelders estimates he was traveling between five (5) to eight (8) MPH when he struck Hartmann. Snelders continued onto the lawn in front of 454 Allen Avenue to a position parallel with the house facing west. Snelders had traveled approximately 90 feet around the SUV from the point at which he had originally stopped, almost completing an arc of 150 degree direction change. After coming to a stop and exiting the RMP, Snelders upon observing Knatz a few feet from Hartmann, who was lying semi on his right side, requested an ambulance respond forthwith. Before leaving Allen Avenue, Snelders spoke with Det. Giovannettone from Crime Scene. Snelders states that "we went over the area of what happened and that's how we came up with the diagram". Snelders assisted with measurement to show where each thing was. During his deposition, Snelders first indicated that the Marker 1, designating the point of impact should be closer to the curb, but subsequently stated when asked, about the point of impact, responded "I don't know where it was".

In his deposition Knatz, states that the RMP was stopped more than a car length behind the SUV on Allen Avenue. When the RMP stopped, Knatz unbuckled his seat belt, exited the vehicle, unholstered his weapon and moved behind the SUV. He first saw Hartmann on Allen Avenue outside his vehicle

13

standing in the middle of the roadway. The driver's side door of Hartmann's vehicle was open. Hartmann was just there in the middle of the roadway. Knatz did not know where he came from. Knatz had a repeated verbal exchange during which Hartmann placed his right hand in his pants saying "Just shoot me". Hartmann then moved to the driver's side of the RMP. Knatz moved from passenger side of the RMP around the back of the RMP to the rear of the driver's side. Knatz "never totally lost sight of Hartmann" and "had a clear shot" while Hartmann was at the driver's side window and he was positioned at the rear driver's side of the RMP. Hartmann backed up to the middle of the road with his hand still in his pants where he continued yelling at us to shoot him. Knatz moved to his right to the middle of the roadway and behind the SUV for cover and concealment. He could no longer see Hartmann. After stating that he next observed Hartmann lying on the grass/sidewalk area already struck by the RMP, he later states he saw Hartmann and the RMP at the same time as it crossed in front of him by the sidewalk. He then goes on to say that he saw Hartmann first and then the RMP but did not see the RMP hit Hartmann and also that he saw Hartmann lying in the grass area and the RMP passed behind him. When Knatz did approach Hartmann lying on the grass, he was on his right side. When the crime scene detective arrived, Knatz spoke to him in general about what had happened. He did not provide specific information. He did not assist with marker placement or measurements as had Snelders.

In his deposition Det. Archer states that he interviewed both Snelders and Knatz at the 7th Precinct on the evening of March 12, 2004. They both advised him that Hartmann after exiting his SUV and approaching them went back to his car on Allen Avenue to retrieve something. Neither Snelders nor Knatz knew if he removed anything. After returning to his car he approached them again. Snelders also told him that when Hartmann placed his hand in his pants, he (Hartmann) was turning away from Snelders before Snelders struck him.

Jamie Florio, the witness, in her deposition states while in her room, on the second floor of her residence, she first heard cars screeching and went to the front window where there was nothing blocking her view of Allen Avenue. She observed both vehicles being driven. She thinks she observed the RMP hit the SUV before they got out. The RMP tried to pull in front of the SUV. After exiting his SUV, she places Hartmann between the RMP and SUV as he was running around. She states in her NCPD supporting deposition that she saw Hartmann (blue sweatshirt) yelling, waving his arms and pointing at Knatz (grey sweatshirt). Knatz (grey sweatshirt) then ran behind the police car and Hartmann (*blue sweatshirt*) ran after him. Hartmann then went back to the front of the Lexus. The RMP then moved in the direction of the front of the SUV. The RMP went over the curb before striking Hartmann. She saw Hartmann get hit in the legs by the RMP on the lawn. Hartmann fell when struck and the RMP continued onto the grass of the house across the street (454 Allen Avenue).

14

Sgt. Carney, BSO, B squad supervisor, upon his arrival at the scene as the ambulance was leaving was advised by Snelders, that Hartmann was on the street next to the curb when struck by the RMP he was operating. Hartmann had a seriously injured leg.

Mr. George Ruotolo the Plaintiff's expert reconstruction witness, asserts that the point of impact (POI) reported by the police evidence technician is inconsistent with the description of the location of Hartmann given by Snelders and Knatz. Among several opinions and conclusions offered by Mr. Ruotolo are:

1.   That the placement of the POI as defined by the police in the photographs, diagrams and measurements is speculative, unsubstantiated and not supported by any physical evidence.

4a.   The most likely placement of impact and the only placement that can be determined based on the physical evidence is at or near the curb or sidewalk on the south side of Allen.

5.   That while no accurate speed can be determined..., 5 to 8 MPH is an unreasonably low estimate. A speed range of 13 to 17 MPH is a more reasonable estimate.

These opinions are supported by mathematical impact calculations provided by Richard Hernance, the Defense reconstruction witness. The calculation for the impact at the minimum speed of 5 MPH would result in a movement of .23 ft while at 16 MPH the movement would be 2.3 ft. The range of movements between .23 and 2.3 feet would still place Hartmann on the sidewalk based upon the location he came to rest after the impact. Their opinions are supportive of the statements of Ms. Florio, the witness and Hartmann as to the point of impact.

The Serious Incident Time Log Worksheet which is intended to record everybody present at the scene is defective in that at least three 1st Precinct units placed themselves at the scene and an additional seven (7) units not listed indicated they were responding.

The Arrest Report (204AROOD4356) list clothing (black slacks, black long sleeve collarless shirt, black suit jacket) totally inconsistent with any description given by Snelders, Knatz Florio and Hartmann.

3)   NCPD Case Reports – PDCN 32SJ-204CR019746 and 19743; Crime Report – PDCN 85ASJ-204CR19482, 19743 and 19746; Arrest Report – PDCN 81SJ-204AR0004356 Hartmann Thomas P; District Court-Information, Arrest# 204AR0004356, CR# 204CR0019743 and 19746.

Snelders and Knatz state, they did not do any paperwork (65:11, 122:2-3) regarding incidents reported on March 12, 2004. Det. Franklin, 7th Sqd., the Detective assigned this case for 3/11 and 3/12, states he never spoke to Snelders

15

and only briefly to Knatz. He claims he did not handle all aspects of the case. He kept the original case from 3/11 and aided in the arrest process with Det. Archer on 3/12. His role is undefined in that he was not involved in the canvass, did not interview witnesses and did not undertake any investigation. Det. Franklin did call Det. Sgt. DeMartinis, 7th Squad supervisor, at home on 3/12. Franklin advised Sgt. DeMartinis that Hartmann had been apprehended and felt the Sergeant should return to work. Sgt. DeMartinis's understanding of why he should return to work was that there "were complications surrounding the arrest". Sgt. DeMartinis responded back to the 7th Squad (not to scene) where Detectives Archer, Albano and Franklin were present. Sgt. DeMartinis supervised the detectives processing the arrest. Contrary to Franklin's position, the sergeant states that Franklin was in charge of the investigation, it was his responsibility and Det. Archer was his partner. As Franklin's partner, Det. Archer assisted with the paperwork consisting of the criminal report, crime report and court information. He interviewed both Snelders and Knatz. Snelders provided the information to prepare (police) reports. They both provided the information for the Court Information. No changes were recommended by either after review. Although Franklin was responsible for both cases (3/11 and 3/12), Archer prepared the reports because Franklin was busy doing something else.

Although Snelders claims he did not prepare any paperwork, NCPD Case Reports (PDCN 32SJ) 204CR0019746 and 19743, both indicate that the narratives for each was prepared by Snelders based on the heading – Preliminary written by 6760SNELD on 3/12/04. Snelders then acknowledges that he did prepare the narrative and call in to case offense Case Report 19743. Initially, he also indicated that he prepared the narrative for 19746 first stating, "I probably dictated it to …" then, "(I) didn't even prepare it….actually I don't remember dictating the narrative either even though it said I did it". He "didn't know who did prepare it or where the information came from". Snelders was signed on the computer and offers that "with our computer system, if I sign on the computer and somebody else types, it will put my name up there as a narrative, but I didn't type the narrative".

Sgt. Stewart upon review of Case Report 19743 (Exhibit 29) and 19746 (Exhibit. 28) credits Snelders with having written both narratives based on the heading -. Written by 6760SNELD. He stated there are rules against calling in under another serial number that are taken very seriously. You are not allowed to use another person's serial number or code to use computers….You cannot use someone else's serial number to call in…..you call in on your number.

D.I. Turk claims that "no other officer can log in or prepare documents or make entries in Snelders name…". Officers are logged by serial number. To log in under someone else's serial number is just not done

Det. Archer who prepared the criminal reports, crime report and court information does not know who prepared case reports 19746 and 19743.

Both case reports contain the same vehicle and location errors – RMP 921 should be 942 and Sunnyside Avenue should be Sunnybrook Drive. As confirmation that he had not written case report 19746, Snelders says he never would have written "about Knatz was pointing his firearm… or yelling to him let me see your hands" because "I didn't see that". Interestingly, the report says "put up your hands" but Knatz in his deposition states he told Hartman "let me see your hands". Further, the description of Snelders striking and running over Hartmann is cryptic at best.

It should also be noted that Det. Franklin, who stated he was not the case detective, had the cases assigned to the 7th Squad, from the 4th Precinct, wrote the DD narrative and signed off on both case reports on 3/13/04.

NCPD Crime Reports (PDCN 85ASJ) 204CR00019484, 19743 and 19746 all contain the same narrative reports written by Det. Archer. The report narratives were based on interviews conducted with Snelders and Knatz. There is no mention of the RMP pulling alongside the SUV on Sunnybrook Drive or the activities that took place at that time. Archer reports that Knatz had to restrain from firing his weapon because of his partner and the vehicle. Knatz has stated that he never lost sight of Hartmann and when Snelders was threatened at the driver's side window of the RMP, he (Knatz) had a clear shot. Archer does not report Hartmann retreating as reported by Snelders and Knatz. Archer does not indicate as reported by Snelders and Knatz that Hartmann had retreated at least 35 feet from the stopped RMP before Snelders moved it forward, intentionally closing the distance. As stated before, the description given on the reports is cryptic and inaccurate at best versus the accounts given by Snelders and Knatz.

On Crime Reports 19743 and 19746, the listing of persons canvassed does not indicate by whom, when or the result. Det. Archer and Albino, 7th Squad, although directed by Det. Sgt. DeMartinis to go back to the scene and canvass for witnesses on the evening of 3/12/04, did not conduct a canvass until the next day. They conducted a canvass the next day going door to door to find witnesses. They learned of a possible witness to the incident and provided the information to Det. Franklin, 7th Squad. No report was prepared. Det. Franklin did not interview witness. There is no indication of any results of the canvass conducted by the 4th Precinct Sergeant and police officers nor if any actions were taken by 4th Precinct detectives who responded to the scene on 3/12/04. There is also no mention on the Crime Reports of the results of the search at the scene, the pursuit route and Brower Avenue conducted by officers from BSO for a weapon under the direction of Sgt. Carney, BSO. Information on the safeguarding of the scene, canvass being conducted and current search for the weapon or gun being conducted was communicated to Lt. Mulrain, BSO Deputy C.O., by Sgt. Carney upon the Lieutenant's arrival at the scene. The search for the weapon was negative. Search of Hartmann's SUV by BSO and/or CS was also negative.

17

Under testimonials, on all three Crime Reports, 19484, 19743 and 19746, Det. Albino is listed as having conducted canvasses at both places of incident. The places are not identified and there are three incident locations. Det. Archer is listed as having conducted canvasses at scene. Scene is not identified. He reinterviewed complainant at her house but there is no indication that a report reflecting the contents of that reinterview was made. Det. Franklin is listed as having interviewed the complainant. There is no indication of a report reflecting that interview. In his deposition, Franklin states he processed paperwork for the arrest. Det. Archer claims he handled arrest paperwork because Franklin was busy. Franklin says he was not involved in the canvas, did not interview witnesses and did not undertake an investigation. He has stated that he did not talk to Snelders and only briefly to Knatz*. The Crime Reports indicate he interviewed both officers involved.

The NCPD Arrest Report (PDCN 81SJ) 204AR0004356 Hartmann Thomas P lists his clothing as black shoes, black slacks, black long sleeve collarless shirt, black suit jacket. This is totally inconsistent with clothing description provided by Snelders, Knatz, Hartman, himself and Ms. Florio. There is also a serious question of the validity of some of the charges which will be addressed later.

The District Court Information for CR#19746 indicated defendant (Hartmann) yelled at officers…and kept walking toward your deponent (Snelders)…Your deponent (Snelders) at this time had to use RMP 921 to terminate the defendants (Hartmann) approach by hitting him with his car. Beside the obvious, that the wrong RMP(921vs942) was identified again, there are no statements directly from Snelders or Knatz, nor attributed to them by others, that has Hartmann approaching the RMP when Snelders struck him and ran him over.

NCPD procedures require that a complete and thorough investigation be conducted. Information should be recorded on PDCN32, Case Report Worksheet, whenever possible. All victims, witnesses and potential offenders should be identified separated and controlled. A canvass should be conducted if the incident involves a serious offense…or other serious incident. It is noted that it is important to the follow-up investigation to conduct a complete and thorough canvass. Any location that may contain persons with knowledge will be canvassed, even if the results are "no one present at location or negative results". This raises a serious question regarding the adequacy of the canvass in which only eight (8) residences at both locations were canvassed while the residence of the original location of assignment, 3247 Brower Avenue, and the residence of the 911caller were not. In addition, case report procedures require the maintenance of a comprehensive reporting system that provides a record of actions taken by Department members in response to requests for service or self initiated actions. There is also a note that police officers should type case report details directly into SWIFT Justice (the NCPD electronic database system) for arrests. It would appear that none of the arrest processing documents listed above comply with any

18

of these procedures. What must be determined is if the rules and regulations of the Department apply to BSO and Detective Squads. Do they have their own set of rules and regulations?

4)     Deadly Physical Force Report – Department Procedure ADM 1221 written by Deputy Inspector Robert M. Turk Dated March 12, 2004.

D. I. Turk responded directly to the 7th Precinct and never went to the scene*. He relied upon his interviews of Snelders and Knatz and conversations with others who had also received their information from Snelders and Knatz to construct the details of his report on the events involving Hartmann on the evening of 3/12/04. The stage was set for these events based on a telephone conversation between Det. Sgt. DeMartinis, 7th Squad and Sgt. Carney, BSO, at approximately 1600 hrs. 3/12/04. Sgt. DeMartinis requested that three (3) locations be kept under surveillance for Hartmann, one of which was 3247 Brower Avenue. Sgt. DeMartinis was advised by a very reliable source that Hartmann would be at the Brower Avenue address between 1700 and 1800 hrs. This was communicated to Sgt. Carney, who then allocated three (3) BSO officers to the two alternative locations and Snelders and Knatz to Brower Avenue. This was done despite the fact that Sgt. DeMartinis had advised that the subject should be considered armed and dangerous based on background and current information. Members of BSO had been made aware of this background information throughout the day.

Turk goes on to describe the events on Sunnyside Dr. in which he states the RMP "turned on to Sunnyside Drive, where they rolled down their passenger side window and Knatz (in the passenger seat) identified himself as a police officer and advised subject (Hartmann) to stop – that he was under arrest. The subject looked right at the officers who had their shields displayed and reached into his waistband while yelling…".Snelders reported that their windows were down before turning onto Sunnyside Drive, that Knatz stepped out of the vehicle (more out than in) with his gun drawn, and challenged Hartmann before Hartmann placed his hand in his pants. Although Knatz claimed he was displaying his shield, Snelders stated he was not*.

Turk reported that after stopping the RMP on Allen Avenue "Officer Knatz observed the subject's driver's side door open, and he exited the RMP 942 expecting to have to go into foot pursuit of the subject. However, the subject exited the SUV and instead of running away from the officers, ran towards them reaching into his waistband while screaming... Officer Knatz drew his weapon and was positioned on the passenger side of 942 as the subject approached the driver's side door of the RMP…Officer Snelders.. believing he was about to be shot by the assailant, raised his left hand over his head in a protective maneuver and attempted to duck across the front seat….Officer Knatz, also fearing the subject was about to shoot Officer Snelders, yelled at the subject to put up his

19

hands and ordered the subject to show his hands. Officer Knatz was unable to shoot the subject because the car and Officer Snelders were in his line of fire". Turk commends Knatz for his tremendous amount of restraint in this setting.

Snelders and Knatz, on the other hand,  both report seeing Hartmann for the first time on Allen Avenue in the roadway, not as he was exiting the vehicle. Neither Snelders nor Knatz saw Hartmann come to a stop on Allen Avenue. Snelders placed the driver's side door of the SUV as open while Knatz said it was closed. Knatz has Hartmann placing his hand in his waistband in the roadway while Snelders says it happened 2 or 3 feet from the driver's side window of the RMP. Knatz reports he had his weapon drawn immediately after exiting the RMP and had it pointed at Hartmann in the middle of the roadway during their verbal exchange. Knatz reports that as Hartmann moved toward the RMP driver's side, he retreated to the rear then the left rear side of the RMP. He never lost sight of Hartmann and at the rear of the RMP had a clear shot but did not fire. Snelders leaned across "toward the passenger seat reaching over to the side panel (passenger door) where I kept the mace and I was reaching for it".

Turk goes on to describe that Hartmann "then started to back pedal away back toward his SUV, repeatedly continuing to reach in his waistband and yelling at the officers. As he reached the SUV (approx. 25 feet from RMP) Officer Snelders started to inch up in RMP 942 as Officer Knatz approached the rear of the SUV on foot. When the subject reached the front of the SUV, he crouched down slightly as he reached deeper into his pants. Officer Snelders believed the subject, now that he was in a position of cover, was now engaged in a last ditch attempt to retrieve the firearm which he had been shouting about. Officer Snelders believed that when the subject came up from his semi-crouch, he would begin firing on the officers. As P.O. Snelders maneuvered RMP 942 around the front of the SUV...the subject started to come out of his crouch with his hand still in his waistband. Officer Snelders, fearing for his life and safety of his partner, struck the subject with RMP 942...".

Knatz reports that Hartmann backed away from the RMP to the center of the roadway with his hand in his pants. Knatz moved from behind the RMP to behind the SUV and could no longer see Hartmann. Snelders reports that Hartmann moved away from the RMP, not running but walking fast toward his SUV. Hartmann had his back to the RMP. Snelders could not see his right or left hand. Hartmann moved toward the driver's side door of the SUV then to the front of the SUV. When he turned his hands were out and empty. Hartmann was almost at the SUV driver's door when Snelders put the RMP in gear and began to inch forward. Turk in his deposition stated Snelders continued to move his RMP forward to attempt to pull in front of subject's vehicle because he believed that Hartmann was going to get back in his vehicle and attempt to flee the scene again. He was concerned with Hartmann's flight. Snelders had just started turning the RMP toward the SUV when Hartmann put his hands in his pants. Hartmann placed his hands in his pants when he was stopped in front of the SUV, semi

facing the RMP. Hartmann didn't say anything as he stood five (5) to ten (10) feet in front of the SUV. Snelders was about ten (10) feet away from Hartmann at this time. Hartmann was in the open directly in front of the RMP. As Hartmann started to back up a little and pull his hand out of his pants, Snelders "gunned the engine and cut the wheel to the right..., striking Hartmann with the right front quarter panel of the car".

Turk places the RMP in the roadway approximately seven (7) feet from the south curb and traveling at approximately 5 to 8 MPH when Snelders struck Hartmann. The RMP comes to rest approximately thirteen feet onto the lawn in front of 454 Allen Avenue. Snelders states the point of impact (POI) is near the curb line while the CS detective shows it based on Snelders assistance, at a point approximately seven (7) feet (north) of the south curb, the same location identified by Turk. This is an interesting coincidence in that Turk did not speak to the Crime Scene detective on the evening of 3/12/04. Plaintiff's expert, Mr. Ruotolo, places the POI at or near the curb or sidewalk. Based on the Defendant's expert, Richard Hernance's impact calculations, the POI at 5-8 MPH would be on the sidewalk and grass area in front of 454 Allen Avenue. This is the same site where blood was identified in the Crime Scene photographs. Even allowing for the greater speed estimate of 13 to 17 MPH suggested by Mr. Ruotolo, and taking into account Mr. Richard Hernance's impact calculations, the POI would only be 2.3 feet away on the north side of the sidewalk. Either of the latter locations, the south side of the sidewalk by the lawn or the north side of the sidewalk by the grass strip would be supported by Ms. Florio's statement that the "RMP went over the curb before striking Hartmann". Using the crime scene diagram measurements, the RMP is not thirteen feet onto the lawn at 454 Allen Avenue. Based on the measurements recorded it would actually be thirteen (13) feet west and twenty three (23) feet south of the POI in the roadway identified by Snelders to Det Giovannettone on the evening of 3/12/04 at the scene.

No BSO Communication records were kept regarding notifications* or BSO officer assignments pertaining to this incident. There is no documentation of any officers activity regarding this incident except the arrest report/forms and summons generated as a direct result of the incident. Turk took no written or recorded statement from either Snelders or Knatz. Turk did not interview any other individuals prior to completing the DPF report on. Turk showed the report to Snelders to make sure it was comprehensive and conclusive because it was important "...to have sequential what happened, what time period and what the actions of each person was". Snelders was free to advise if anything was inaccurate. Turk doesn't recall any changes and believes the report was completed in one draft*. Turk determined based on the interviews of Snelders and Knatz at the 7th Precinct and the first hand observations of Lt. Mulrain that Snelders was legally justified in his use of force.

> 5)  Police Department – County of Nassau
>     Supporting Deposition – Jamie Florio
>     dated  3/21/04 1807 hours taken by

Det. Sgt. John DeMartinis 7th Sqd.

Ms. Florio, who resides at 445 Allen Avenue, Oceanside, N.Y., witnessed events that took place on March 12, 2004 at approximately 1458 hours in front of 454 Allen Avenue, Oceanside, N.Y. Her residence is located diagonally across the street and she observed the events from her second floor window which provided an unobstructed view. The supporting deposition was taken on 3/21/04 although the police were aware on 3/12/04 that she had witnessed the event. Ms. Florio states that the Nassau County Police Department was aware that she had been a witness to the incident on Allen Avenue and was home around 20 to 30 minutes after the incident. Although there is no record of a canvass by the 4th Precinct Sergeant and police officers, Sgt. Carney BSO reported that on his arrival at the scene at 1711 hours, the canvass was already being conducted by them*. Lt. Mulrain, BSO, was advised of this upon his arrival at 1740 hours. Snelders acknowledges that he was aware that when he was there (at scene) they did a canvass. "I know they talked to someone there… (Allen Avenue). "I know they talked to a woman…" and Jamie Florio is listed under persons canvassed on Case Report 19746. There is no indication if she was interviewed or by whom or if there was a statement.

Det. Archer and Det. Albano, 7th Sqd, were directed by Det. Sgt. DeMartinis, 7th Sqd., to go back to the scene and conduct a canvass on the evening of 3/12/04. They did not return to conduct a canvas until the next day. The next day following the canvass, Det. Archer advised Det. Franklin, 7th Sqd. (case detective) and Sgt. DeMartinis about a witness who was not at home at the time – Jamie Florio. Det. Franklin did not follow-up. Lt. Schoepp, 7th Sqd. Commanding Officer and Det. Sgt. DeMartinis were both present and had spoken to each other at the 7th Sqd. on the night of 3/12/04. They both should have been aware of the witness at that time. Not until 3/21/04 did Lt. Schoepp, direct Det Sgt. DeMartinis to return with Det. Sgt. Palmer, 7th Sqd., to interview Jamie Florio at her residence. The Sergeants inspected Ms. Florio's bedroom, she described what had happened, and then they took a written statement. Ms. Florio told Sgt. DeMartinis what she remembered and he wrote it as she spoke. There was only one draft. Sgt. DeMartinis took what he describes as a thorough and comprehensive statement. He had no questions after she gave the statement. Although Sgt. DeMartinis had completed his interview with Ms. Florio, had interviewed Snelders on 3/12, to the day of his deposition (Aug 24, 2005), he was not aware of the location where Hartmann was struck. Lacking this fundamental but critical piece of information, he certainly could not determine if Ms. Florio had a clear line of sight. It would have been a challenge to ask intelligent questions. If this is an indication of his preparation for an interview, it is no wonder that he did not ask any questions.

Det. Franklin states he didn't review the Florio statement because the menacing charge was being handled by Det. Archer. In fact, the supporting deposition (witness statement) was not placed in his case file. Lt. Schoepp had

determined that the Florio witness statement had nothing in it involved in the criminal case and sent it to D.I. Turk as part of his deadly physical force investigation. The Lieutenant, determined that the statement "did not support or dissuade -- had no bearing on the charges".

Although, the Lieutenant sent the deposition to Turk, he did not send it to the DA because "it did not support or detract from the criminal charges. (He) determined it would be used as part or the physical force investigation". The decision was made despite the fact that the statement clearly impacted on the menacing charges (criminal). The case report number links the supporting deposition to the case report and crime report on Hartmann drawn on 3/12/04. Because Schoepp did not provide any other instructions beyond sending the witness statement to D.I. Turk, the end result was that there was no follow up or documentation of the statement. It was not put in the detective's case file nor was it forwarded to the DA. The original document, for no explainable reason, traveled to the 1st precinct with Det. Sgt. Palmer when he was transferred.

Sgt. DeMartinis believes a supporting deposition should be kept as part of the detective's case file. His explanation as to why Florio's supporting deposition was not included in the case file or sent to the DA was that Lt. Schoepp decided it was too vague. It did not support the menacing charge. "Her words (Ms. Florio) were just yelling, no articulation as to what transpired, because she did not identify who was who, since everybody was in plain clothes, since she could not tell who was a police officer or not, I believe that was part of the reason why". The statement was not included in the case file and consequently it was not sent to the DA. Det. Franklin it appears concurs with Sgt. DeMartinis. He would turn over all statements, whether they help or hurt. Failure to do so would result in discipline. His opinion is supported by D.I. Turk who believes it would be Lt. Schoepp's responsibility to present the whole package to the DA.. Curiously, following 3/12/04, Sgt. DeMartinis, 7th Sqd. Supervisor, did not receive an update or status from Detective Franklin or Detective Archer regarding the case. Sgt DeMartinis could not offer a plausible explanation as to why Sgt. Palmer retained the original statement and took it with him when he was transferred to the 1st Precinct.

D. I. Turk received a fax copy of the witness statement following the canvass. He did not make any changes to his DPF report after his review of the statement. He found it to be consistent with the statements of Snelders and Knatz. His determination that the content of Ms. Florio's statement is consistent with the statements of Snelders and Knatz is as arbitrary, uninformed and a reflection of poor judgment as the statement and actions of Lt. Schoepp.

With little or no difficulty both Hartmann and Knatz are easily distinguishable through their clothing description. Although Ms. Florio could not discern the words being exchanged, she was quite capable of observing the activity on the street. In some ways not being able to identify who is the police officer, etc. adds to the objectivity of the witness. The events she described

clearly contradict the statements of Snelders and Knatz. Hartmann is described as waving his arms not putting his hands in his pants. She describes Hartmann chasing Knatz as opposed to approaching Snelders side of the RMP. She has Hartmann falling after being struck with no indication that he was propelled, thrown or dragged which would possibly distort the point of impact. Her testimony disclosed other information that should have been obtained when she was initially interviewed. She saw the incident from the onset on Allen Avenue when both vehicles were moving. The RMP went over the curb before striking Hartmann. She saw Hartmann get hit by the car on the lawn. Perhaps with a more timely and thorough interview more detail would have been forthcoming.

NCPD Procedures require a canvass be conducted if the incident involves a serious offense…or other serious incident. "It is important to the follow-up investigation to conduct a complete and thorough canvass. Any location that may contain persons with knowledge will be canvassed, even if the results are no present at location or negative results. The policy of the Police Department is to maintain a comprehensive reporting system that provides a record of action taken by Department members in response for request for service or self-initiated actions.

6)    Nassau County Police Department Communications
       Bureau tape for 3/12/04 – 3247 Brower Avenue,
       Allen Avenue & Fortesque Avenue, Oceanside
       (1) 911 and RADIO F6 1655:23 – 1729:00, F5 1655:16
       1702:30, F71654:29 – 1656:45, 1657:40 – 1819:05

The tape covers transmissions on three frequencies used by police personnel involved in the incident culminating in the use of deadly physical force by P.O. Snelders NCPD BSO against Thomas P. Hartmann in the vicinity of 454 Allen Avenue, Oceanside, New York. Based on a review of the tapes and cross referencing activity communicated on each frequency, a time line can be established.

| | | |
|---|---|---|
| (A) Hartmann SUV first observed | 1654:29 | |
| (B) Pursuit begun | 1655:06 | :37 sec. |
| (C) Pursuit ended | 1656:35 | 1:29 sec. |
| (D) Ambulance requested-Hartmann in custody | 1657:04 | :29 sec. |
| Elapsed time | | 2:35 sec. |

The time line established through the use of these communication tapes from the NCPD creates a challenge to the credibility of Snelders and Knatz's account of actions taken by them and Hartmann on both Sunnybrook Drive and Allen Avenue (see page 29-30 for details of Snelders and Knatz accounts). The time established when a unit requested an ambulance and advised Hartmann was in custody obviously was after Hartmann had been struck and run over. This would further reduce the time involved in this segment of the event. The elapsed time and time Hartmann was struck would be reduced by an additional 10 seconds if the 911 call were used in place of the request for an ambulance (19 seconds and

24

2:25 seconds, respectively).  The time frames more readily support the accounts offered by Ms. Florio in her statement and Hartmann in his deposition.  The extent of the activities that each depicted are far more likely to have occurred within the time line.

## SUMMARY

Throughout the review of the documents provided, it became evident that during the investigation of this event members of the Nassau County Police Department consistently failed to "maintain a comprehensive reporting system that provides a record of actions taken by Department members…".

o   There is no documentation presented to support the content of any report or document beyond the instrument itself.

o   There is no documentation regarding communication, notification, assignment or police activities at BSO, the 7th Precinct or the 7th Precinct Squad. There is no way to verify the exchange of information or the content of information allegedly communicated.

o   The reports prepared (pursuit, crime scene and DPF) are documentation of the statements and interviews of Snelders and/or Knatz. To call these reports an investigation would be a misnomer.

o   These same reports contain numerous inconsistencies and contradictions with the statements of Snelders and Knatz, even though, just as with the court deposition, the pursuit report and DPF reports were reviewed by Snelders and/or Knatz for accuracy and completeness There were no suggestion for changes. The Crime Scene report with its deficiencies was constructed with the cooperation, assistance and information provided by Snelders.

o   All the arrest processing documents (case report, arrest report and court information) were prepared based on interviews with Snelders and/or Knatz. Each report contains errors and omissions. They all lack thorough, detailed preparation.

Apparently, not the slightest effort was made to cross reference any of these documents to assess the continuity of what was being reported and to uncover inconsistencies which might require more effort to address.

Snelders is an experienced member of NCPD (20 years) and BSO (13 years), upon whom Detective and BSO supervisors, as well as, 7th Precinct detectives, relied on for information regarding events of 3/12/04. However the following, should be noted.

o   He makes about 100 arrests per year, does not maintain any notes on his activities and relies on his "pretty good memory" for to recall details not contained in official Department reports.

o   When questioned at his deposition, Snelders could not recall documents or their contents that he had reviewed only two days prior.

o   He states he has the ability and experience to judge speed, distance and time, however, when questioned on these factors he repeatedly could not or would, or maybe would not because he could not, give or estimate times, distances or speed even when they were relative to his own actions.

o   Snelders doesn't know if he would or would not advise of an inaccuracy in a report. " not unless it was blatantly out and out something totally

26

wrong". He has a total lack of concern for verification of reports, report detail and accuracy, or correcting report errors.

There appears to be a complete lack of objectivity, thoroughness and attention to detail on the part of BSO supervisors and 7th Precinct detectives and their supervisors with regard to creating comprehensive and accurate reports.. They all relied on an officer whose recall and attention to detail are inconsistent and unreliable, at best.

Objectivity, diligence and thoroughness are the benchmarks of an executive investigation. The quality of the information sought and obtained guides the path to appropriate and accurate conclusions.

- o D. I. Turk did not respond to the scene, although ample time and opportunity were present. He relied upon a subordinate to assume his responsibility*.
- o The majority of document compiled for review and evaluation of Snelders actions preceded the event. Turk is not aware if Sgt. Stewart was at the scene, although he directed the Sergeant to prepare the pursuit report. Turk never saw the pursuit report before his deposition on 5/20/05. Turk was advised that the pursuit report was completed the evening of 3/12/04, he did not review it.
- o There was no apparent cross referencing of the reports and documents, specifically related to the event of 3/12/04, to establish continuity or conflict with accounts reported by Snelders and Knatz to various BSO and Detective Supervisors and detectives.
- o Turk relied on the crime scene sketch to support the statements of Snelders and Knatz. He apparently misread CS sketch upon which he placed such faith. His distance placement of Snelders vehicle at rest after the incident appears to be wrong. Turk never spoke to the Crime Scene detective.
- o There is no indication that anyone attempted to interview Hartmann or, if not, why not.
- o Turk failed to access available information such as communication transmissions which would have provided a time line of events. There is no indication he sought information through 911 calls. There is no indication that he attempted to pursue either avenue for information.
- o Snelders spoke by telephone with Lt. Mulrain who was at BSO headquarters.. Snelders explained what happened and Mulrain did not ask any questions.. Turk reported that the Lt. Mulrain spoke to Snelders at the scene but Snelders reported that he didn't speak to anyone else from BSO at the scene. Snelders only recalls speaking to a 4th Precinct sergeant and the CS detective. There is no indication that Snelders spoke to Lt. Mulrain at any other time the evening of 3/12/04.
- o Turk was unaware of who provided information to the NCPD Public Information Office for their news release. The document attributes details contained in the release to D.I. Turk. There are details contained in the release that are not part of his DPF report but are contained in his deposition.

27

o   Turk dismissed the Florio statement as being consistent with the statement of Snelders and Knatz. It did not warrant further review of the actions of Snelders and Knatz. There is no indication of a supplemental report documenting that decision and explaining his rational for the decision. There appears to be no overhead command review of his decision. Actually, there is no evidence of any conferral with an overhead command. The criteria for this decision are certainly not supported by the content of the supporting deposition. The decision could be judged as both arbitrary and autonomous.

At best, this was a poorly conducted investigation. It certainly does not appear to follow Turk's objective of a "comprehensive and conclusive report.

Essential to accomplishing a thorough, comprehensive and valid investigation is the need for a diligent and coordinated effort by the detective squad.

o   Det. Lt. Schoepp, CO, 7th Squad arbitrarily made decisions beyond the scope of his authority by insuring that an eye witness's statement directly related to the case was kept out of the detective case folder* and was not forwarded to the DA.

o   Det. Lt. Schoepp was remiss in not insuring a timelier interview of the witness. He was present on the night of the incident and presumably, if D.I. Turk was aware that the canvass had identified a witness, he should have been aware as well. In addition, he had interviewed Snelders who was aware of the witness.

o   D. I. Turk and Det. Sgt. DeMartinis both express the belief that the supporting deposition belonged in the case file.

o   Det. Franklin, the case detective, who was a new detective was well aware that all statements should be turned over whether they help or hurt and that failure to do so would result in discipline.

o   Det. Sgt. DeMartinis who supervised the detectives processing the arrest, places the responsibility as case detective on Det. Franklin*. Det. Archer, Det. Franklin's partner, placed responsibility for the case with Det. Franklin. Det. Franklin who was not involved in the canvass did not interview witnesses (incl. Snelders) and did not undertake any investigation. He asserts the case was being handled by Det. Archer.

o   After the evening of 3/12/04, Det. Sgt. DeMartinis, the supervisor of Detectives Franklin and Archer, did not receive an update or status report from either detective regarding this case.

o   On the evening of 3/12/04, Det. Sgt. DeMartinis directed Det. Archer and Det. Albano to go back out to the scene and conduct a canvass for witnesses. Det. Archer and Det. Albano failed to do so but did conduct a canvass the next day. There does not appear to be a report for the canvass.

o   Snelders reports that on 3/12, no one from the 7th Precinct or the 7th Precinct Sqd. responded to the scene which is supported by a review of the Serious Incident Time Log Worksheet.

28

Organizationally, the 7th Squad appears in disarray. Detectives do not follow directions, supervisors do not follow up and leadership acts contrary to standards understood and appreciated by subordinates. The inconsistencies, omission and contradictions evident in the investigation and document preparation are a direct result.

The witness statement of Ms. Florio was essentially dismissed as irrelevant, although it contained statements contradicting those of Snelders and Knatz and challenging the justification of the use of DPF and the charge of menacing.

o Det. Lt. Schoepp determined., unilaterally, that the statement didn't support or dissuade – had no bearing on charges against Hartmann. The Florio statement was not part of the criminal investigation it was part of the physical force investigation and sent it to D.I. Turk as part of his investigation. He gave "no other instructions for the distribution of the statement". He was aware it was not put in Det. Franklin's case file.

o D. I. Turk did not make any changes after his review – somehow he determined it was consistent with the statements of Snelders and Knatz..

o Det. Sgt. DeMartinis reported that it was the decision of Lt. Schoepp not to send the statement to the DA. because it was too vague even though he believes that supporting depositions should be kept as part of the detectives case file.

o Det. Franklin did not review the statement but would turn over all statements whether they help or hurt. Failure to do so would result in discipline.

o Det. Sgt. Palmer 7th Squad, who was present at the interview and subsequent discussions with Lt. Schoepp for some unexplained reason, retained possession of the original supporting deposition and had it with him at the 1st Precinct where he had been transferred

The evaluation and handling of case documents challenges the notion of preparing comprehensive and conclusive reports as put forth by D. I. Turk. To the contrary, this is exemplary of the unprofessional manner in which the administrative and investigatory process was followed throughout the handling of the events involving Hartmann on 3/12/04.

Security is the cornerstone in maintaining document integrity. Authorization codes identify, limit and memorialize access to electronic data systems. The same would apply to a telephone reporting system, but both are compromised by unsecured access codes.

o Snelders had a very conflicting account as to who provided and input the information into the SWIFT Justice system for Case Report #19743 and 19746. After a number of variations, he finally settled on having called in 19743 but denied having entered or called 19746 into the system*.

o Snelders contented that while he was signed into the system someone else must have typed in the information under his log on. He had no idea who could have done it.

29

- o  Knatz did not prepare any paperwork, Franklin did not handle the case and Archer doesn't know who prepared the case report narratives for 19743 and 19746.
- o  Sgt. Stewart reports that only the officer who is identified on the report can call it in. Other officers are not allowed to use another's serial number. There are rules against doing so that are taken very seriously. Stewart identified both 19743 and 19746 as being written by Snelders.
- o  Turk states that another officer could not prepare a document with Snelders serial number. It is just not done. Turk believes that Snelders authored 19743 and 19746 based on identity provided on the document.

The security protocol sounds more like an honor system than a security procedure. Based on Snelders denial the flaws are readily apparent. Anyone would be able to obtain someone else's access code by reviewing previously generated documents which readily identify the code. It would appear, based on preceding statements that the code is a permanently assigned serial number and the first five (5) letters of the last name. Alternatively, someone can apparently make an entry under someone else's identification if that person is signed onto the system. If either or both of these are an accurate assessment, then the system relied upon to maintain the integrity of document collection and storage is exceedingly vulnerable to unauthorized access and utilization.

"A police officer…in the course of effecting or attempting to effect an arrest…or in self defense or to defend a third person…"may use deadly physical force "if necessary to defend the police officer…or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force". The level of threat perceived by the NCPD and Snelders and Knatz is questionable by their actions.

- o  Even though information obtained from reliable sources indicated that Hartmann would be at the location, only two members of BSO were assigned to Brower Avenue, while three (3) members were assigned to each of two other alternate sites.
- o  Snelders and Knatz limited their response options by leaving OC and batons in inaccessible locations, although they had ample time before Hartmann's arrival to properly access and secure the equipment.
- o  Snelders did not perceive any threat as they approached Hartmann on Sunnybrook Drive.
- o  Knatz, at both locations believed Hartmann's objective was to flee as they approached, which is exactly what Hartmann stated were his intentions.
- o  Knatz, at both locations had his weapon drawn and aimed at Hartmann but was not sufficiently fearful enough for his safety or Snelders to discharge his weapon. Not even when Hartmann was allegedly threatening Snelders by the driver's side window of the RMP on Allen Avenue, where he had a "clear shot".
- o  Snelders did not react to Hartmann's alleged threats on Sunnybrook Drive nor initially on Allen Avenue when he displayed the same conduct that prompted him to run him over.

    o  Snelders stated that there was no threat to Knatz on Allen Avenue when Hartmann had moved to the front of his SUV.

Any action involving the use of DPF by Snelders was not to protect a third party (Knatz). Hartman continually exhibited intentions of flight, even as Snelders drove the RMP at him, at a minimum it is acknowledged, "he was backing away".

The following is a capsulated listing of the activities on Brower Avenue/Sunnybrook Drive and subsequently on Allen Avenue as presented by Snelders and Knatz.

Based on a review of F5, F6 and F7 tapes, the elapsed time between a transmission stating the vehicle is pulling up to the house on Brower to the point that a pursuit ensues was thirty seven (37) seconds.

Brower Avenue/Sunnyside Drive

- RMP pulls from curb on Brower after Snelders fastened seat belt and placed red light on dash and traveled 300 ft to Sunnybrook Drive.
- Made left on to Sunnybrook then proceeded at slow speed to a stop, 10 ft. behind SUV.
- Knatz exits RMP halfway, draws weapon and challenges Hartmann who is at the rear bumper of his SUV
- Verbal exchange between Knatz and Hartmann, then Hartmann returns to and reenters his SUV, after opening and closing door. Knatz reenters the RMP.
- After Hartman entered the SUV, Snelders pulled the RMP forward alongside the SUV.
- When the RMP was parallel to the SUV, Snelders leaned across the front seat of his vehicle and claims he observed Hartmann reaching for something.
- Snelders then reversed the RMP to the rear of the SUV.
- SUV did not drive off until the RMP had stopped behind it.

Based on a review of F5, F6, and F7 tapes the elapsed time between transmissions stating that Hartmann bailed out of his vehicle on Allen Avenue and a request for an ambulance was thirty (30) seconds.

Allen Avenue

- Enter Allen Avenue after SUV has stopped. RMP travels slowly in center of roadway and stops 25 ft. behind the SUV.
- After RMP stops, Knatz unbuckles his seat belt, exits the RMP, closes the door, unholstered

his revolver, positions himself by the passenger side door and points his weapon at Hartmann.

- Knatz and Hartmann, again, have a confrontational verbal exchange.
- Hartmann then moves approximately 35 ft. to the RMP driver's side door where he threatens Snelders.
- Hartmann then retreats 35 ft. to the door of the SUV, then to the front of the SUV, then an additional 5 to 10 ft. into the roadway in front of the SUV.

31

- Snelders begins to move the RMP slowly forward when Hartmann had reached the SUV door – rate of speed less than one (1) MPH from his stopped location to a position perpendicular to the front of the SUV.
- Snelders then "gunned the engine", crossed the curb, struck Hartmann and proceeded approximately 30-40 ft. across the lawn.
- Snelders unbuckled his seat belt, exited the RMP, moved to the front of the RMP and calls for an ambulance.

Establishing a time line provides an orderly context in which to view events. It sets boundaries and limitations. It allows for evaluation of activities reported within a recorded time line. The time line can resolve issues of feasibility or raise concern if an incompatible time-activity picture is presented. The plausibility of Snelders and Knatz having completed the series of activities recorded within the respective time frame is highly improbable. Additionally, the accounts provided by Ms. Florio and Hartmann with respect to the Allen Avenue incident fit far more readily into the time line. As well, Hartmann's account of activity at Sunnybrook Drive location is far more compatible than that of Snelders and Knatz. A proper and thorough investigation instead of a simple documentation of events on 3/12/04, would have disclosed these time line dilemmas and should have resulted in an alternative conclusion through a proper investigation.

Crucial to this investigation, although never addressed in any report documents, was the position Hartmann occupied after being struck and run over as well as determining a point of impact (POI).

- Hartmann was on his right side lying partially on the sidewalk and partially on the lawn (not the median between the curb and sidewalk). This was confirmed by Snelders and Knatz, and the location is supported by Crime Scene photographs.
- There are no claims that he was propelled, projected or dragged after having been struck. This is also supported by Snelders, Knatz, Hartmann and Florio's statements.
- Plaintiff's reconstruction expert estimates impact speed between 13 to 17 MPH. Defense reconstruction expert calculates the result of impact at 16 MPH to be 2.3feet. Plaintiff's medical expert report, based on the nature of the injury and agreement with estimates of 15MPH impact speed, agrees that a pedestrian (Hartmann) would be pushed slightly forward and to the right side of the vehicle.
- Snelders, Florio and Hartmann, agree that when he (Hartmann) was struck, he fell down immediately. Based on the nature of his injuries and Knatz's statements, he did not move after striking the ground.
- Hartmann contends that he had his back to the RMP and was running away when struck which is consistent with the Plaintiff's medical expert opinion.

From the foregoing, it is evident that Snelders account can not and should not have been relied upon as accurate. It would appear that the POI was at or near

32

the location on the sidewalk/lawn area in CS photograph 19 and he was struck from the rear or left rear side as he was running away from Snelders in the RMP.

Adherence to rules and regulations is the backbone of any police organization.   Without compliance to them , discipline and the successful accomplishment of the Department's mission cannot be attained.  The following were reviewed for compliance with performance guideline documents provided, regarding procedural, administrative and tactical requirements applicable to NCPD members of the force (MOF).

Veh. Stops

- o   RMP position -- pull behind vehicle <u>NEVER ALONGSIDE</u>.
- o   Prior to stop -- notify CB location, etc..
- o   Request appropriate assistance and direct them to where you want them to respond.
- o   All officers should use available cover.
- o   Use PA system, if available, to give clear controlled commands.

Veh. Pursuits

- o   Policy...minimize risk of pursuits by limiting vehicle pursuits to only those situations where the escape of the suspect poses a greater risk of harm to the general public than does the pursuit itself.
- o   Pursuit alternatives -- obtain an arrest warrant if the subject is known to the Police Officer or it is likely the subject can be identified.
- o   Pursuit conditions -- excessive vehicular or pedestrian traffic, and the police vehicle is unmarked are primary consideration before initiating a pursuit.
- o   Commanding Officer -- endorses the pursuit case report by indicating that either (a) no further review is necessary or (b) further review is pending.

Auto Accident Investigation

- o   Detective response necessary (when) any aided person has died or is likely to die as a result of the auto accident...and there are criminal charges.
- o   It is essential that...witnesses be separated, identified and encouraged to remain at the scene.
- o   ...officer is not merely a report taken; rather he/she is conducting an investigation...all available information evaluated to determine contributing factors.
- o   Consider whether the statements made are consistent with physical damage.  Determine the point of original contact.
- o   <u>Preliminary Investigation</u>
- o   ...conduct a complete and thorough preliminary investigation aimed at resolving a specific situation or apprehending those responsible.
- o   Prepare PDCN Form 32, Case Report Worksheet, whenever possible.
- o   ...separate all victims, witnesses and potential offenders.
- o   PDCN Form 32B, Supporting Deposition should be taken from people with knowledge of the situation.
- o   It is important to the follow-up investigation to conduct a complete and thorough canvass.  Any location that may contain persons with knowledge

33

will be canvassed. The results of the canvass will be included in the case report, even if the results are no one present at the location or negative results.

Case Reports
- o Ensure a preliminary investigation has been completed and the Case Report Criteria have been met.
- o Ensure all relevant information is collected for a complete case report*.
- o Police officers should type the case report details directly into SWIFT Justice for arrests.

Department Rules
- o Members of the Force (MOF) - Lts., Sgts., P.O.s) who regularly perform patrol duty…will maintain a memorandum book.
- o MOF maintaining a memorandum book will enter a full and accurate record of duty performed all activities of his duties, all relevant occurrences and any action taken.

Use of Force
- o P.O.'s have a sworn duty to safeguard the rights of the individual. This duty prohibits officers from abridging the rights of a person even under the most stressful and dangerous conditions. Therefore, the use of force must be REASONABLE, NECESSARY as it relates to the circumstances, and LAWFUL..
- o Tactical problems -- Time -…often less than three (3) seconds to make a decision, Distance -- often opponent is extremely close…rarely more than 20 feet away. Stress -- officer's state of excitement, stressful environment, contribute to the difficulty of the situation. Margin for error -- society imposes little room for error in cases where deadly physical force is used.
- o There is a progression of force available to police officers including the use of mace/OC spray and impact weapons before the last resort of DPF.
- o Tactics -- many times Police Officers use poor tactical judgment in handling a situation and this contributes to the need for the use of physical force.

Force
- o The responsibility to make proper decisions is an ever present reality and is not lessened by the fact that the officer must make these decisions under the worst of circumstances.
- o …the vast majority of Police Officers rely primarily, if not exclusively, on the SELF-DEFENSE rules in making their decisions regarding the use of DPF.

Arrests
- o The arresting officer will prepare a crime report…for all arrests made for felonies, misdemeanors and violations.
- o Completed arrest file will contain Supporting Depositions (PDCN Form 32B.

DPF Team

  o DPF Team will respond to the scene and ascertain the facts regarding the incident.

  On the presumption that the foregoing Rules and Regulations are applicable to BSO and the Detective Squad, and contrasting the actions and omissions by NCPD personnel, one must conclude that the investigation of the actions of P.O.s Snelders and Knatz was conducted haphazardly, without adherence to procedures and regulations (procedural, operational, administrative and tactical) and completely lacked supervision.

  The reports and documents generated by NCPD personnel are inconsistent and contradictory. As a result, they are defective and unreliable. The conclusions drawn by D.I. Turk and Sgt. Stewart that the officers Snelders and/or Knatz actions were in compliance and appropriate within Department guidelines are also defective and unreliable.

35

## CONCLUSION

The foregoing poses a challenge to the findings in D. I. Turk's DPF report. D.I. Turk is absolutely correct in his deposition when he "categorizes the force used by Snelders as deadly physical force. He also agrees it would not be proper to use DPF if a subject is fleeing from the police. And it would not be proper to strike a subject from the rear who is running from a patrol vehicle. To do either, would violate Tennessee vs. Garner, as well as, NCPD policies and rules. Had D.I. Turk met his own standards of preparing a comprehensive and conclusive report, and applied his demonstrated knowledge, he would have had to draw a very different conclusion on the actions of Snelders.

The statements of Ms. Florio and Mr. Hartmann, the former dismissed and the latter never sought, add to conflicts and inconsistencies among and between the various versions of the event reported by and attributed to P. O. Snelders during his confrontation with Hartmann. Ms. Florio's statement contradicts the alleged threats to P.O. Snelders by Hartmann at the driver's side window of the RMP and in the roadway before Snelders struck and ran over Hartmann. Hartmann claims he was attempting to run away toward the house (454 Allen Avenue) when he was struck from behind by the RMP. The findings of Dr. Thanning support Hartmann's account based on an in depth evaluation of his injuries. Viewing the account presented by Snelders in a context of time – the maximum elapsed time challenges his credibility. There is no evidence, including his own actions other than his own statements, which support his claim that he was in fear of imminent use of deadly force against him. To the contrary, Florio's statements discredit the menacing and Dr. Thanning conclusively supports Hartmann's contention that he was running away and was struck from the rear or left side.

Regardless of the accuracy of Hartmann's prior history, or the veracity of the alleged aggressive and furtive movements and verbal threats, the missing element for justification for the use of deadly physical force is the use or imminent use of deadly force against Snelders or a third party by Hartmann. When Snelders used his RMP to strike and run over Hartmann, no weapon was ever displayed nor was one ever recovered. Furthermore, Hartmann was retreating across the sidewalk with his back or left side facing the RMP. This would be supported by the statements of P.O.s Snelders and Knatz who observed Hartmann immediately afterwards lying on his right side, a position consistent with being struck from the left side facing forward. According to Snelders, his partner Knatz was not threatened by Hartmann. When P.O. Snelders used deadly physical force to inflict injuries upon Mr. Hartmann, Snelders created a substantial risk of death, caused protracted and serious disfigurement and caused protracted impairment of health. He used the ultimate in excessive physical force deadly physical force, in his effort to apprehend Hartmann wanted on misdemeanor charges Snelders was not justified in his use of deadly physical force as defined in the Penal Law, State of New York nor were the actions consistent with the Rules and Regulations of the Nassau County Police Department

*Timothy M. Sheehan*

Sworn to before me this
30th day of August, 2006

*[signature]*
Notary Public

DANIEL HANSEN
Notary Public, State of New York
No. 02HA6066280
Qualified in Suffolk County
Commission Expires October 14, 2009

**Timothy M. Sheahan**
14 Warbler Lane
Commack, New York  11725
(516) 543-4365

<u>WORK EXPERIENCE:</u>
*TKT CONSULTING – May 1995 to present*
> Provide consulting services to legal firms on governmental, agency and community relation's matters as they relate to local policing issues. Develop, implement and coordinate property casualty programs for the livery industry.

*PRG BROKERAGE, INC & PROMPT CLAIM SERVICE, INC –October 1995 to May 2001*
> As President of both corporations responsible for the management of a unique niche market liability insurance program for the livery industry in N.Y.C. and adjacent counties. On a day to day basis handled the underwriting and claims for major voluntary companies contracted under these programs. Responsibilities included maintaining compliance with underwriting standards and claims oversight. Claims oversight consisted of monitoring claims files, conducting and supervising investigations and negotiating and settling claims. In addition, provided evaluation of liability for legal defense.

*NEW YORK CITY POLICE DEPARTMENT – March 1974 – May 1995*
> Patrol experience developed and expanded from first assignment on a foot post to responsibility and accountability for directing, controlling and coordinating the Operational and administrative functions of a patrol precinct. Subsequent staff assignments involved research, development and implementation of operational, personnel and administrative policy on a department wide basis, as well as, resource enhancement and allocation on a bureau wide basis. Recipient of sixteen (16) Department awards for exceptional, meritorious or commendable police actions. Member of the New York Police Department Honor Legion, Emerald Society, Holy Name Society, Patrolmen's Benevolent Association and Captain's Endowment Association.

*Deputy Inspector – September 1990 - May 1995*
> Following promotion continued as Precinct Commander until January 1992 when transferred to Police Commissioner's staff as the Commanding Officer of the Resource Analysis Section in the Office of Management, Analysis and Planning. Responsibilities included supervising a staff of thirty-five uniform and civilian analysts in reviewing and analyzing department policy, structure and staffing and prepare resources allocation recommendations. Additionally, conducted numerous and varied surveys initiated, monitored and evaluated pilot projects and compiled reports as directed by the Police Commissioner's office. Supervised the Grant Development Unit, which monitored the availability of various law enforcement grant opportunities and prepared and submitted proposals, where applicable. Transferred in August 1993 to the Internal Affairs Bureau and assigned as the Commanding Officer of the Investigative Support Division. Routinely supervised the activities of 110 uniform and civilian personnel assigned to seven sub-units responsible to provide support services for the Internal Affairs Bureau. Specifically, responsible for the development and delivery of training, evaluation, selection, procurement and maintenance of technical equipment; deployment of personnel resources, collection, maintenance and storage of case records; intake, recording and assessment of case allegations, enhancement of an allocation of material resources; and identification, selection, development and maintenance of office sites and equipment.

37

*Captain – August 1986 – September 1990*
> Initially assigned to special projects at a division level. After three months designated Executive Officer/Deputy Captain. During this period a format was devised to simplify accounting for daily administrative precinct level entries. Served as Executive Officer/Duty Captain in one precinct command for 20 months until designated as Commanding Officer of a precinct in May 1988. Assigned to a second command in the same position November 1989. As a Precinct Commander responsible for the administrative and patrol functions of over 220 civilian and uniformed employees and the maintenance and operation of a physical plant that houses over 500 employees from other units. Daily objective is to deploy, monitor and assign personnel to combat crime and respond to community needs for police services. To accomplish this mission requires energies be expanded on achieving efficiency through discipline, training and guidance. Responsible to evaluate and improve subordinates responses to situations, as well as, respond personally to command scenes of unusual occurrences.

*Lieutenant – May 1985 – August 1986*
> Designated a platoon commander, with accountability for both patrol and administrative functions on a precinct level for fixed tour. Span of control increased from 36 to 48 officers. This experimental concept of platoon commander was eventually expanded citywide by 1990.

*Sergeant – September 1980 – May 1985*
> Upon promotion assigned to supervise patrol functions on a precinct level. Span of control ranged from eight to twelve officers. Subsequently, assigned to steady midnights as a patrol supervisor with expanded supervisory responsibility ranging from eighteen to twenty-four officers.

*Police Officer – March 1974 – September 1985*
> Assigned to a patrol precinct after successful completion of the Police Academy. Primarily performed uniformed patrol duties with exceptional periods assigned: first, to a precinct anti-crime (plain clothes) and second, to an experimental arson investigation unit which was the prototype of today's Arson/Explosion Squad.

*NEW YORK CITY FIRE DEPARTMENT - May 1973 – March 1974*
> Upon completion of training, assigned as member of engine company. Successfully completed training and probationary periods before transferring to Police Department.

**TEACHING EXPERIENCE:**

*LONG ISLAND UNIVERSITY/C. W. POST – September 1995 –* **May 1995**
> As an Adjunct Professor, taught graduate courses in both the Criminal Justice and Public Administration areas.

*STATE UNIVERSITY OF NEW YORK – OLD WESTBURY – January 1995 – May 1995*
> As an Adjunct Professor, taught undergraduate classes in the School of Business.

| | | |
|---|---|---|
| **ACADEMIC:** | **Long Island University** | **1994** |
| | **C.W. Post Campus** | |
| | Masters Degree in Business Administration | |
| | Grade Point Average - 3.8 | |
| | **Long Island University** | **1996** |
| | **C.W. Post Campus** | |
| | Post Masters Certificate – Finance | |
| | **Columbia University Graduate School of Business** | **1993** |
| | Arden House, Harriman, New York | |
| | Police Management Institute | |

| | |
|---|---|
| **Long Island University**<br>**C.W. Post Campus**<br>Masters Degree in Public Administration<br>Grade Point Average – 3.94 | **1990** |
| **New York City Police Academy**<br>Executive Development Program<br>Classroom Hours – 300 hours | **1987-1992** |
| **Adelphi University**<br>Bachelor of Arts Degree in Social Science<br>Grade Point Average – 3.80 | **1976** |
| **St. John's University Junior College**<br>**Brooklyn Campus**<br>Associate's Degree – A.A. History<br>Grade Point Average -  3.02 | **1965** |

## LICENSING/CERTIFICATION

Licensed Property and Casualty Broker
Licensed General Adjuster (1996-2002)
Licensed Public Adjuster (1996-2002)
Licensed Private Investigator
Certified Instructor for Peace Officer and Security Guard Training (1997-1999)

# EXHIBIT C

# Thomas Hartman - Post-Op X-Ray

**Original Film**

**Color Interpretation**





**AP View of the Right Knee**

# Thomas Hartman - 03/12/2004 Bilateral Tibula and Fibula Comminuted Fractures & Open Degloving Anterior

**Original Film**

**Color Interpretation**





**AP View of the Right Knee**

# Thomas Hartman - 03/12/2004 Bilateral Tibula and Fibula Comminuted Fractures & Open Degloving Anterior

**Original Film**



**AP View of the Legs**

Impression:
Bilateral tibial and fibular fractures. Superficial
femoral and three vessels are patent of runoff
the level of ankle.

**Close Up**



# Thomas Hartman - 03/12/2004 Bilateral Tibula and Fibula Comminuted Fractures & Open Degloving Anterior

**Original Film**

**Color Interpretation**

WARNING: LOSSY COMPRESSION 6



WARNING: LOSSY COMPRESSION 6



Spin: -90
Tilt: 0

Spin: -90
Tilt: 0

**Lateral View of the Right Knee**

# Thomas Hartman - 03/12/2004 Bilateral Tibula and Fibula Comminuted Fractures & Open Degloving Anterior





**AP View of the Legs**

# EXHIBIT D





**Next Frame** Next

V1

V2

Body
Blood

Prev    Next





**V1**

**Body**

**Blood**

Prev

Next



Prev   Next









Prev    Next

